ROSMAN & GERMAIN LLP
Daniel L. Germain (Bar No. 143334)
16311 Ventura Boulevard
Suite 1200
Encino, CA  91436-2152
Telephone: (818) 788-0877
Facsimile: (818) 788-0885
E-Mail: Germain@Lalawyer.com

Counsel for Plaintiffs and the Putative Class

[Additional Counsel Listed on Signature Page]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TIM DAVIS, GREGOR MIGUEL, and AMANDA BREDLOW, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SALESFORCE.COM, INC., BOARD OF DIRECTORS OF SALESFORCE.COM, INC., MARC BENIOFF, THE INVESTMENT ADVISORY COMMITTEE, JOSEPH ALLANSON, STAN DUNLAP, and JOACHIM WETTERMARK,<br><br>Defendants. | CIVIL ACTION NO.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Tim Davis, Gregor Miguel, and Amanda Bredlow ("Plaintiffs"), by and through their attorneys, on behalf of the Salesforce 401(k) Plan (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

## I.   INTRODUCTION

1.     This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Salesforce.com, Inc. ("Salesforce" or the "Company"), the Board of Directors of Salesforce ("Board") and its members during the Class Period, and the Investment Advisory Committee ("Committee") and its members during the Class Period for breaches of their fiduciary duties.

2.     Defined contribution retirement plans, like the Plan, confer tax benefits on participating employees to incentivize saving for retirement.  As of the end of 2015, Americans had approximately $6.7 trillion in assets invested in defined contribution plans.  *See* INVESTMENT COMPANY INSTITUTE, *Retirement Assets Total $24.0 Trillion in Fourth Quarter 2015* (Mar. 24, 2016), available at https://www.ici.org/research/stats/retirement/ret_15_q4;  PLAN SPONSOR, *2015 Recordkeeping Survey* (June 2015), available at http://www.plansponsor.com/2015-Recordkeeping-Survey/.

3.     In a defined contribution plan, participants' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1826 (2015).  Thus, the employer has no incentive to keep costs low or to closely monitor the Plan to ensure every investment remains

---

[1] The Plan is a legal entity that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party.  Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

prudent, because all risks related to high fees and poorly-performing investments are borne by the participants.

4.     To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. 29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. Dec. 30, 2016) (*en banc*). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope.  29 U.S.C. § 1104(a)(1)(B).

5.     The Plan had over a billion dollars in assets under management in 2016, $1.8 billion in assets as of the end of 2017, and over $2 billion in assets at the end of 2018 that were/are entrusted to the care of the Plan's fiduciaries.  The Plan's assets under management qualifies it as a large plan in the defined contribution plan marketplace, and among the largest plans in the United States.  As a large plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.  Defendants, however, did not try to reduce the Plan's expenses or exercise appropriate judgment to scrutinize each investment option that was offered in the Plan to ensure it was prudent.

6.     Plaintiffs allege that during the putative Class Period (March 11, 2014 through the date of judgment) Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost;  and (2) maintaining certain funds in the Plan despite the availability of identical or similar investment options with lower costs and/or better performance histories.

7.     To make matters worse, Defendants failed to utilize the lowest cost share class for many of the mutual funds within the Plan, and failed to consider collective

trusts, commingled accounts, or separate accounts as alternatives to the mutual funds in the Plan, despite their lower fees.

8.     It appears that in 2019, *five years* into the Class Period, wholesale changes were made to the Plan wherein certain Plan investment options, some of which are the subject of this lawsuit, were converted to lower class shares.

9.     These changes were far too little and too late as the damages suffered by Plan participants to that point had already been baked in.  There is no reason to not have implemented these changes by the start of the Class Period when the majority of lower-class shares were available.  Moreover, these changes may not have cured the Company's fiduciary breaches because the circumstances under which changes were made have not been disclosed to Plaintiffs.

10.     Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duties of prudence and loyalty, in violation of 29 U.S.C. § 1104.  Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

11.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duties of loyalty and prudence (Count One) and failure to monitor fiduciaries (Count Two).

## II. JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

13.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

14.   Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.   Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.   PARTIES

### Plaintiffs

15.    Plaintiff Tim Davis ("Davis") resides in Tillamook, Oregon.   During his employment, Plaintiff Davis participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

16.   Plaintiff Gregor Miguel ("Miguel") resides in Oakland, California. During his employment, Plaintiff Miguel participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

17.   Plaintiff Amanda Bredlow ("Bredlow") resides in Kirkland, Washington. During her employment, Plaintiff Bredlow participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

18.   Each Plaintiff has standing to bring this action on behalf of the Plan because each of them participated in the Plan and were injured by Defendants' unlawful conduct.   Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

19.   Plaintiffs did not have knowledge of all material facts (including, among other things, the investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available alternatives within similarly-sized plans, total cost comparisons to similarly-sized plans, information regarding other available share

classes, and information regarding the availability and pricing of separate accounts and collective trusts) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.  Further, Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing Plan investments, because this information is solely within the possession of Defendants prior to discovery.  Having never managed a large 401(k) plan such as the Plan, Plaintiffs lacked actual knowledge of reasonable fee levels and prudent alternatives available to such plans.  Plaintiffs did not and could not review the Committee meeting minutes (to the extent they exist) or other evidence of Defendants' fiduciary decision making, or the lack thereof.[2]  For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth herein.

**Defendants**

**Company Defendant**

20.    Salesforce is the Plan sponsor with a principal place of business in San Francisco, California.  *See* 2018 Form 5500 at 1.  Salesforce describes itself as "a customer relationship management solution that brings companies and customers together. It's one integrated CRM platform that gives all your departments — including marketing, sales, commerce, and service — a single, shared view of every customer.[3]

---

[2] *See Braden v. Wal-mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.") Indeed, several weeks prior to filing the instant lawsuit, Plaintiffs requested pursuant to ERISA §104(b)(4) that the Plan administrator produce several Plan governing documents, including any meeting minutes of the relevant Plan investment committee(s).  Their request for meeting minutes was denied for the asserted reason that the request went beyond the scope of Section 104(b)(4).

[3] *See* https://www.salesforce.com/products/what-is-salesforce/

21.    At all times, the Company acted through its officers, including the Board and Committee members, to perform Plan-related fiduciary functions in the course and scope of their employment.

22.    Additionally, the Company appointed the committee responsible for selecting and monitoring the Plan's investment options.  *See* "Statement of Investment Policy, Objectives and Guidelines for Salesforce 401(k) Plan, updated September 9, 2016" ("Investment Policy") at 4 ("In accordance with the Plan provisions, the Committee has been appointed by the organization to supervise, monitor and evaluate the investment of Plan assets.")

23.    Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.  Accordingly, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

### Board Defendants

24.    The Company acted through the Board (defined above) to perform some of the Company's Plan-related fiduciary functions, including appointing the Committee.  Investment Policy at 4.

25.    The Board also had discretionary authority to make contributions to Plan participants' accounts.  *See* Salesforce 401(k) Summary Plan Description, Effective January 2, 2019 ("SPD") at 6.

26.    During the Class Period, Chief Executive Officer Marc Benioff ("Benioff") served on the Board as Chairman.

27.    Mr. Benioff, and each member of the Board during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority to appoint and/or monitor the Committee and other Plan fiduciaries, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

28.    The members of the Board of Directors for Salesforce during the Class Period are collectively referred to herein as the "Board Defendants."

### Committee Defendants

29.    The Committee's role with the Plan is to "supervise, monitor and evaluate the investment of Plan assets." Investment Policy at 4. Among other things, the Committee is charged with the following responsibilities:

- Identifying investment options or funds which it deems appropriate and prudent to make available to Plan participants;
- Selecting qualified investment funds;
- Selecting a qualified Trustee and Recordkeeper, as required;
- Reviewing the investment results of the funds;
- Reviewing that the costs (direct and indirect) of the Plan's service providers including but not limited to investment funds, trustee, recordkeeper, auditors, attorney, and investment advisers are reasonable and disclosed to the extent required under ERISA Section 408(b)(2).
- Taking appropriate action if objectives are not being met or if policy and guidelines ae not being followed.

*Id.* at 5.

30.    Further, "[f]rom time to time, the Committee at its discretion, may add investment options/categories to the current core options." *Id.* at 7.

31.    Additionally, the Committee had monitoring responsibility for the brokerage window. "If permitted by the Committee, participants may direct the investment of their Plan account through and individual brokerage window under the Plan." *Id.* at 7. Further, "[t]he individual brokerage window will be reviewed periodically as determined by the Committee based on criteria determined by the Committee." *Id.*

32.    Lastly, the Investment Policy gave the Committee great latitude in selecting investment fund types. "The Committee will select investment options that

are liquid, diversified and cost efficient." *Id.* at 8.  Specifically, the "Committee may select registered mutual funds, collective investment trusts or separately managed accounts for the Plan investments." *Id.*

33.    During the Class Period the following Salesforce employees served as members of the Committee:

- Joseph Allanson ("Allanson") – Executive VP, Chief Accounting Officer
- Stan Dunlap ("Dunlap") – Senior VP Global Rewards
- Joachim Wettermark ("Wettermark") - SVP, Treasurer

34.    The Committee and each of its members, including Allanson, Dunlap, and Wettermark, were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

**Non-Defendant Fiduciaries**

**Bridgebay Financial, Inc.**

35.    Bridgebay Financial, Inc. ("Bridgebay") was the investment consultant hired to "support[] the Committee through the provision of independent, third party research and analysis.  The Investment Consultant produces quarterly reports that integrate the [Investment Policy] with ongoing performance monitoring of the investment options."  Investment Policy at 6.

36.    Although Bridgebay is a relevant party and likely to have information relevant to this action, it is not named as a defendant given that the Committee remains responsible for the overall selection and monitoring of all investment options.  Plaintiffs reserve the right to name Bridgebay as a defendant in the future if deemed necessary.

**IV.    THE PLAN**

37.    "The Plan is a multiple employer defined contribution plan that was established in 2000 by [Salesforce] to provide benefits to eligible employees."

Financial Statements and Supplemental Schedules (attached to 2018 Form 5500) ("Financial Statements") at 7.  With regard to the two participating companies in the Plan, "Salesforce.com, Foundation" contributes 2.7% to the Plan while Salesforce contributes 97.3%.  *See* Attachment to 2018 Form 5500, Multiple-Employer Plan Information.

38.    "The purpose of the plan is to enable eligible Employees to save for retirement."  SPD at 1.

39.    The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account.  Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

### *Eligibility*

40.    In general, all employees are eligible to participate in the Plan. SPD at 4.

### *Contributions*

41.    There are several types of contributions that can be added to a participant's account, including: an employee salary deferral contribution, employer paid bonuses, an employee after-tax contribution, catch-up contributions for employees aged 50 and over, rollover contributions, and employer matching contributions.  SPD at 6.   Additionally, Salesforce "may make discretionary nonelective contributions in an amount to be determined by the Board of Directors for each Plan Year."  *Id.*

42.    With regard to employee contributions, the percentage a participant defers "is subject to an annual limit of the lesser of 50.00% of eligible compensation or $19,000 (in 2019)."  *Id.* at 5.

43.    "Discretionary matching contributions, if made, will be computed by [Salesforce] based on [the participant's] eligible compensation deferred into the Plan each Plan Year." *Id.* at 6.

44.    "Prior to March 1, 2017, the Company matched the lesser of 50 percent of each eligible participant's contributions up to a maximum of 6 percent of eligible annual compensation or $4,000 per calendar year."   Financial Statements at 7. "Effective March 1, 2017, the Company increased the amount in which a participant's contributions would be matched to 100 percent of each eligible participant's contributions up to the lesser of 6 percent of eligible annual compensation or $5,000 per calendar year." *Id*.

45.    Like other companies that sponsor 401(k) plans for their employees, Salesforce enjoys both direct and indirect benefits by providing matching contributions to Plan participants.  Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made.  *See generally* https:/www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

46.    Salesforce also benefits in other ways from the Plan's matching program.  It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover."  *See* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

47.    Given the size of the Plan, Salesforcce likely enjoyed a significant tax and cost savings from offering a match.

### *Vesting*

48.    A participant is 100 percent vested at all times in their "Rollover Contributions, Employer Matching Contributions, After-Tax Contributions, Qualified Nonelective Contributions, Deferral Contributions and any earnings thereon." *Id.* at 8-9.   Nonelective Contributions are vested in accordance with a sliding scale

depending on years of service (between less than 1 and 5 years of service.  *Id.* at 9. Those with less than a year of service have zero percent vested while those with 5 years of service have 100% vested.  *Id.*

### The Plan's Investments

49.    Several funds were available to Plan participants for investment each year during the putative Class Period.  As of December 31, 2018, the Plan held twenty-seven investment options which were all mutual funds.  Plan participants also had access to additional investment options through a brokerage link.  Financial Statements at 13.

50.    The Plan's assets under management for all funds as of December 31, 2018 was $2,018,134,000 and $1,800,084,000 as of December 31, 2017.  Financial Statements at 5.

## V.    CLASS ACTION ALLEGATIONS

51.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[4]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between March 11, 2014 to the date of judgment (the "Class Period").[5]

52.    The members of the Class are so numerous that joinder of all members is impractical.  The 2018 Form 5500 filed with the Dept. of Labor lists 25,849 Plan "participants with account balances as of the end of the plan year."  *Id*. at p. 2.

---

[4] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

[5] Plaintiffs reserve their right to seek modification of the close of the Class Period in the event that further investigation/discovery reveals a more appropriate end period.

53.     Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan.  Defendants treated Plaintiffs consistently with other Class members, and managed the Plan as a single entity.  Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

54.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

      A.    Whether Defendants are fiduciaries of the Plan;

      B.    Whether Defendants breached their fiduciary duties of loyalty and prudence by engaging in the conduct described herein;

      C.    Whether the Board Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

      D.    The proper form of equitable and injunctive relief; and

      E.    The proper measure of monetary relief.

55.     Plaintiffs will fairly and adequately represent the Class, and have retained counsel experienced and competent in the prosecution of ERISA class action litigation.  Plaintiffs have no interests antagonistic to those of other members of the Class.  Plaintiffs are committed to the vigorous prosecution of this action, and anticipate no difficulty in the management of this litigation as a class action.

56.     This action may be properly certified under Rule 23(b)(1).  Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the

members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

57.    In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## VI.    DEFENDANTS' FIDUCIARY STATUS AND OVERVIEW OF FIDUCIARY DUTIES

58.    ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

59.    ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercise any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

60.    As described in the Parties section above, Defendants were fiduciaries of the Plan because:

        (a)    they were so named; and/or

        (b)    they exercised authority or control respecting management or disposition of the Plan's assets; and/or

(c)     they exercised discretionary authority or discretionary control respecting management of the Plan; and/or

(d)     they had discretionary authority or discretionary responsibility in the administration of the Plan.

61.     As fiduciaries, Defendants are/were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan, and the Plan's investments, solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  These twin duties are referred to as the duties of loyalty and prudence, and are "the highest known to the law." *Tibble*, 843 at 1197.

62.     The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants.  *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000). "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display . . . complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons."  *Pegram*, 530 U.S. at 224 (quotation marks and citations omitted).  Thus, "in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider *only* factors relating to the interests of plan participants and beneficiaries . . . . A decision to make an investment may not be influenced by [other] factors unless the investment, when judged *solely* on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan."  *Dep't of Labor ERISA Adv. Op. 88-16A*, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added).

63.     In effect, the duty of loyalty includes a mandate that the fiduciary display complete loyalty to the beneficiaries, and set aside the consideration of third persons.

64.    ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).   In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015).   "[A] fiduciary cannot free himself from his duty to act as a prudent man simply by arguing that other funds . . . could theoretically, in combination, create a prudent portfolio."   *In re Amer. Int'l Grp., Inc. ERISA Litig. II*, No. 08-cv-5722, 2011 WL 1226459, at *4 (S.D.N.Y. Mar. 31, 2011) (quoting *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 n.3, 423-24 (4th Cir. 2007)).

65.    In addition, ERISA § 405(a), 29 U.S.C. § 1105(a) (entitled "Liability for breach by co-fiduciary") further provides that:

> [I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

66.    During the Class Period, Defendants did not act in the best interests of the Plan participants.  Investment fund options chosen for a plan should not favor the fund provider over the plan's participants.  Yet, here, to the detriment of the Plan and their participants and beneficiaries, the Plan's fiduciaries included and retained in the Plan many mutual fund investments that were more expensive than necessary and otherwise were not justified on the basis of their economic value to the Plan.

67.    Based on reasonable inferences from the facts set forth in this Complaint, during the Class Period Defendants failed to have a proper system of review in place to ensure that participants in the Plan were being charged appropriate and reasonable fees for the Plan's investment options.  Additionally, Defendants failed to leverage the size of the Plan to negotiate for lower expense ratios for certain investment options maintained and/or added to the Plan during the Class Period.

68.    As discussed below, Defendants breached fiduciary duties to the Plan and its participants and beneficiaries, and are liable for their breaches and the breaches of their co-fiduciaries under 29 U.S.C. § 1104(a)(1) and 1105(a).

## VII.   SPECIFIC ALLEGATIONS

### A.    Improper Management of an Employee Retirement Plan Can Cost the Plan's Participants Millions in Savings

69.    Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must provide diversified investment options for a defined-contribution plan while also giving substantial consideration to the cost of those options.  "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA") § 7.

70.    "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'"  *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. Dec. 30, 2016) (*en banc*) (quoting

Restatement (Third) of Trust § 90, cmt. b).  *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").  As the Ninth Circuit described, additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time."  *Tibble*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

71.     Most participants in 401(k) plans expect that their 401(k) accounts will be their principal source of income after retirement.  Although at all times 401(k) accounts are fully funded, that does not prevent plan participants from losing money on poor investment choices of plan sponsors and fiduciaries, whether due to poor performance, high fees, or both.

72.     In fact, the Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices," among other duties.  *See* "*A Look at 401(k) Plan Fees*," *supra*.

73.     The duty to evaluate and monitor fees and investment costs includes fees paid directly by plan participants to investment providers, usually in the form of an expense ratio or a percentage of assets under management within a particular investment.  *See* Investment Company Institute ("ICI"), *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses*, (July 2016), at 4.  "Any costs not paid by

the employer, which may include administrative, investment, legal, and compliance costs, effectively are paid by plan participants." *Id.* at 5.

74.    The fiduciary task of evaluating investments and investigating comparable alternatives in the marketplace is made much simpler by the advent of independent research from companies like Morningstar, which sorts mutual funds of all kinds into categories "based on the underlying securities in each portfolio…We place funds in a given category based on their portfolio statistics and compositions over the past three years." *See* http://www.morningstar.com/InvGlossary/morningstar_category.aspx.[6]

75.    On average, there are lower expense ratios for 401(k) participants than those for other investors. *See The Economics of Providing 401(k) Plans*, at 11. ERISA-mandated monitoring of investments leads prudent and impartial plan sponsors to continually evaluate performance and fees, resulting in great competition among mutual funds in the marketplace. Furthermore, the large average account balances of 401(k) plans, especially the largest ones as measured by assets managed, lead to economies of scale and special pricing within mutual funds. *See id* at 10.

76.    This has led to falling mutual fund expense ratios for 401(k) plan participants since 2000. In fact, these expense ratios fell 31 percent from 2000 to 2015 for equity funds, 25 percent for hybrid funds, and 38 percent for bond funds. *See id.* at 1.

77.    The most recent comprehensive average mutual fund expense data for plans of different sizes is from 2012, and industry analysts have recognized a marked trend toward lower fees in 401(k)s over the past four years. *See* Anne Tergesen,

_____

[6] As described by Morningstar, these categories "were introduced in 1996 to help investors make meaningful comparisons between mutual funds. Morningstar found that the investment objective listed in a fund's prospectus often did not adequately explain how the fund actually invested…[we] solved this problem by breaking portfolios into peer groups based on their holdings. The categories help investors identify the top performing funds, assess potential risk, and build well-diversified portfolios." *See The Morningstar Category Classifications* (June 30, 2016), at 7. These categories are assigned to mutual funds, variable annuities, and separate accounts. *Id.*

*401(k) Fees, Already Low, Are Heading Lower*, WALL STREET JOURNAL (May 15, 2016), available at http://www.wsj.com/articles/401-k-fees-already-low-are-heading-lower-1463304601 (noting precipitous drop in overall 401(k) fees from 2012 to 2014).

78.   The following figure published by the ICI best illustrates that 401(k) plans on average pay far lower fees than regular industry investors, even as expense ratios for all investors continued to drop for the past several years.[7]

FIGURE 7
**Average Total Mutual Fund Expense Ratios**
*Percent, 2013–2015*

| | 2013 | | 2014 | | 2015 | |
|---|---|---|---|---|---|---|
| | Industry[1] | 401(k)[2] | Industry[1] | 401(k)[2] | Industry[1] | 401(k)[2] |
| **Equity funds** | **0.74** | **0.58** | **0.70** | **0.54** | **0.68** | **0.53** |
| Domestic | 0.67 | 0.54 | 0.64 | 0.50 | 0.62 | 0.51 |
| World | 0.90 | 0.73 | 0.86 | 0.67 | 0.82 | 0.62 |
| **Hybrid funds** | **0.80** | **0.57** | **0.78** | **0.55** | **0.77** | **0.54** |
| **Bond funds** | **0.61** | **0.48** | **0.57** | **0.43** | **0.54** | **0.38** |
| High-yield and world | 0.83 | 0.79 | 0.78 | 0.65 | 0.74 | 0.56 |
| Other | 0.51 | 0.44 | 0.48 | 0.40 | 0.46 | 0.35 |
| **Money market funds** | **0.17** | **0.19** | **0.13** | **0.16** | **0.14** | **0.16** |

[1] The industry average expense ratio is measured as an asset-weighted average.
[2] The 401(k) average expense ratio is measured as a 401(k) asset-weighted average.
Note: Data exclude mutual funds available as investment choices in variable annuities and tax-exempt mutual funds.
Sources: Investment Company Institute and Lipper

*Id*. at 12.

79.   Prudent and impartial plan sponsors thus should be monitoring both the performance and cost of the investments selected for their 401(k) plans, as well as investigating alternatives in the marketplace to ensure that well-performing, low cost investment options are being made available to plan participants.

---

[7] This chart does not account for the strategy of a mutual fund, which may be to mirror an index, a so-called passive management strategy, or may attempt to "beat the market" with more aggressive investment strategies via active management.  Active management funds tend to have significantly higher expense ratios compared to passively managed funds because they require a higher degree of research and monitoring than funds which merely attempt to replicate a particular segment of the market.

1.   **Passively Managed Funds Cost Less Than Actively Managed Funds**

80.   ERISA is derived from trust law.   *Tibble*, 135 S. Ct. at 1828. Accordingly, the Supreme Court has stated that where ERISA is silent, courts should seek guidance from trust law.   *Varity Corp v. Howe*, 516 U.S. 489, 496-97 (1996). One such area is the selection of appropriate funds for a plan.   Trust law states it depends on "the type of trustee and the nature of the breach involved, the availability of relevant data, and other facts and circumstances of the case."   Restatement (Third) of Trusts § 100 cmt. b(1).   To determine whether a fiduciary has selected appropriate funds for the trust, appropriate comparators may include "return rates of one or more suitable common trust funds, or suitable index mutual funds or market indexes (with such adjustments as may be appropriate)."   *Id.*

81.   In this action, each investment option within the Plan charged certain fees, to be paid by deductions from the pool of assets under management.   For passively managed funds, which are designed to mimic a market index such as Standard & Poor's 500, securities were purchased to match the mix of companies within the index.   Because they are simply a mirror of an index, these funds offer both diversity of investment and comparatively low fees.

82.   By contrast, actively managed funds, which have a mix of securities selected in the belief they will beat the market, have higher fees, to account for the work of the investment managers of such funds and their associates.

83.   While higher-cost mutual funds may outperform a less-expensive option, such as a passively-managed index fund, over the short term, they rarely do so over a longer term.   *See* Jonnelle Marte, *Do Any Mutual Funds Ever Beat the Market? Hardly*, The Washington Post, available at https://www.washingtonpost.com/news/get-there/wp/2015/03/17/do-any-mutual-funds-ever-beat-the-market-hardly/ (citing a study by S&P Dow Jones Indices which looked at 2,862 actively managed mutual funds, focused on the top quartile in

performance and found most did not replicate performance from year to year); *see also Index funds trounce actively managed funds: Study*, available at http://www.cnbc.com/2015/06/26/index-funds-trounce-actively-managed-funds-study.html ("long-term data suggests that actively managed funds "lagged their passive counterparts across nearly all asset classes, especially over the 10-year period from 2004 to 2014.")

84.    Indeed, investments with high fees on average perform worse than less expensive investments, even on a pre-fee basis. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. Econ. Behav. & Org. 871, 873 (2009) (hereinafter "*When Cheaper is Better*"); *see also* Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. Pa. L. Rev. 1961, 1967-75 (2010) (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

## 2.    Institutional Share Classes Cost Less Than Investor Share Classes

85.    Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors.  Generally, more expensive share classes are targeted at smaller investors with less bargaining power, while lower cost shares are targeted at institutional investors with more assets, generally $1 million or more, and therefore greater bargaining power.  There is no difference between share classes other than cost—the funds hold identical investments and have the same manager.

86.    Large defined contribution plans such as the Plan have sufficient assets to qualify for the lowest cost share class available.  Even when a plan does not yet meet the investment minimum to qualify for the cheapest available share class, it is well-known among institutional investors that mutual fund companies will typically waive those investment minimums for a large plan adding the fund in question to the plan as a designated investment alternative.  Simply put, a fiduciary to a large defined contribution plan such as the Plan can use its asset size and negotiating power to

invest in the cheapest share class available.  For this reason, prudent retirement plan fiduciaries will search for and select the lowest-priced share class available.

87.    One recent article written by the head of a fiduciary consulting firm described the failure to investigate the availability of and subsequently utilize the lowest-cost share class as an "egregious fiduciary breach[]" that is responsible for "[w]asting plan assets" in a manner that is "clearly imprudent." Blaine Aikin (exec. chairman of fi360 Inc.), *Recent Class-Action Surge Ups the Ante for 401(k) Advice*, INVESTMENTNEWS         (Jan.       21,       2016),       available       at http://www.investmentnews.com/article/20160121/BLOG09/160129985/recent-class-action-surge-ups-the-ante-for-401-k-advice.   Indeed, recently a court observed that "[b]ecause the institutional share classes are otherwise *identical* to the Investor share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary.  Thus, the 'manner that is reasonable and appropriate to the particular investment action, and strategies involved…in this case would mandate a prudent fiduciary – who indisputably has knowledge of institutional share classes and that such share classes provide identical investments at lower costs – to switch share classes immediately."  *Tibble, et al. v. Edison Int. et al.*, No. 07-5359, slip op. at 13 (C.D. Cal. Aug. 16, 2017).

88.    This claim is not about the use of "retail mutual funds" versus the use of "institutional mutual funds."   Retail mutual funds are perfectly acceptable and prudent choices under certain circumstances.   In some instances, a mutual fund company may only offer retail mutual funds.  Or, in other instances, the mutual fund company might restrict institutional share classes in such a manner that would make it impossible to utilize the mutual funds.    This claim is instead about utilizing the lowest-cost class of shares that is available to the Plan.

3. **Collective Trusts And Separate Accounts Cost Less Than Their Virtually Identical Mutual Fund Counterparts**

89.     Throughout the Class Period, the investment options available to participants were almost exclusively mutual funds, which are pooled investment products.

90.     Plan fiduciaries such as Defendants here must be continually mindful of investment options to ensure they do not unduly risk plan participants' savings and do not charge unreasonable fees.  Some of the best investment vehicles for these goals are collective trusts, which pool plan participants' investments further and provide lower fee alternatives to even institutional and 401(k) plan specific shares of mutual funds.  As noted *supra*, trust law specifically identifies "one or more suitable common trust funds" as a comparator to determine whether a trust is invested in suitable investments.  Restatement (Third) of Trusts § 100 cmt. b(1).

91.     Collective trusts are administered by banks or trust companies, which assemble a mix of assets such as stocks, bonds and cash.  Regulated by the Office of the Comptroller of the Currency rather than the Securities and Exchange Commission, collective trusts have simple disclosure requirements, and cannot advertise nor issue formal prospectuses.  As a result, their costs are much lower, with less or no administrative costs, and less or no marketing or advertising costs.  *See* Powell, Robert, "Not Your Normal Nest Egg," The Wall Street Journal, March 2013, available                                                                              at http://www.wsj.com/articles/SB10001424127887324296604578177291881550144.

92.     Due to their potential to reduce overall plan costs, collective trusts are becoming increasingly popular; *Use of CITs in DC Plans Booming* (discussing data showing that among both mid-size and large defined contribution plans, significantly more assets are held in collective trusts than in mutual funds).[8]  Indeed, as of 2012,

---

[8] The criticisms that have been launched against collective trust vehicles in the past no longer apply.  Collective trusts use a unitized structure and the units are valued daily; as a result, participants

among plans over $1 billion in size, more assets were held in collective trusts than in mutual funds.  *See* Investment Company Institute, *A Close Look at 401(k) Plans*, at 21, 23 (Dec. 2014), available at https://www.ici.org/pdf/ppr_14_dcplan_profile_401k.pdf.

93.   Thus, a prudent fiduciary managing a large plan will give serious consideration to the use of separate accounts or collective trusts, and in the majority of cases, will opt to move out of mutual funds.

94.   Separate accounts are another type of investment vehicle similar to collective trusts, which retain their ability to assemble a mix of stocks, bonds, real property and cash, and their lower administrative costs.

95.   Separate accounts are widely available to large plans such as the Plan, and offer a number of advantages over mutual funds, including the ability to negotiate fees.  Costs within separate accounts are typically much lower than even the lowest-cost share class of a particular mutual fund.  By using separate accounts, "[t]otal investment management expenses can commonly be reduced to one-fourth of the expenses incurred through retail mutual funds."  U.S. Dep't of Labor, *Study of 401(k) Plan Fees and Expenses*, at 17 (April 13, 1998), available at https://www.dol.gov/sites/dolgov/files/EBSA/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf

---

invested in collective trusts are able to track the daily performance of their investments online.  *Use of CITs in DC Plans Booming*; Paula Aven Gladych, *CITs Gaining Ground in 401(k) Plans*, EMPLOYEE BENEFIT NEWS (Apr. 14, 2016), available at http://www.benefitnews.com/news/cits-gaining-ground-in-401-k-plans (hereinafter CITs Gaining Ground).  Many if not most mutual fund strategies are available in collective trust format, and the investments in the collective trusts are identical to those held by the mutual fund. *Use of CITs in DC Plans Booming; CITs Gaining Ground*.  And because collective trusts contract directly with the plan, and provide regular reports regarding costs and investment holdings, the Plan has the same level of protection that the Investment Company Act provides to individual investors, thus eliminating the need for the protections of the Investment Company Act.  Further, collective trusts are still subject to state and federal banking regulations that provide comparable protections. American Bankers Association, ABA Primer on Bank Collective Funds, June 2015, at 1, available at https://www.aba.com/advocacy/policy-analysis/primer-bank-collective-investment-funds.

**B.**    **Defendants Breached Their Fiduciary Duties in Failing to Investigate and Select Lower Cost Alternative Funds**

96.    The Supreme Court recently reaffirmed the ongoing fiduciary duty to monitor a plan's investment options in *Tibble*, 135 S. Ct. at 1823.  In *Tibble*, the Court held that "an ERISA fiduciary's duty is derived from the common law of trusts," and that "[u]nder trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones."  *Id.* at 1828.  In so holding, the Supreme Court referenced with approval the Uniform Prudent Investor Act, treatises, and seminal decisions confirming the duty.

97.    Under trust law, one of the responsibilities of the Plan's fiduciaries is to "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "significantly different costs." Restatement (Third) of Trusts ch. 17, intro. note (2007); *see also* Restatement (Third) of Trusts § 90 cmt. B (2007) ("Cost-conscious management is fundamental to prudence in the investment function.").  Adherence to these duties requires regular performance of an "adequate investigation" of existing investments in a plan to determine whether any of the plan's investments are "improvident," or if there is a "superior alternative investment" to any of the plan's holdings.  *Pension Ben. Gaur. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 718-19 (2d Cir. 2013).

98.    When large plans, particularly those with a billion or more dollars in assets like the Plan here, have options which approach the retail cost of shares for individual investors or are simply more expensive than the average or median institutional shares for that type of investment, a careful review of the plan and each option is needed for the fiduciaries to fulfill their obligations to the plan participants.

99.    The Plan has retained several actively-managed funds as Plan investment options despite the fact that these funds charged grossly excessive fees compared with comparable or superior alternatives, and despite ample evidence available to a

reasonable fiduciary that these funds had become imprudent due to their high costs. Indeed, in 2018, 19 out of 25 core investments, or almost 80% (not including money markets and investments available through brokerage link), were actively managed.

100.   During the Class Period, the Plan lost millions of dollars in offering investment options that had similar or identical characteristics to other lower-priced investment options.

101.   The funds in the Plan stayed relatively unchanged from 2013 until 2019. Taking 2018 as an example year, almost half of the Plan's core investments (including all but one of the target date funds) were much more expensive than comparable investments found in similarly-sized plans (plans having over a billion dollars in assets).  The expense ratios for these funds were in some cases up to *135%* (in the case of the Fidelity Contra Class K) above the median expense ratios in the same category: [9]

| Fund | ER[10] | Category | ICI Median Fee[11] |
|---|---|---|---|
| JPMorgan SmartRetirement 2020 Institutional | 0.66 % | Target Date | 0.56% |
| JPMorgan SmartRetirement 2025 Institutional | 0.69% | Target Date | 0.56% |
| JPMorgan SmartRetirement 2030 Institutional | 0.70% | Target Date | 0.56% |

---

[9] *See*  BrightScope/ICI Defined Contribution Plan Profile: *A Close Look at 401(k) Plans, 2015* at 69 (March 2018) (hereafter, "ICI Study") available at *https://www.ici.org/pdf/ppr_18_dcplan_profile_401k.pdf*

[10]   The listed expense figures are from 2019.

[11] This median fee is taken from plans with over $1b in assets.

| | | | |
|---|---|---|---|
| JPMorgan SmartRetirement 2035 Institutional | 0.70% | Target Date | 0.56% |
| JPMorgan SmartRetirement 2040 Institutional | 0.71% | Target Date | 0.56% |
| JPMorgan SmartRetirement 2045 Institutional | 0.72% | Target Date | 0.56% |
| JPMorgan SmartRetirement 2050 Institutional | 0.71% | Target Date | 0.56% |
| JPMorgan SmartRetirement 2055 Institutional | 0.71% | Target Date | 0.56% |
| JPMorgan SmartRetirement Income Fund Institutional | 0.61% | Domestic Equity | 0.31% |
| Fidelity Contra Class K | 0.73% | Domestic Equity | 0.31% |
| Fidelity Diversified International Class K | 0.69% | International Equity | 0.49% |

102.   The above comparisons understate the excessiveness of fees in the Plan throughout the Class Period.  That is because the ICI study was conducted in 2015 when expense ratios would have been higher than today given the downward trend of expense ratios the last few years.  Accordingly, the median expense ratios in 2019 utilized by similar plans would be lower than indicated above, demonstrating a greater disparity between the 2019 expense ratios utilized in the above chart for the Plan's current funds and the median expense ratios in the same category.

103.   Further, median-based comparisons also understate the excessiveness of the investment management fees of the Plan funds because many prudent alternative funds were available that offered lower expenses than the median.

104.   As demonstrated by the chart below, in several instances, Defendants failed to prudently monitor the Plan to determine whether the Plan was invested in the lowest-cost share class available for the Plan's mutual funds, which are identical to the mutual funds in the Plan in every way except for their lower cost.

105.   For example, during the Class Period several funds in the Plan had identical lower share counterparts that were never selected by the Plan's fiduciaries. The chart below uses 2019 expense ratios reported as of September 2019, to demonstrate how much more expensive the funds were than their identical counterparts:

| Fund in Plan | 2019 Exp Ratio | Lower Cost Share Class | 2019 Exp. Ratio | % Fee Excess |
|---|---|---|---|---|
| JPMorgan SmartRetirement 2020 Institutional | 0.66 % | JPMorgan Smart Retirement 2020 R6 | 0.45% | 47% |
| | | JPMorgan Smart Retirement 2020 R5 | 0.55% | 20% |
| JPMorgan SmartRetirement 2025 Institutional | 0.69% | JPMorgan Smart Retirement 2025 R6 | 0.47% | 47% |
| | | JPMorgan Smart Retirement 2025 R5 | 0.57% | 21% |
| JPMorgan SmartRetirement 2030 Institutional | 0.70% | JPMorgan Smart Retirement 2030 R6 | 0.48% | 46% |
| | | JPMorgan Smart Retirement 2030 R5 | 0.58% | 21% |
| JPMorgan SmartRetirement 2035 Institutional | 0.70% | JPMorgan Smart Retirement 2035 R6 | 0.48% | 46% |
| | | JPMorgan Smart Retirement 2035 R5 | 0.58% | 21% |
| JPMorgan SmartRetirement 2040 Institutional | 0.71% | JPMorgan Smart Retirement 2040 R6 | 0.48% | 48% |
| | | JPMorgan Smart Retirement 2040 R5 | 0.59% | 20% |
| JPMorgan SmartRetirement 2045 | 0.72% | JPMorgan Smart Retirement 2045 R6 | 0.50% | 44% |

| Institutional | | JPMorgan Smart Retirement 2045 R5 | 0.60% | 20% |
|---|---|---|---|---|
| JPMorgan SmartRetirement 2050 Institutional | 0.71% | JPMorgan Smart Retirement 2050 R6 | 0.49% | 45% |
| | | JPMorgan Smart Retirement 2050 R5 | 0.59% | 20% |
| JPMorgan SmartRetirement 2055 Institutional | 0.71% | JPMorgan Smart Retirement 2055 R6 | 0.49% | 45% |
| | | JPMorgan Smart Retirement 2055 R5 | 0.59% | 20% |
| JPMorgan SmartRetirement Income Fund Institutional | 0.61% | JPMorgan Smart Retirement Income Fund R6 | 0.42% | 45% |
| | | JPMorgan Smart Retirement Income Fund R5 | 0.52% | 17% |
| Fidelity Contra Class K | 0.73% | Fidelity Contra Commingled Pool | 0.43% | 70% |
| Fidelity Diversified International Class K | 0.69% | Fidelity Diversified International Commingled Pool | 0.58% | 19% |

106.   The above is for illustrative purposes only.  At all times during the Class Period, Defendants knew or should have known of the existence of cheaper share classes and therefore also should have immediately identified the prudence of transferring the Plan's funds into these alternative investments.  The JPMorgan Smart Retirement R5 shares were available during the entirety of the Class Period, while the JPMorgan Smart Retirement R6 funds had an inception date of November 2014.

107.   As a large plan, the Plan had sufficient assets under management at all times during the Class Period to qualify for lower share classes.  Assets under management for funds ranged from $12m to $191m in 2018:

| Fund in Plan | 2018 Assets Under Management |
|---|---|
| JPMorgan SmartRetirement 2020 Institutional | $20, 959,000 |
| JPMorgan SmartRetirement 2025 Institutional | $56,841,000 |
| JPMorgan SmartRetirement 2030 Institutional | $105,720,000 |
| JPMorgan SmartRetirement 2035 Institutional | $149,758,000 |
| JPMorgan SmartRetirement 2040 Institutional | $182,232,000 |
| JPMorgan SmartRetirement 2045 Institutional | $191,127,000 |
| JPMorgan SmartRetirement 2050 Institutional | $183,385,000 |
| JPMorgan SmartRetirement 2055 Institutional | $104,786,000 |
| JPMorgan SmartRetirement Income Fund Institutional | $12,382,000 |
| Fidelity Contra Class K | $159,651,000 |
| Fidelity Diversified International Class K | $38,195,000 |

108.   A prudent fiduciary conducting an impartial review of the Plan's investments would have identified the cheaper share classes available and transferred the Plan's investments in the above-referenced funds into the lower share classes at the earliest opportunity.

109.   There is no good-faith explanation for utilizing high-cost share classes when lower-cost share classes are available for the exact same investment.  The Plan did not receive any additional services or benefits based on its use of more expensive share classes; the only consequence was higher costs for Plan participants.

110.   The Plan also incurred excess fees due to Defendants' failure to adequately investigate the availability of collective trusts and/or separate accounts in the same investment style of mutual funds in the Plan.  Indeed, the Investment Policy specifically authorizes the Committee to investigate the use of collective trusts or separate accounts.  *See* Investment Policy at 8.  Because of the Plan's size, it could have reaped considerable cost savings by using collective trusts or separate accounts, but Defendants again failed to investigate this option.

111.   Unlike mutual funds, which by law must charge the same fee to all investors, separate account fee schedules are subject to negotiation.  Industry data shows that actual fee schedules on separate accounts are typically lower than advertised fee schedules, particularly when the plan or investor has a large amount of assets to invest, as did the Plan here.

112.   In summary, Defendants could have used the Plan's bargaining power to obtain high-quality, low-cost alternatives to mutual funds, in order to negotiate the best possible price for the Plan.  By failing to investigate the use of lower cost share classes Defendants caused the Plan to pay millions of dollars per year in unnecessary fees.

113.   Defendants also failed to consider materially similar but cheaper alternatives to the Plan's investment options.  The chart below demonstrates that the expense ratios of the Plan's target date funds were more expensive by multiples of

comparable alternative funds in the same investment style.   A reasonable investigation would have revealed the existence of these lower-cost alternatives.   The chart below uses 2019 expense ratios as a methodology to demonstrate how much more expensive the Plan's funds were than their alternative fund counterparts.

| Fund in Plan | 2019[12] Exp. Ratio | Lower Cost Alternative | 2019 Exp. Ratio | % Fee Excess |
|---|---|---|---|---|
| JPMorgan SmartRetirement 2020 Institutional | 0.66% | Vanguard Inst. Trgt Retire 2020 Instl | 0.09% | 633% |
| JPMorgan SmartRetirement 2025 Institutional | 0.69% | Vanguard Inst. Trgt Retire 2025 Instl | 0.09% | 667% |
| JPMorgan SmartRetirement 2030 Institutional | 0.70% | Vanguard Inst. Trgt Retire 2030 Instl | 0.09% | 678% |
| JPMorgan SmartRetirement 2035 Institutional | 0.70% | Vanguard Inst. Trgt Retire 2035 Instl | 0.09% | 678% |

114.   The above is for illustrative purposes only as the significant fee disparities detailed above existed for all years of the Class Period until 2019 for all the target date funds.   The Plan expense ratios were multiples of what they should have been given the bargaining power available to the Plan fiduciaries.

---

[12] Uses fee information as of 3Q 2019.

115. Moreover, the Plan's fiduciaries cannot justify selecting actively managed funds over passively managed ones.   As noted above, while higher-cost mutual funds may outperform a less-expensive option such as a passively-managed index fund over the short term, they rarely do so over a longer term.  With regard to this action in particular, there is objective evidence that selection of actively managed funds over passively managed ones with materially similar characteristics was unjustified.  Comparing the five-year returns of some of the Plan's actively managed funds with those of comparable index (passively managed) funds with lower fees demonstrates that accounting for fees paid, the actively managed funds lagged behind in performance.  The chart below indicates the efficiency of the active funds or lack thereof (*i.e.*, the return needed by the actively managed fund to match the returns of the passively managed fund):

| Fund Name/ Comparator | Expense Ratio[13] | Return (5 Year) | Return Deficiency |
|---|---|---|---|
| JPMorgan SmartRetirement Income Fund Inst | 0.61 | 4.1 | Requires 1.38 % more return to be efficient |
| TIAA-CREF Lifecycle Index Ret Inc Instl | 0.10 | 4.97 | |
| | | | |

---

[13] Expense ratios are as of January 2020.

| | | | |
|---|---|---|---|
| JPMorgan SmartRetirement 2055 Institutional | 0.71 | 5.57 | Requires 1.7 % more return to be efficient |
| TIAA-CREF Lifecycle Index 2055 | 0.10 | 6.74 | |
| | | | |
| JPMorgan SmartRetirement 2050 Institutional | .71 | 5.54 | Requires 4.36 % more return to be efficient |
| TIAA-CREF Lifecycle Index 2050 | 0.10 | 9.25 | |
| | | | |
| JPMorgan SmartRetirement 2045 Institutional | 0.71 | 5.54 | Requires 1.65 % more return to be efficient |
| TIAA-CREF Lifecycle Index 2045 | 0.10 | 6.6 | |
| | | | |
| JPMorgan SmartRetirement 2040 | 0.71 | 5.56 | Requires 1.6 % more return to |

| | | | |
|---|---|---|---|
| Institutional | | | be efficient |
| TIAA-CREF Lifecycle Index 2040 | 0.10 | 6.51 | |
| | | | |
| JPMorgan SmartRetirement 2035 Institutional | 0.70 | 5.39 | Requires 1.56 % more return to be efficient |
| TIAA-CREF Lifecycle Index 2035 | 0.10 | 6.29 | |
| | | | |
| JPMorgan SmartRetirement 2030 Institutional | 0.70 | 5.28 | Requires 1.38 % more return to be efficient |
| TIAA-CREF Lifecycle Index 2030 | 0.10 | 6.0 | |
| | | | |
| JPMorgan SmartRetirement 2025 Institutional | 0.69 | 5.02 | Requires 1.26% more return to be efficient |
| TIAA-CREF Lifecycle | 0.1 | 5.7 | |

| | | | |
|---|---|---|---|
| Index 2025 | 0 | | |
| | | | |
| JPMorgan SmartRetirement 2020 Institutional | 0.66 | 4.71 | Requires 1.17 % more return to be efficient |
| TIAA-CREF Lifecycle Index 2020 | 0.10 | 5.37 | |
| | | | |
| Fidelity Diversified International Class K | 0.63 | 4.18 | Requires 3.44 % more return to be efficient |
| Vanguard Intl Growth | 0.32 | 8.27 | |
| | | | |

116.   Defendants' failure to investigate lower cost alternative investments (both actively and passively managed funds) during the Class Period cost the Plan and its participants millions of dollars.

**C.   Defendants Breached their Duty of Loyalty to the Plan and its Participants**

117.   Of particular importance to this case, Salesforce is a publicly traded Company.  Fidelity Investments, Inc. ("FMR, LLC") owned over 94 million shares of Salesforce as of September 30, 2019.  FMR's affiliates, including Fidelity Retirement Services, served as the Plan's recordkeeper and investment manager of some of the

Plan's investments.   Further, Fidelity Contrafund is the largest mutual fund investment in Salesforce with 27.1 million shares.   The fund has 2.55% of assets invested in Salesforce, which is 3.70% of the firm's outstanding shares.   *See* https://www.investopedia.com/articles/investing/031816/top-5-mutual-fund-holders-salesforcecom-crm-orcl.asp.   This is significant because at over $159 million of assets under management, the Contrafund is the largest single actively managed non-target date investment in the Plan by far.

118.   Another investment manager under the Plan, JPMorgan Chase, owned over 13 million shares of Salesforce and is the 8th largest owner of Salesforce shares as of December 31, 2019.

119.   Having the Plan's investment managers own a portion of the Company created an indisputable conflict of interest for the Plan's fiduciaries.   That is because this relationship prevented the Plan's fiduciaries from (1) critically reviewing the fees or performance of the Fidelity and JPMorgan Chase branded investments that are the subject of this lawsuit, and (2) making decisions with an "eye single" to the interests of plan participants.   *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000).

## FIRST CLAIM FOR RELIEF

### Breaches of Fiduciary Duties of Loyalty and Prudence

### (Asserted against the Committee Defendants)

120.   Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

121.   At all relevant times, the Committee Defendants ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

122.   As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).   These fiduciary duties

included managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

123.   The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint.   They did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the best interest of Plan participants.   Instead, the Prudence Defendants selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments.   The Prudence Defendants also failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plan.   In addition, the Prudence Defendants failed to investigate separate accounts and/or collective trusts as alternatives to mutual funds, even though they generally provide the same investment management services at a lower cost.

124.   As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns.   Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

125.   Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.   In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

126.   The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's

own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## SECOND CLAIM FOR RELIEF

### Failure to Adequately Monitor Other Fiduciaries

### (Asserted against Salesforce and the Board Defendants)

127.   Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

128.   Salesforce and the Board Defendants (the "Monitoring Defendants") had the authority to appoint members of the Committee, and the duty to monitor the Committee.   Further, they were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plan.

129.   In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee Defendants were not fulfilling those duties.

130.   The Monitoring Defendants also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties (or used qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Monitoring Defendants.

131.   The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

(a)    Failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee Defendants' imprudent actions and omissions;

(b)    failing to monitor the processes by which Plan investments were evaluated,  their failure to investigate the availability of lower-cost share classes, and their failure to investigate the availability of lower-cost separate account and collective trust vehicles; and

(c)    failing to remove Committee members whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, all to the detriment of the Plan and Plan participants' retirement savings.

132.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses.  Had Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

133.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee Defendants.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## **PRAYER FOR RELIEF**

145. WHEREFORE, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.     A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.     An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.     An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.     Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.     An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.     Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

I.     An award of pre-judgment interest;

J.     An award of costs pursuant to 29 U.S.C. § 1132(g);

K.     An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.     Such other and further relief as the Court deems equitable and just.

1

## JURY DEMAND

2
Plaintiffs hereby demand a trial by jury.

3

4
Dated: March 11, 2020                    Respectfully submitted,

5

6
**ROSMAN & GERMAIN LLP**

7

8
By: *s/ Daniel L. Germain*
Daniel L. Germain (State Bar No. 143334)

9
16311 Ventura Boulevard, Suite 1200
Encino, CA  91436-2152

10
Telephone: (818) 788-0877
Facsimile: (818) 788-0885

11
Email: germain@lalawyer.com

12
Mark K. Gyandoh

13
(*pro hac vice to be requested*)
**CAPOZZI ADLER, P.C.**

14
312 Old Lancaster Road

15
Merion Station, PA 19066
Tel: (610) 890-0200

16
Email: markg@capozziadler.com

17
Donald R. Reavey, Esquire
(*Pro hac vice to be requested*)

18
**CAPOZZI ADLER, P.C.**
2933 North Front Street

19
Harrisburg, PA 17110
(717) 233-4101

20
Fax (717) 233-4103
Email: donr@capozziadler.com

21

22
Counsel for Plaintiffs and the Putative Class

23

24

25

26

27

28