1  Laurie Edelstein (CA Bar #164466)
   STEPTOE & JOHNSON LLP
2  One Market Plaza
   Spear Tower, Suite 3900
3  San Francisco, CA 94105
   Telephone: (415) 365-6700
4  Facsimile: (415) 365-6699
   ledelstein@steptoe.com
5
   Paul J. Ondrasik, Jr. (*pro hac vice*)
6  Eric G. Serron (*pro hac vice*)
   Justin Ben-Asher (*pro hac vice* to be filed)
7  STEPTOE & JOHNSON LLP
   1330 Connecticut Ave., NW
8  Washington, DC 20036
   Telephone: (202) 429-3000
9  Facsimile:  (202) 429-3902
   pondrasik@steptoe.com
10 eserron@steptoe.com
   jbenasher@steptoe.com
11
   *Counsel for Defendants salesforce.com, inc.,*
12 *Board of Directors of salesforce.com, inc., Marc*
   *Benioff, The Investment Advisory Committee,*
13 *Joseph Allanson, Stan Dunlap, and Joachim*
   *Wettermark*
14

*Left margin (vertical):* STEPTOE & JOHNSON LLP
One Market Plaza, Spear Tower, Suite 3900
San Francisco, CA 94105

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TIM DAVIS, GREGOR MIGUEL, and AMANDA BREDLOW, individually and on behalf of all others similarly situated, | Case No. 3:20-cv-01753-MMC |
| Plaintiffs, | **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS AND TO STRIKE JURY DEMAND** |
| v. | |
| SALESFORCE.COM, INC., BOARD OF DIRECTORS OF SALESFORCE.COM, INC., MARC BENIOFF, THE INVESTMENT ADVISORY COMMITTEE, JOSEPH ALLANSON, STAN DUNLAP, and JOACHIM WETTERMARK, | Judge:  Maxine M. Chesney |
| | Date:   September 25, 2020 |
| | Time:   9:00 a.m. |
| | Ctrm:   7 – 19th Floor |
| Defendants. | |

**NOTICE OF MOTION AND MOTION**

**TO THE COURT, ALL PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE that** on September 25, 2020, or as soon thereafter as the matter may be heard, in Courtroom 7 of the above-entitled Court, on the 19th Floor of the United States Courthouse, 450 Golden Gate Avenue, San Francisco, California, Defendants salesforce.com, inc., Board of Directors of salesforce.com, inc., Marc Benioff, The Investment Advisory Committee, Joseph Allanson, Stan Dunlap, and Joachim Wettermark ("Defendants") will and hereby do move for an order dismissing in its entirety the Complaint of Plaintiffs Tim Davis, Gregor Miguel, and Amanda Bredlow ("Plaintiffs"), pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, and striking Plaintiffs' jury demand pursuant to Rule 12(f) of the Federal Rules of Civil Procedure.

Defendants move to dismiss this action on the grounds that the Complaint fails to state a claim upon which relief can be granted. Plaintiffs have not alleged facts to support their conclusory allegations. Each and every theory of liability alleged by Plaintiffs fails because the allegations of the Complaint, matters judicially noticeable, and documents central to Plaintiffs' claims demonstrate they cannot establish the necessary elements of any of their claims.

Defendants move to strike Plaintiffs' jury demand on the grounds that there is no right to a jury trial in ERISA actions for breach of fiduciary duty, which are equitable in nature.

This Motion is based on this Notice of Motion, the attached Memorandum of Points and Authorities in support of the Motion, the declaration of Eric Serron, the Request for Judicial Notice, the pleadings and papers on file in this action, and on all other matters that may be judicially noticed or presented at the hearing of this matter.

DATED:  June 15, 2020

STEPTOE & JOHNSON LLP

By:     _/s/ Laurie Edelstein_

Laurie Edelstein (CA Bar #164466)
Paul J. Ondrasik, Jr. (*pro hac vice*)
Eric G. Serron (*pro hac vice*)
Justin Ben-Asher (*pro hac vice* to be filed)

*Counsel for Defendants salesforce.com, inc., Board of Directors of salesforce.com, inc., Marc Benioff, The Investment Advisory Committee, Joseph Allanson, Stan Dunlap, and Joachim Wettermark*

STEPTOE & JOHNSON LLP
One Market Plaza, Spear Tower, Suite 3900
San Francisco, CA 94105

**STEPTOE & JOHNSON LLP**
**One Market Plaza, Spear Tower, Suite 3900**
**San Francisco, CA 94105**

# TABLE OF CONTENTS

STATEMENT OF ISSUES TO BE DECIDED ............................................................................. 1

INTRODUCTION ........................................................................................................................ 1

BACKGROUND .......................................................................................................................... 5

    A.    Salesforce and Its Plan. ............................................................................................. 5

    B.    The Plan Offers Participants a Diverse Array of Investment Options. .................... 5

    C.    Plan Fees and Expenses. ........................................................................................... 6

LEGAL STANDARD .................................................................................................................. 8

ARGUMENT ............................................................................................................................... 9

I.    PLAINTIFFS FAIL TO STATE A CLAIM FOR BREACH OF THE DUTY
    OF PRUDENCE. ............................................................................................................. 9

    A.    The Inclusion of Actively-Managed Funds on the Plan's Investment
        Menu Does Not Support a Plausible Inference of Imprudence. ........................... 10

    B.    Plaintiffs' Allegation That the Plan Did Not Always Offer the
        Cheapest Share Classes Does Not Support a Plausible Inference of
        Imprudence. ............................................................................................................ 15

    C.    Plaintiffs' Allegation That the Plan Failed to Offer Collective Trusts
        and Separate Accounts Does Not Support an Inference of Imprudence. .............. 18

II.    PLAINTIFFS FAIL TO STATE A CLAIM FOR BREACH OF THE DUTY
    OF LOYALTY ............................................................................................................... 19

III.    PLAINTIFFS' DERIVATIVE FAILURE-TO-MONITOR CLAIM ALSO
    FAILS AS A MATTER OF LAW .................................................................................. 20

IV.    PLAINTIFFS' JURY TRIAL DEMAND SHOULD BE STRICKEN. ........................... 21

CONCLUSION .......................................................................................................................... 21

STEPTOE & JOHNSON LLP
One Market Plaza, Spear Tower, Suite 3900
San Francisco, CA 94105

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ................................................................8, 17

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ........................................................................8

*Braden v. Wal-Mart Stores, Inc.,*
   588 F.3d 585 (8th Cir. 2009) ...........................................................9

*Davis v. Washington Univ. in St. Louis,*
   No. 18-3345, 2020 WL 2609865 (8th Cir. May 22, 2020) .................11, 12

*Divane v. Northwestern Univ.,*
   953 F.3d 980 (7th Cir. 2020) .........................................................10, 15

*Dorman v. Charles Schwab Corp.,*
   No. 17-00285-CW, 2018 WL 6803738 (N.D. Cal. Sept. 20, 2018) ..............4, 11, 20

*Dorman v. Charles Schwab Corp.,*
   No. 17-cv-00285 (CW), 2019 WL 580785 (N.D. Cal. Feb. 8, 2019) ...............13, 15

*Fifth Third Bancorp v. Dudenhoeffer,*
   573 U.S. 409 (2014) .......................................................................9, 15

*Hecker v. Deere,*
   556 F.3d 575 (7th Cir. 2009) .........................................................11, 13

*Laboy v. Bd. of Trustees of Bldg. Serv. No. 32 BJ SRSP,*
   513 F. App'x 78 (2d Cir. 2013) .....................................................15

*Loomis v. Exelon Corp.,*
   658 F.3d 667 (7th Cir. 2011) ....................................................2, 10, 13, 18

*Marks v. Trader Joe's Co.,*
   No. CV19-10942 (PA), 2020 WL 2504333 (C.D. Cal. Apr. 24, 2020)..............4, 18

*Marshall v. Northrop Grumman Corp.,*
   No. CV 16-06794-AB (JCX), 2018 WL 1406703 (C.D. Cal. Feb. 15, 2018) ........21

*Meiners v. Wells Fargo & Co.,*
   898 F.3d 820 (8th Cir. 2018) .......................................................12, 13, 14

*Meiners v. Wells Fargo & Co.,*
   No. CV 16-3981, 2017 WL 2303968 (D. Minn. May 25, 2017)....................14

*Moitoso v. FMR LLC*,
    No. CV 18-12122 (WGY), 2020 WL 1495938 (D. Mass. Mar. 27, 2020)............................18

*Patterson v. Capital Group Cos.*,
    No. CV-17-4399 DSF, 2018 WL 748104 (C.D. Cal. Jan. 23, 2018)........................................12

*Patterson v. Morgan Stanley*,
    No. 16-cv-6568 (RJS), 2019 WL 4934834 (S.D.N.Y. Oct. 7, 2019).............................. *passim*

*Renfro v. Unisys Corp.*,
    671 F.3d 314 (3d Cir. 2011)..................................................................................2, 10, 13

*Rinehart v. Akers*,
    722 F.3d 137 (2d Cir. 2013)..............................................................................................20

*Rosen v. Prudential Ret. Ins. & Annuity Co.*,
    718 F. App'x 3 (2d Cir. 2017) ...........................................................................................19

*PBGC ex rel. St. Vincent Catholic Med'l Ctrs. Ret. Plan v. Morgan Stanley Inv.
    Mgmt., Inc.*,
    712 F.3d 705 (2d Cir. 2013)...........................................................................................8, 9

*Thomas v. Oregon Fruit Prod. Co.*,
    228 F.3d 991 (9th Cir. 2000) ...........................................................................................21

*Tibble v. Edison Int'l*,
    135 S. Ct. 1823 (2015).......................................................................................................9

*Tibble v. Edison Int'l*,
    639 F. Supp. 2d 1074 (C.D. Cal. 2010) ...........................................................................16

*Tibble v. Edison Int'l*,
    729 F.3d 1110 (9th Cir. 2013) ...........................................................................2, 10, 13, 16

*Tibble v. Edison Int'l*,
    No. CV 07-5359 SVW, 2010 WL 2757153 (C.D. Cal. July 8, 2010) ....................................16

*Tibble v. Edison Int'l*,
    No. CV 07-5359 (SVW), 2017 WL 3523737 (C.D. Cal. Aug. 16, 2017) ...............................16

*Tussey v. ABB, Inc.*,
    746 F.3d 327 (8th Cir. 2014) ............................................................................................15

*White v. Chevron Corp.*,
    752 F. App'x 453 (9th Cir. 2018) ............................................................................. *passim*

*White v. Chevron Corp.*,
    No. 16-cv-0793-PJH, 2017 WL 2352137 (N.D. Cal. May 31, 2017).....................4, 17, 18, 20

**STEPTOE & JOHNSON LLP**
One Market Plaza, Spear Tower, Suite 3900
San Francisco, CA 94105

STEPTOE & JOHNSON LLP
One Market Plaza, Spear Tower, Suite 3900
San Francisco, CA 94105

*White v. Chevron*,
   No. 16-cv-0793-PJH, 2016 WL 4502808 (N.D. Cal. Aug. 29, 2016) ........................... *passim*

*Wildman v. Am. Century Servs.*,
   LLC, 362 F. Supp. 3d 685 (W.D. Mo. 2019).........................................................11

**Statutes**

15 U.S.C. § 80a-18(f)................................................................................................18

26 U.S.C. § 851(b)(3) ..............................................................................................18

29 U.S.C. § 1104(c) ...................................................................................................3

ERISA § 3(34), 29 U.S.C. § 1002(34)........................................................................5

ERISA § 403(a), 29 U.S.C. § 1103(a) ......................................................................16

ERISA § 404(a), 29 U.S.C. § 1104(a)........................................................................1

ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A)...................................................19

ERISA § 404(c), 29 U.S.C. § 1104(c) ..............................................................3, 5, 10

**Other Authorities**

17 C.F.R. § 270.0-1(a)(7)..........................................................................................18

U.S. Dep't of Labor, 2019 Instructions for Form 5500 Annual Return/Report of
   Employee Benefit Plan at 26,
   https://www.dol.gov/sites/dolgov/files/EBSA/employers-and-advisers/plan-
   administration-and-compliance/reporting-and-filing/form-5500/2019-
   instructions.pdf; ................................................................................................7

Federal Rule of Civil Procedure 12(b)(6) ..............................................................1, 21

Federal Rule of Civil Procedure 12(f) ...................................................................1, 21

*CRM Institutional Holdings*, NASDAQ (last accessed June 15, 2020),
   https://www.nasdaq.com/market-activity/stocks/crm/institutional-holdings ...................19, 20

*Glide Path*, INVESTOPEDIA (last accessed June 15, 2020),
   https://www.investopedia.com/terms/g/glide-path.asp.........................................14

U.S. Dep't of Labor, Supplemental Frequently Asked Questions about the 2009
   Schedule C, Q7 (Oct. 2010),
   https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-
   activities/resource-center/faqs/supplemental-2009-schedule-c.pdf........................7

*TIAA-CREF Lifecycle Index 2030 Fund*, NUVEEN (last accessed June 12, 2020),
    https://www.nuveen.com/mutual-funds/tiaa-cref-lifecycle-index-2030-
    fund?shareclass=Advisor ..........................................................................................14

*Top 5 Mutual Fund Holders of Salesforce.com*, INVESTOPEDIA (May 2, 2018),
    https://www.investopedia.com/articles/investing/031816/top-5-mutual-fund-
    holders-salesforcecom-crm-orcl.asp .....................................................................19

STEPTOE & JOHNSON LLP
One Market Plaza, Spear Tower, Suite 3900
San Francisco, CA 94105

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DEFENDANTS' NOTICE OF MOTION AND                    CASE NO.  3:20-CV-01753-MMC
MOTION TO DISMISS AND TO STRIKE JURY DEMAND
v

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendants salesforce.com, inc. ("Salesforce" or the "Company") and various alleged fiduciaries of the Salesforce 401(k) Plan ("Plan")[1] respectfully submit this Memorandum of Points and Authorities in support of their Motion to Dismiss the Complaint filed by Plaintiffs in this action and to strike Plaintiffs' jury demand.

## STATEMENT OF ISSUES TO BE DECIDED

1.      Whether Plaintiffs' claim against the Committee for breaches of the fiduciary duties of loyalty and prudence under ERISA § 404(a), 29 U.S.C. § 1104(a), should be dismissed with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6) because Plaintiffs have failed to allege facts from which it can plausibly be inferred that the Committee acted disloyally or that their decision-making process was flawed.

2.      Whether Plaintiffs' claim against Salesforce and the Board for failure to adequately monitor the Committee should be dismissed with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6) because the Complaint fails to state a plausible underlying breach of fiduciary duty claim against the Committee.

3.      Whether Plaintiffs' demand for a jury trial should be stricken pursuant to Federal Rule of Civil Procedure 12(f) because Plaintiffs' claims for breach of fiduciary duty under ERISA are equitable in nature.

## INTRODUCTION

In this putative ERISA class action, Plaintiffs—who are current or former Plan participants—allege that Defendants violated ERISA's fiduciary standards by offering Plan participants a number of investment options that allegedly underperformed and/or were more costly than other options available in the market.   In so doing, Plaintiffs conveniently ignore the overall structure of the Plan's investment program, the numerous options made available to participants, and the manner in which the Plan's administrative costs were paid.  When viewed

---

[1] In addition to Salesforce, these alleged fiduciaries include the Company's Board of Directors ("Board"), the Plan's Investment Advisory Committee (the "Committee"), a member of the Board, and members of the Committee (collectively, "Defendants").

STEPTOE & JOHNSON LLP
One Market Plaza, Spear Tower, Suite 3900
San Francisco, CA 94105

STEPTOE & JOHNSON LLP
One Market Plaza, Spear Tower, Suite 3900
San Francisco, CA 94105

1   against that background, it soon becomes clear that there is no basis in law or fact for the

2   hindsight challenges that Plaintiffs have attempted to mount to certain of the Plan's investment

3   offerings.  Indeed, rather than give rise to any inference of fiduciary misconduct, the Plaintiffs'

4   allegations are entirely consistent with a prudent and sound investment program.  Not

5   surprisingly then, courts, including the Ninth Circuit, have soundly rejected the type of hindsight

6   challenges Plaintiffs make to the Plan's investment offerings for failing to state a claim for

7   breach of fiduciary duty.  *See White v. Chevron Corp.*, 752 F. App'x 453, 454 (9th Cir. 2018),

8   *cert. denied*, 139 S. Ct. 2646 (2019).

9   　　　The Plan is a participant-directed individual account plan in which participants are

10   responsible for selecting the options in which their accounts will be invested from among the

11   options available on the Plan's investment menu.  "[P]articipant choice is the centerpiece of what

12   ERISA envisions for defined-contribution plans."  *Tibble v. Edison Int'l*, 729 F.3d 1110, 1134-35

13   (9th Cir. 2013), *vacated on other grounds*, 135 S. Ct. 1823 (2015).  Participant-directed plans are

14   intended to provide participants with a "reasonable mix and range of investment options" from

15   which to construct a portfolio meeting their individual retirement needs.  *Renfro v. Unisys Corp.*,

16   671 F.3d 314, 327 (3d Cir. 2011).  ERISA thus "encourages sponsors to allow more choice to

17   participants" in such plans.  *Loomis v. Exelon Corp.*, 658 F.3d 667, 673 (7th Cir. 2011).

18   　　　Throughout the putative class period, the Plan's investment menu has been entirely

19   consistent with ERISA's "participant-choice" objective.  It offers participants three distinct

20   "tiers" of investment options:

21   　　　• A broad range of at least eighteen diversified investment options spanning the asset
22   　　　　class and investment strategy spectrums—including both actively and passively
23   　　　　managed (index fund) options—that allow participants to construct their own
　　　　　　personal investment portfolios;

24   　　　• A series of nine actively-managed "target date" funds for participants who prefer
25   　　　　to have their investment and asset allocation decisions made by investment
　　　　　　professionals; and

26   　　　• A "brokerage window"—administered by the Plan's recordkeeper, Fidelity
27   　　　　Investments—for more sophisticated participants who want an even broader array
　　　　　　of investment options from which to choose.

28

---

DEFENDANTS' NOTICE OF MOTION AND
MOTION TO DISMISS AND TO STRIKE JURY DEMAND

CASE NO.  3:20-CV-01753-MMC

STEPTOE & JOHNSON LLP
One Market Plaza, Spear Tower, Suite 3900
San Francisco, CA 94105

Although the Plan could have charged all recordkeeping and other plan administration expenses directly to participants' individual accounts, the Plan instead used "revenue sharing" from the investment options offered on its investment menu to pay a large portion of its administration expenses.  Under this "revenue-sharing" approach, which is both common and lawful, a portion of a mutual fund's investment management fee is used to compensate a plan's other service providers for their services.  The Complaint does not allege that the fees paid for Plan administration were unreasonable.  Moreover, Plaintiffs do not suggest that the investment choices offered to them lacked investment merit, were imprudent on their face, or otherwise subjected participants to catastrophic losses or unreasonable risk.  Nor could such allegations be made—the investment options offered were all mainstream, widely-held mutual funds which permitted participants to construct well-diversified portfolios.

Rather, based largely on conclusory allegations, Plaintiffs' Complaint asserts that Defendants have violated ERISA's fiduciary duties of prudence and loyalty by maintaining certain funds on the Plan's investment menu that allegedly underperformed or charged excessive fees.  The allegations underlying Plaintiffs' prudence claim fall into three categories:  (1) a challenge to the Plan's inclusion of actively managed funds, which ignores that cheaper, passively managed index funds also were available on the menu; (2) an allegation that the Plan did not always offer the cheapest mutual fund share classes available, which ignores the role that revenue sharing played in paying the Plan's administrative costs; and (3) an allegation that the Plan failed to offer collective trusts and separate accounts.  Plaintiffs have identified nothing amiss concerning Defendants' decision-making process in these areas, much less alleged facts that could give rise to an inference of fiduciary misconduct.

*__Actively Managed Funds:__*  The Plan offered participants both actively managed and passively managed funds.  Plaintiffs' allegation that the Plan's inclusion of actively managed funds was improper is contrary to the participant choice policy underlying ERISA § 404(c).[2]

---

[2] Section 404(c) of ERISA provides a special rule for individual account plans that allow participants to control the investment of their accounts.  *See* 29 U.S.C. § 1104(c).  Under a § 404(c) plan, fiduciaries are expressly exempted from any liability resulting from a participant's exercise of such control.

1    Indeed, courts have consistently rejected claims that fiduciaries somehow violate their duties by

2    offering actively managed funds to 401(k) plan participants, even when, unlike here, passively

3    managed funds were not made available.  As courts in this District have made clear, fiduciaries

4    can "value investment features other than price (and indeed are required to do so)."  *White v.*

5    *Chevron Corp.*, No. 16-cv-0793-PJH, 2017 WL 2352137, *11 (N.D. Cal. May 31, 2017); *see*

6    *also Dorman v. Charles Schwab Corp.*, No. 17-00285-CW, 2018 WL 6803738, *3 (N.D. Cal.

7    Sept. 20, 2018) (quoting *White*).  Moreover, Plaintiffs' allegations that the actively managed

8    funds' returns "lagged behind" those of index funds is too conclusory to support a plausible

9    claim.

10    **Share Classes:**  Plaintiffs' allegation that the Plan did not always offer the cheapest share

11    class fails to account for the use of revenue sharing from investment options to pay for

12    recordkeeping and other administrative services provided to the Plan.  Revenue sharing is a

13    commonplace practice that courts have uniformly held is permissible.  *See, e.g.*, *White*, 2017 WL

14    2352137, at *14; *Marks v. Trader Joe's Co.,* No. CV19-10942 (PA)(JEMx), 2020 WL 2504333,

15    at *6 (C.D. Cal. Apr. 24, 2020).  Mutual fund share classes that offer revenue sharing typically

16    have higher expense ratios, *i.e.*, fees, than those classes which do not.  Without any allegation

17    that the fees paid for Plan administration were unreasonable (and there is no such allegation), no

18    plausible inference of fiduciary misconduct can be drawn from the Complaint's allegations that

19    the fees charged by some of the Plan's investment options were somehow "excessive" in

20    isolation.

21    **Collective Trusts and Separate Accounts:**  Plaintiffs' assertion that Defendants breached

22    fiduciary duties by failing to offer collective trusts and separate accounts is meritless.  Courts

23    have consistently held that plans are under no duty to offer alternatives to mutual funds such as

24    collective trusts and separate accounts.  *See, e.g., Dorman*, 2018 WL 6803738, at *3-4; *White*,

25    2017 WL 2352137, at *11.

26    Plaintiffs' loyalty and monitoring claims are also without merit.  The loyalty claim

27    nowhere identifies any plausible benefit that Defendants derived from the challenged actions or

28

---

DEFENDANTS' NOTICE OF MOTION AND                                CASE NO.  3:20-CV-01753-MMC
MOTION TO DISMISS AND TO STRIKE JURY DEMAND

STEPTOE & JOHNSON LLP
One Market Plaza, Spear Tower, Suite 3900
San Francisco, CA 94105

any basis for suggesting that they acted to confer an improper benefit on a third party.  The derivative monitoring claim fails due to the absence of any underlying fiduciary breach.

## BACKGROUND

### A.    Salesforce and Its Plan.

Salesforce is a company based in San Francisco, California that sells subscriptions to cloud-based customer relationship management software and other business management tools.  *See* Compl. ¶ 20.  Salesforce offers retirement benefits to its employees through the Salesforce 401(k) Plan that it sponsors.  *Id.*  The Plan has over 25,000 participants, and had over $2 billion in assets as of the end of 2018.  *Id.* at ¶ 52; Declaration of Eric G. Serron ("Serron Decl."), Ex. 5 (2018 Form 5500), at 2, 100.[3]

The Plan is a defined contribution, individual account plan.  ERISA § 3(34), 29 U.S.C. § 1002(34); Compl. ¶ 39.  The Plan covers employees of two participating companies: Salesforce and the Salesforce.com Foundation, a 501(c)(3) nonprofit organization that funds charitable initiatives.  *See* Ex. 5 at 92.  The Plan bases participants' retirement benefits solely on amounts contributed to their accounts, plus earnings and less any losses or allocated expenses.  Compl. ¶ 39.  Participant and employer contributions fund those accounts.  *Id.* ¶¶ 41-44.  Participants direct the investment of their accounts in the Plan's investment options, *i.e.*, the Plan is "participant-directed."  Serron Decl., Ex. 6 (Statement of Investment Policy, Objectives and Guidelines for Salesforce 401(k) Plan, updated September 9, 2016), at 8.

### B.    The Plan Offers Participants a Diverse Array of Investment Options.

The Plan is designed to comply with ERISA § 404(c).  *See* Ex. 7 (2017 SPD), at 7-8. Consequently, participants control their investments.  Participants can select from among investment options selected by the Committee, which is responsible for selecting and monitoring the Plan's investment options.  Compl. ¶ 22.

---

[3] As explained in Defendants' Request for Judicial Notice, the Court may take judicial notice of Form 5500s and other plan documents on motions to dismiss in ERISA fiduciary breach cases.

STEPTOE & JOHNSON LLP
One Market Plaza, Spear Tower, Suite 3900
San Francisco, CA 94105

Since the March 2014 start of the putative class period, the Plan has offered participants a broad array of well-diversified investment options to meet their individual retirement objectives. Between 2014 and 2018, the Plan offered participants between 27 and 30 investment options.[4] *See* Serron Decl., Exs. 1-5 (Forms 5500, 2014-2018).  For example, in 2018, the Plan's investment menu included (i) six passively-managed index funds covering all of the major asset categories, and (ii) roughly a dozen actively-managed funds covering all of the major asset categories, managed by professional investment managers who try to "beat the market" through picking individual investments.  In addition, for participants who wished to have investment professionals make their investment and asset allocation decisions, the Plan offered a series of nine actively-managed JPMorgan target date funds ("JPMorgan TDFs").  *See* Serron Decl., Ex. 5 (2018 Form 5500), at 98.  The assets in these JPMorgan TDFs are allocated among the funds' holdings based on an assumed retirement target date, with such allocation becoming more conservative as the retirement target date approaches.

### C.   Plan Fees and Expenses.

The Complaint alleges without factual support that the actively managed funds in the Plan "charged grossly excessive fees compared with comparable or superior alternatives" and that "almost half of the Plan's core investments (including all but one of the target date funds) were much more expensive than comparable investments found in similarly-sized plans." Compl. ¶¶ 99, 101.  Plaintiffs point to no industry averages or data that reflect fees charged for actively managed funds.  Instead, they refer to an average fee for mutual funds generally, which makes no distinction by asset class, investment strategy, or active versus passive management. *Id.* at 27 n.9.  Further, there is no allegation that the fees of any of the Plan's funds were "unreasonable," only that they were "above the median in the same category."  *Id.* at ¶ 101.

The Complaint also alleges that the Plan did not offer the lowest-fee share class of the JPMorgan TDFs on its investment menu.  Specifically, the Complaint alleges that the Plan

---

[4] As explained previously, the Plan also offered a "brokerage window" option for more sophisticated participants who were interested in selecting from an even broader range of investment options.

STEPTOE & JOHNSON LLP
One Market Plaza, Spear Tower, Suite 3900
San Francisco, CA 94105

1   offered a higher-fee Institutional share class of these TDFs, even though a lower-fee R5 share

2   class was allegedly available during the alleged class period, and an even cheaper R6 share class

3   was allegedly available beginning in November 2014.  *Id.* ¶ 105-06.

4        These allegations are inaccurate and misleading for two independent reasons.  First,

5   Plaintiffs' assertion that the Plan should have offered R5 shares rather than "Institutional" shares

6   of the JPMorgan TDFs (Compl. ¶ 105-06) is simply misinformed, because "Institutional" and

7   "R5" were in fact merely ***successive names for the same share class***: on March 29, 2017,

8   JPMorgan publicly announced that as of April 3, it was renaming the "Institutional" class of its

9   TDFs "Class R5," "to align [them] more closely with industry convention."[5]  Thus, the Plan

10  actually offered the very share class Plaintiffs suggest was appropriate.[6]

11       Second, throughout the time that Institutional (later renamed R5) shares of these TDFs

12  were offered by the Plan, a significant portion of the Plan's recordkeeping and other

13  administrative expenses were paid through revenue sharing—an arrangement under which

14  payments received from investment options offered on a participant-directed plan's investment

15  menu are used to compensate a plan service provider indirectly for performing administrative or

16  record-keeping services for the plan.  *See* Serron Decl., Ex. 1 (2014 Form 5500), at 4, 6 (showing

17  the Fidelity was receiving "only eligible indirect compensation,"[7] *i.e.*, that it was receiving

18  indirect compensation for its services to the Plan through a revenue sharing arrangement); *id.* at

19  27-30 (showing that Fidelity received 0.15% (or 15 basis points) in revenue sharing from each of

20

21  _____

[5] Serron Decl., Ex. 15 (JPMorgan Funds Announcement); *see id.*, Ex. 10 (JPMorgan Prospectus
22  Supplement) (reporting change in share class name).

23  [6] *See* Serron Decl., Ex. 4 (2017 Form 5500), at 4, 7, 8-11 (showing that the R5 Share Class of the
    JPMorgan TDFs paid indirect compensation to the Plan's recordkeeper, Fidelity, in 2017).

24  [7] The instructions to Schedule C of the Form 5500 state that "eligible indirect compensation"
    includes "fees or expense reimbursement payments charged to investment funds and reflected in
25  the value of the plan's investment or return on investment of the participating plan or its
    participants."  *See* U.S. Dep't of Labor, 2019 Instructions for Form 5500 Annual Return/Report
26  of Employee Benefit Plan at 26, https://www.dol.gov/sites/dolgov/files/EBSA/employers-and-
    advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2019-
27  instructions.pdf; U.S. Dep't of Labor, Supplemental Frequently Asked Questions about the 2009
    Schedule C, Q7 (Oct. 2010), https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-
28  activities/resource-center/faqs/supplemental-2009-schedule-c.pdf.

_____

DEFENDANTS' NOTICE OF MOTION AND                        CASE NO.  3:20-CV-01753-MMC
MOTION TO DISMISS AND TO STRIKE JURY DEMAND

STEPTOE & JOHNSON LLP
One Market Plaza, Spear Tower, Suite 3900
San Francisco, CA 94105

the JPMorgan TDFs as compensation for recordkeeping services provided to the Plan; also cataloguing the formulae or amounts of indirect compensation that Fidelity received from other Plan investments); Serron Decl., Ex. 2 (2015 Form 5500), at 4, 6, 38-41 (same for 2015); Serron Decl., Ex. 3 (2016 Form 5500), at 4, 6, 48-51 (same for 2016); Serron Decl., Ex. 4 (2017 Form 5500), at 4, 7, 8-11 (same for 2017).[8]   Significantly, the Complaint contains no allegations concerning the fees paid by the Plan for administrative services, much less any suggesting that such fees were unreasonable.

## LEGAL STANDARD

"Dismissal of a complaint is appropriate if it fails to 'state a claim to relief that is plausible on its face.'"  *White*, 752 F. App'x at 454 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A complaint "must demonstrate more than a sheer possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Where there are two possible explanations [for the plaintiff's allegations], only one of which can be true and only one of which results in liability, plaintiff[ ] cannot offer allegations that are merely consistent with [its] favored explanation but are also consistent with the alternative explanation…. Something more is needed, such as facts tending to exclude the possibility that the alternative explanation is true… in order to render plaintiffs' allegations plausible within the meaning of *Iqbal* and *Twombly*."  *White*, 752 F. App'x at 454-55 (citations and internal quotation marks omitted).  "[A]llegations under ERISA call[] for particular care … to ensure that the … Complaint alleges *nonconclusory* factual content raising a *plausible* inference of misconduct and does not rely on 'the vantage point of hindsight.'"  *PBGC ex rel. St. Vincent Catholic Med'l Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt., Inc.*, 712 F.3d 705, 718 (2d Cir. 2013) ("*St. Vincent*") (emphases in original) (quoting *In re Citigroup ERISA Litig.*, 662 F.3d 128, 140 (2d Cir. 2011)).

---

[8] Contrary to the Complaint's allegations, the Plan in fact switched to the R6 share class of the JPMorgan TDFs in December 2017, after which Fidelity stopped receiving revenue sharing from the JPMorgan TDFs as compensation for its recordkeeping services.  *See* Serron Decl., Ex. 5 (2018 Form 5500), at 8-75 (excluding JPMorgan TDFs from the list of investments that paid revenue sharing or other indirect compensation to Fidelity for recordkeeping services provided to the Plan); *id.*, Ex. 9 (Plan Participant Notice).

STEPTOE & JOHNSON LLP
One Market Plaza, Spear Tower, Suite 3900
San Francisco, CA 94105

**ARGUMENT**

## I.   PLAINTIFFS FAIL TO STATE A CLAIM FOR BREACH OF THE DUTY OF PRUDENCE.

ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 419 (2014) (quoting *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 143 n.10 (1985)).  Thus, "[a]n ERISA fiduciary must discharge his responsibility 'with the care, skill, prudence, and diligence' that a prudent person 'acting in a like capacity and familiar with such matters' would use." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015) (quoting 29 U.S.C. § 1104(a)(1)(B)).  "[T]he content of the duty of prudence turns on 'the circumstances … prevailing' at the time the fiduciary acts," so "the appropriate inquiry will necessarily be context specific." *Dudenhoeffer*, 573 U.S. at 425 (quoting § 1104(a)(1)(B)).

The duty of prudence "focus[es] on a fiduciary's conduct in arriving at an investment decision, not on its results, and ask[s] whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment." *St. Vincent*, 712 F.3d at 716 (quoting *In re Unisys Savings Plan Litig.*, 74 F.3d 420, 434 (3d Cir. 1996)).  Thus, in evaluating whether a fiduciary acted prudently, courts "focus on the process by which it makes its decisions rather than the results of those decisions." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 595 (8th Cir. 2009).

Here, Plaintiffs admit that they "did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing Plan investments." Compl. ¶ 19.  To state a plausible claim when lacking "direct evidence of the fiduciaries' process, the plaintiff must at a minimum plead facts that give rise to a 'reasonable inference' that the defendant committed the alleged violation." *White v. Chevron*, No. 16-cv-0793-PJH, 2016 WL 4502808 (N.D. Cal. Aug. 29, 2016), at *19; *see also St. Vincent*, 712 F.3d at 718 (where the plaintiffs' allegations "do not 'directly address[] the process by which the Plan was managed,'" the complaint will be dismissed unless "the court, based on circumstantial factual allegations,

may reasonably 'infer from what is alleged that the process was flawed.'" (quoting *Braden*, 588 F.3d at 596)).

While long on rhetoric, the complaint is noticeably short on facts that would support a plausible inference that the procedures followed by the defendants in selecting and monitoring the cost and performance of the Plan's investment options were deficient.  Instead, Plaintiffs present threadbare allegations second-guessing the Plan's inclusion of certain actively managed funds with the benefit of hindsight.

### A.   The Inclusion of Actively-Managed Funds on the Plan's Investment Menu Does Not Support a Plausible Inference of Imprudence.

The Complaint's broad allegation that Defendants somehow acted imprudently by offering actively managed funds on the Plan's investment menu (Compl. ¶¶ 80-84, 99) is contrary to the participant choice policy underlying ERISA § 404(c).  *Tibble,* 729 F.3d at 1134-35 ("[P]articipant choice is the centerpiece of what ERISA envisions for defined contribution plans."); *see also Renfro*, 671 F.3d at 327; *Loomis*, 658 F.3d at 673.  As Plaintiffs acknowledge, the Plan in fact offered no fewer than six passively managed index funds in addition to participants' choice of actively managed funds.  Compl. ¶ 99.  Those index funds covered all of the major asset categories: long term fixed income, core fixed income, large cap equity, mid cap equity, small cap equity, and international equity.  *See* Serron Decl., Ex. 5 (2018 Form 5500), at 98.

Plaintiffs' apparent preference for index funds does not make it imprudent for the Plan's fiduciaries to offer participants a choice between actively managed and passively managed funds.  *See Divane v. Northwestern Univ.*, 953 F.3d 980, 991 (7th Cir. 2020) ("Plaintiffs … spill much ink in their amended complaint describing their clear preference for low-cost index funds. We understand their preference and acknowledge the industry may be trending in favor of these types of offerings.…  Plaintiffs failed to allege, though, that Northwestern did not make their preferred offerings available to them.  In fact, Northwestern did.").  Nor does the Complaint allege any facts from which it can plausibly be inferred that the Plan's fiduciaries acted

STEPTOE & JOHNSON LLP
One Market Plaza, Spear Tower, Suite 3900
San Francisco, CA 94105

1 imprudently in selecting or retaining any particular actively managed fund on the Plan's

2 investment menu.

3       **Passively-Managed (Index) Funds.**  No plausible inference of imprudence can be drawn

4 from the Complaint's allegation that the actively-managed funds offered on the Plan's

5 investment menu were more expensive than "comparable" passively-managed index funds.  *See*

6 Compl. ¶¶ 80-84, 99.  Contrary to Plaintiffs' assertions (*see* Compl. ¶¶ 99, 115), index funds are

7 not comparable to actively-managed funds in any meaningful way.  *See Davis v. Washington*

8 *Univ. in St. Louis*, No. 18-3345, 2020 WL 2609865, at *4 (8th Cir. May 22, 2020) ("[Index funds

9 and actively-managed funds] have different aims, different risks, and different potential rewards

10 that cater to different investors.  Comparing apples and oranges is not a way to show that one is

11 better or worse than the other."); *Patterson v. Morgan Stanley*, No. 16-cv-6568 (RJS), 2019 WL

12 4934834, at *12 (S.D.N.Y. Oct. 7, 2019) (fees of actively managed fund could not be

13 "meaningfully compared" to fees of passively managed fund).

14       Moreover, nothing in ERISA requires fiduciaries of participant-directed plans to offer

15 index funds as plan investment options.  *See Wildman v. Am. Century Servs.*, LLC, 362 F. Supp.

16 3d 685, 704 (W.D. Mo. 2019) ("ERISA does not require a retirement plan to offer an index

17 fund," and the failure to do so, "standing alone, does not violate the duty of prudence.").  Nor

18 does ERISA require fiduciaries of such plans "to scour the market to find and offer the cheapest

19 possible fund (which might, of course, be plagued by other problems)."  *Hecker v. Deere*, 556

20 F.3d 575, 586 (7th Cir. 2009).  Rather, "in choosing funds, a fiduciary considers not only modest

21 differences in price and performance, but also other relevant factors, such as strategy, security

22 lending practices, economic cycles, and market fluctuations.  The law is clear that fiduciaries can

23 'value investment features other than price, and indeed are required to do so.'"  *Dorman*, 2018

24 WL 6803738, at *3 (quoting *White*, 2017 WL 2352137, at *14).  In short, prudent fiduciaries

25 have a sound basis to offer participants actively managed funds.  As the ICI Study cited in the

26 Complaint explains, "actively managed mutual funds can offer investors the chance to earn

27 superior returns, access specialized sectors, or take advantage of alternative investment

28

STEPTOE & JOHNSON LLP
One Market Plaza, Spear Tower, Suite 3900
San Francisco, CA 94105

strategies, all of which can make a fund more expensive to manage."[9]  Thus, no inference of imprudence can plausibly be drawn from Plaintiffs' allegation that the actively-managed funds offered on the Plan's investment menu were more expensive than passively-managed index funds.

**Comparison to the "ICI Median."**  Plaintiffs' allegation that the actively-managed funds offered on the Plan's investment menu were more expensive than the "ICI Median" for their investment category likewise raises no inference of imprudence.  *See* Compl. ¶¶ 101-03. That a mutual fund's fees may merely be "above the [ICI] median expense ratios in the same category" does not demonstrate that its fees are unreasonable.  *Id.* ¶ 101.  The "ICI Median" includes cheaper passively-managed funds as well as actively-managed funds, which has the effect of lowering the "median" expense ratio.  *See id.* ¶ 78 n.7 (acknowledging that "[a]ctive management funds tend to have significantly higher expense ratios compared to passively managed funds because they require a higher degree of research and monitoring than funds which merely attempt to replicate a particular segment of the market.").  Indeed, as a matter of law, passively-managed funds are not "comparable" to actively-managed funds for purposes of assessing whether the fees charged for active management are "reasonable."  *Patterson*, 2019 WL 4934834, at *12 (fees of actively managed fund could not be "meaningfully compared" to fees of passively managed fund); *Davis*, 2020 WL 2609865, at *4 (comparing actively managed funds and index funds is comparing "apples and oranges").  Thus, the Complaint's "ICI Median" comparison proves nothing.

Furthermore, the law is clear that "the existence of a cheaper fund does not mean that a particular fund is too expensive … or that it is otherwise an imprudent choice." *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823-24 (8th Cir. 2018); *see also Patterson v. Capital Group Cos.*, No. CV-17-4399 DSF (PJWx), 2018 WL 748104, at *4 (C.D. Cal. Jan. 23, 2018).  The expense ratios of all of the actively managed funds challenged in the Complaint, which allegedly ranged

---

[9] *See* Serron Decl., Ex. 13 (Brightscope and Investment Company Institute, *BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2015* (March 2018) ("ICI Study")), at 59.

from .61% to .73% (*see* Compl. ¶¶ 101, 105, 113), were well within ranges found reasonable by other courts.  *E.g.*, *Tibble*, 729 F.3d at 1134, *vacated on other grounds by* 134 S. Ct. 1823 (2015) (rejecting imprudence claim where plan offered funds with fees ranging from 0.03% to 2%); *Renfro*, 671 F.3d at 319 (fees from 0.1% to 1.21%); *Loomis*, 658 F.3d at 669 (fees from 0.03% to 0.96%); *Hecker*, 556 F.3d at 586 (fees from 0.07% to over 1%); *Dorman v. Charles Schwab Corp.*, No. 17-cv-00285 (CW), 2019 WL 580785, at *5 (N.D. Cal. Feb. 8, 2019) (rejecting prudence claim where fund charged three times as much as comparable fund); *White*, 2016 WL 4502808, at *11 (collecting cases).

**Vague Allegations Regarding Returns.**  Plaintiffs' allegation that the five-year returns of "some" of the Plan's actively managed funds "lagged behind" those of certain alternative index funds also fails to state a plausible claim of imprudence.  Compl. ¶ 115.  The Complaint alleges no facts to support a conclusion that Plaintiffs' self-serving alternatives provide a "meaningful benchmark" for comparison.  *Meiners*, 898 F.3d at 822 (complaint failed to establish that Vanguard TDFs were a "meaningful benchmark" for assessing the performance of Wells Fargo TDFs).  Nor does prudence require fiduciaries to "pick the best performing fund." *Id*. at 823.

> Put simply, the duty of prudence does not compel ERISA fiduciaries to reflexively jettison investment options in favor of the prior year's top performers. If that were the case, Plan sponsors would be duty-bound to merely follow the industry rankings for the past year's results, even though past performance is no guarantee of future success.  Clearly, no court has ever suggested the existence of such a duty.

*Patterson*, 2019 WL 4934834, at *11.  Because prudence does not require investors to "follow the industry rankings," *Patterson*, 2019 WL 4934834, at *11, allegations about a few funds with better performance, cherry-picked for litigation purposes with the benefit of hindsight, are insufficient to state a plausible claim of imprudence.  *Meiners*, 898 F.3d at 823 n.3 ("the choice of a particular fund is not flawed merely because of the existence of one fund that ended up performing better"); *White*, 752 F. App'x at 455 (allegations that the defendant "could have chosen different investment vehicles that performed better during the relevant period" were insufficient to state a claim).

STEPTOE & JOHNSON LLP
One Market Plaza, Spear Tower, Suite 3900
San Francisco, CA 94105

Plaintiffs' inapposite comparisons to different kinds of investment vehicles also fail to account for differing investment strategies. Plaintiffs allege that certain TIAA-CREF target date index funds achieved better returns than supposedly comparable actively managed JPMorgan TDFs. Compl. ¶ 115. But even apart from the fact that the TIAA-CREF funds are passively managed—the two groups of retirement funds pursue fundamentally different long-term investment strategies, making a snapshot of one 5-year period a poor basis for comparison. The JPMorgan 2030 TDF, for example, has a more conservative asset allocation "glide path"[10] that ramps down investment in equities rapidly in the 15 years leading up to the retirement date, with only 32.5% of the fund invested in equities by the target retirement date of 2030 and the remainder in fixed income or money market funds.[11] In contrast, the TIAA-CREF Lifecycle Index 2030 Fund has a "through" glide path that maintains higher levels of investment in equities through retirement, with approximately 50% of the fund still invested in equities in 2030.[12] Courts have found that such differences in investment strategies preclude meaningful comparisons between investment options. In *Meiners*, the court concluded that even when comparing investments of the same type—index fund TDFs—it was not imprudent for a plan to select Wells Fargo TDFs that underperformed Vanguard TDFs during a certain period, because the two funds had "a different investment strategy": Wells Fargo's TDFs had "a higher allocation of bond[s]." *Meiners v. Wells Fargo & Co.*, No. CV 16-3981 (DSD/FLN), 2017 WL 2303968, at *3 (D. Minn. May 25, 2017); *see Meiners v. Wells Fargo & Co.*, No. CV 16-3981 (DSD/FLN), ECF No. 1 (Compl.) ¶ 27 (comparing TDFs).

To state a plausible prudence claim based on allegations of underperformance, the complaint must not only identify an appropriate measure of performance, but also allege facts

---

[10] The "glide path" of a target date fund determines how the fund's asset allocation changes as it approaches the target date. *See generally Glide Path*, INVESTOPEDIA (last accessed June 15, 2020), https://www.investopedia.com/terms/g/glide-path.asp.

[11] Serron Decl,, Ex. 11 (JPMorgan SmartRetirement 2030 Fund Summary Prospectus), at 10.

[12] Serron Decl,, Ex. 12 (TIAA-CREF Lifecycle Index 2030 Fund Summary Prospectus),  at 3-5; *TIAA-CREF Lifecycle Index 2030 Fund*, NUVEEN (last accessed June 12, 2020), https://www.nuveen.com/mutual-funds/tiaa-cref-lifecycle-index-2030-fund?shareclass=Advisor.

showing that any underperformance against that measure was both substantial and long-term. *Patterson*, 2019 WL 4934834, at *10 (although "consistent, ten-year underperformance may support a duty of prudence claim, the underperformance must be substantial" (citation omitted)); *see also White*, 2016 WL 4502808, at *17 ("a fiduciary may—and often does—retain investments through a period of underperformance as part of a long-range investment strategy"). Allegations of underperformance based on five-year returns are not sufficiently long-term to state a plausible claim of imprudence.  *See Dorman*, 2019 WL 580785, at *6 (observing that "three to five years . . . [is] considered [a] relatively short period[] of underperformance" that does not support a plausible inference of imprudence).  Nor does the Complaint plausibly allege that any such underperformance was substantial.  *Patterson*, 2019 WL 4934834, at *10 (dismissing prudence claim where fund allegedly underperformed its benchmark by returning 7.42% over a 10-year period, compared to 8.16% for the benchmark); *Laboy v. Bd. of Trustees of Bldg. Serv. No. 32 BJ SRSP*, 513 F. App'x 78, 79-80 (2d Cir. 2013) (allegations that fund had underperformed comparable funds by between 6% and 22% during the class period were insufficient to state a claim for breach of the duty of prudence).[13]

### B.     Plaintiffs' Allegation That the Plan Did Not Always Offer the Cheapest Share Classes Does Not Support a Plausible Inference of Imprudence.

Plaintiffs' allegation that the Plan did not always offer the lowest-fee share class of the JPMorgan TDFs is fundamentally an attack on the Plan's use of revenue sharing from investment options to pay for recordkeeping and other administrative services provided to the Plan.  *See* Compl. ¶¶ 86-88, 104-07.  As courts have uniformly recognized, "[t]here is … nothing wrong—for ERISA purposes —with plan participants paying recordkeeping costs through expense ratios."  *Divane*, 953 F.3d at 990 (citing *Hecker*, 556 F.3d at 585); *see also Tussey*, 746 F.3d at

---

[13] Plaintiffs' allegations of underperformance (*see* Compl. ¶ 115 n.13) are also impermissible hindsight.  *See Dudenhoeffer*, 573 U.S. at 425 (quoting ERISA § 1104(a)(1)(B)).  Recognizing how easily an investment can be second-guessed based on subsequent performance, courts have made clear that a fiduciary "deserves discretion to the extent its *ex ante* investment choices were reasonable given what it knew at the time."  *Tussey v. ABB, Inc.*, 746 F.3d 327, 338 (8th Cir. 2014).

STEPTOE & JOHNSON LLP
One Market Plaza, Spear Tower, Suite 3900
San Francisco, CA 94105

334 ("revenue sharing" is a "common" and "acceptable" industry practice that "frequently inure[s] to the benefit of ERISA plans").  Where, as in this case, revenue sharing is used to pay reasonable expenses of plan administration, it is entirely permissible to use higher-fee share classes—which provide greater revenue sharing— to increase the amount of revenue sharing available for that purpose.

Plaintiffs' argument based on *Tibble v. Edison Int'l*, No. CV 07-5359 (SVW)(AGRx), 2017 WL 3523737 (C.D. Cal. Aug. 16, 2017), that prudence *requires* fiduciaries to utilize the lowest-cost share class available to a plan is misplaced.  *See* Compl. ¶ 87.  The governing plan document in *Tibble* contained an unusual provision that required *the employer* to pay the cost of plan administration.  *See Tibble v. Edison Int'l*, 639 F. Supp. 2d 1074, 1099 (C.D. Cal. 2010) ("The operative language from the Master Plan document states that '[t]he cost of administration of the Plan will be paid by the Company.'").  The court interpreted that provision "as *allowing* the use of revenue sharing to offset . . . recordkeeping costs," *id.* at 1100 (emphasis added), thus leaving the employer with an obligation to pay *only* those administrative costs that were *not* covered by revenue sharing.  The court recognized, however, that this interpretation "created a conflict of interest, whereby [the employer] had an interest in selecting mutual funds with higher revenue sharing." *Id*. at 1101.  Not surprisingly, the *Tibble* plaintiffs later claimed at trial that the defendants' decision to offer retail shares rather than cheaper institutional shares of certain mutual funds was "improperly motivated" by a desire to use revenue sharing to pay for an obligation of the employer.  *See Tibble v. Edison Int'l*, No. CV 07-5359 SVW (AGRx), 2010 WL 2757153, at *21 (C.D. Cal. July 8, 2010).

The conflict of interest created by the plan document in *Tibble* is not present in this case.  Unlike *Tibble*, the Salesforce Plan's governing document does not obligate Salesforce to pay any expenses of plan administration, much less obligate it to pay plan administration expenses that are not covered by revenue sharing.  Rather, as expressly permitted by ERISA,[14] the Salesforce

---

[14] *See* ERISA § 403(a), 29 U.S.C. § 1103(a) ("the assets of a plan . . . shall be held for the exclusive purposes of providing benefits . . . and defraying reasonable expenses of administering the plan").

STEPTOE & JOHNSON LLP
One Market Plaza, Spear Tower, Suite 3900
San Francisco, CA 94105

Plan document makes clear that plan assets may be used to pay reasonable expenses of administering the Plan.  *See* Serron Decl., Ex. 8 (Plan) §§ 19.05, 20.14.

Under these circumstances, revenue sharing provides an "obvious, alternative [and lawful] explanation" for why the Plan offered institutional (later renamed R5) share classes of the JPMorgan target date funds in some years, rather than cheaper R6 share classes that offered little or no revenue sharing.  *See Ashcroft v. Iqbal*, 556 U.S. at 682 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 567 (2007)).  Indeed, in announcing the creation of the R6 share class for its TDFs in November 2014, JPMorgan expressly stated that it was offering the lower cost R6 share class because "[t]he availability of the R6 share class offers advisers and plan sponsors… a non revenue share class,"[15] suggesting that the institutional share class was appropriate for revenue sharing arrangements.  *White v. Chevron Corp.*, 2017 WL 2352137 (N.D. Cal. May 31, 2017), a case from this District, is directly on point.  In *White*, the plaintiffs alleged that a plan's fiduciaries breached the duty of prudence by including retail share classes of certain funds, rather than cheaper, institutional share classes of those funds.  The court rejected the plaintiffs' imprudence claim, holding that revenue sharing "provides an 'obvious, alternative explanation' for why [the plan] included retail share classes of certain funds—those share classes paid the Plan's recordkeeping expenses." *Id.* at *14.[16]  According to the court, "merely alleging that a Plan offers retail-class rather than institutional-class funds is insufficient to state a claim for breach of the duty of prudence." *Id.*

Tellingly, Plaintiffs have not challenged the fees paid for Plan administration services, either alone or in combination with the fees paid for investment management services.  In the absence of any such challenge, "all that remains is Plaintiffs' conclusory assertion that fees under a revenue-sharing arrangement are unreasonable.  Such a per-se rule is without support.

---

[15] Serron Decl., Ex. 14 (JPMorgan Press Release).

[16] As the ICI Study cited by Plaintiffs explains, the range in expenses for different kinds of funds "is at least partly attributable to differences in fee arrangements.  For example, though some or all costs associated with plan recordkeeping can be paid by fees associated with the mutual fund investment, other costs may be paid as a per-participant charge by participants or the employer. Expenses also may be paid through a combination of these methods."  Serron Decl., Ex. 13 (ICI Study), at 59.

STEPTOE & JOHNSON LLP
One Market Plaza, Spear Tower, Suite 3900
San Francisco, CA 94105

Revenue sharing is a 'common' and 'acceptable' investment industry practice that 'frequently inures to the benefit of ERISA plans.'" *Marks v. Trader Joe's Co.,* 2020 WL 2504333, at *6 (quoting *White*, 2016 WL 4502808, at *14) (citations and internal quotation marks omitted).

### C. Plaintiffs' Allegation That the Plan Failed to Offer Collective Trusts and Separate Accounts Does Not Support an Inference of Imprudence.

Plaintiffs fault the Plan for failing to offer collective trusts and separate accounts, which they allege are cheaper than what they characterize as "virtually identical mutual fund counterparts." Compl. ¶¶ 89-95. But courts have repeatedly rejected this argument. "Numerous courts have ruled that plans are under no duty to offer alternatives to mutual funds, even when the plaintiffs argue they are markedly superior." *Moitoso v. FMR LLC*, No. CV 18-12122 (WGY), 2020 WL 1495938, at *13 (D. Mass. Mar. 27, 2020) (citing *Larson v. Allina Health Sys.*, 350 F. Supp 3d 780, 796 (D. Minn. 2018); *White*, 2016 WL 4502808, at *8-12; *Dorman*, 2018 WL 6803738, at *3-4); *see also Patterson*, 2019 WL 4934834, at *26 ("certainly nothing in ERISA requires a Plan to offer separate accounts in lieu of reasonably-priced mutual funds").

Indeed, courts have recognized that separate accounts and collective trusts are far from "virtually identical" to mutual funds. Mutual funds offer greater transparency than separate accounts and collective trusts,[17] as well as important regulatory safeguards, including investment diversification requirements, limitations on leverage, and mandatory oversight by a largely independent board of directors.[18] "These non-mutual fund vehicles differ so much from mutual funds… in terms of their regulatory and transparency features that other courts have found it impossible to make an 'apples-to-oranges' comparison of the two." *Moitoso*, 2020 WL 1495938, at *14 (citing *White*, 2016 WL 4502808, at *12, and *Loomis*, 658 F.3d at 671-72); *see also White*, 2017 WL 2352137, at *11 ("mutual funds have unique regulatory and transparency features, which make any attempt to compare them to other investment vehicles such as collective trusts and separate accounts an 'apples-to-oranges' comparison").

---

[17] *See Loomis*, 658 F.3d at 671-72 (rejecting argument that fiduciary was imprudent for failing to offer collective trusts); *White,* 2016 WL 4502808, at *9-10 (same).

[18] *See* 15 U.S.C. § 80a-18(f); 26 U.S.C. § 851(b)(3); 17 C.F.R. § 270.0-1(a)(7).

STEPTOE & JOHNSON LLP
One Market Plaza, Spear Tower, Suite 3900
San Francisco, CA 94105

## II.   PLAINTIFFS FAIL TO STATE A CLAIM FOR BREACH OF THE DUTY OF LOYALTY.

ERISA's loyalty duty requires a fiduciary to act "solely in the interest" of the Plan's participants and for the "exclusive purpose" of providing benefits and defraying reasonable plan administration expenses.  ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A).  To state a claim for breach of the duty of loyalty, the Complaint must allege facts from which it can plausibly be inferred that the Plan's fiduciaries subjectively intended to benefit either themselves or a third party at the expense of the Plan's participants.  *See White*, 2016 WL 4502808, at *4–5 (dismissing complaint that pled "no facts sufficient to raise a plausible inference that defendants took any of the actions alleged for the purpose of benefitting themselves or a third-party entity").  Plaintiffs "must do more than simply recast purported breaches of the duty of prudence as disloyal acts."  *Rosen v. Prudential Ret. Ins. & Annuity Co.*, 718 F. App'x 3, 7 (2d Cir. 2017) (quoting *Sacerdote v. New York Univ.*, 2017 WL 3701482, at *5 (S.D.N.Y. Aug. 25, 2017)).

Plaintiffs' allegations fail to satisfy this requirement.  The Complaint contains no allegations that Defendants benefited from the challenged actions.  Rather, Plaintiffs base their claims on the fact that two of the Plan's third-party providers, Fidelity Investments and JPMorgan Chase, were Salesforce shareholders.  *See* Compl. ¶¶ 117-19.  But that allegation does not support a plausible inference of disloyalty.  The fact that Fidelity and JPMorgan were shareholders is unremarkable, since more than 80% of Salesforce's outstanding shares are currently held by institutional investors, most of which are mutual fund companies.[19]  Indeed, the article cited in the Complaint states that "Salesforce.com has been a popular holding for many mutual fund portfolio managers."[20]  The top five institutional investors in Salesforce are all

---

[19] *See CRM Institutional Holdings*, NASDAQ (last accessed June 15, 2020), https://www.nasdaq.com/market-activity/stocks/crm/institutional-holdings.

[20] *Top 5 Mutual Fund Holders of Salesforce.com*, INVESTOPEDIA (May 2, 2018), https://www.investopedia.com/articles/investing/031816/top-5-mutual-fund-holders-salesforcecom-crm-orcl.asp.

---

STEPTOE & JOHNSON LLP
One Market Plaza, Spear Tower, Suite 3900
San Francisco, CA 94105

1  household names:  Fidelity, Vanguard, Blackrock, T Rowe Price, and State Street.[21]   No

2  plausible inference of disloyalty can be drawn from the inclusion of a fund managed by these (or

3  any other) financial institutions on the Plan's menu of investment options, simply because one or

4  more funds managed by that financial institution happen to own Salesforce stock.

5    Another court in this District has already rejected an attempt by plaintiffs to assert claims

6  for breach of the duty of loyalty based on similar allegations.  In *White*, the court dismissed a

7  duty of loyalty claim alleging that Chevron acted in the interests of Vanguard and at the expense

8  of plan participants by paying too much for recordkeeping.  2017 WL 2352137, at *2.  Plaintiffs

9  based their claim on the fact that Vanguard held $13 billion of Chevron stock, was the

10  company's largest institutional shareholder, and had a policy of voting proxy shares in favor of

11  management proposals.  Despite these ties, the court reasoned that "the allegations that Chevron

12  had its own interests and the interests of Vanguard at heart, rather than the interests of the Plan

13  participants, are entirely speculative, and unsupported by any facts, other than 'facts' alleged on

14  information and belief or based on pure conjecture."  *Id.* at *8.  Plaintiffs' allegations of

15  disloyalty in this case are equally speculative and should be dismissed.

### III. PLAINTIFFS' DERIVATIVE FAILURE-TO-MONITOR CLAIM ALSO FAILS AS A MATTER OF LAW.

18    Plaintiffs' failure-to-monitor claim is derivative of a claim for underlying breach, and

19  fails with that claim.  *See, e.g., Rinehart v. Akers*, 722 F.3d 137, 154 (2d Cir. 2013), *abrogated*

20  *on other grounds by Dudenhoeffer*, 134 S. Ct. 2459 ("Plaintiffs cannot maintain a claim for

21  breach of the duty to monitor by the Director Defendants absent an underlying breach of the

22  duties imposed under ERISA by the Benefit Committee Defendants."); *Dorman*, 2018 WL

23  6803738, at *7; *White*, 2016 WL 4502808, at *19.  Because Plaintiffs have failed to plead any

24  underlying breach of ERISA, their failure-to-monitor claim must also be dismissed.

---

[21] *See CRM Institutional Holdings*, NASDAQ (last accessed June 15, 2020), https://www.nasdaq.com/market-activity/stocks/crm/institutional-holdings.

STEPTOE & JOHNSON LLP
One Market Plaza, Spear Tower, Suite 3900
San Francisco, CA 94105

1    Moreover, even if Plaintiffs had adequately pleaded an underlying claim, their failure-to-

2  monitor claim would still fail because they offer nothing more than conclusory allegations to

3  support it.  *See* Compl. ¶¶ 131-32.  To state a claim, Plaintiffs must make a "threshold showing

4  that the monitoring fiduciary failed to 'review the performance of its appointees at reasonable

5  intervals in such a manner as may be reasonably expected to ensure compliance with the terms of

6  the plan and statutory standards.'"  *White*, 2016 WL 4502808, at *18 (quoting *In re Calpine*

7  *Corp.*, No. C-03-1685 (SBA), 2005 WL 1431506 at *6 (N.D. Cal. Mar. 31, 2005)).  Plaintiffs

8  have made no showing that Defendants failed to properly review the performance of appointees

9  to the Committee.

10  **IV.    PLAINTIFFS' JURY TRIAL DEMAND SHOULD BE STRICKEN.**

11    If the Court does not dismiss the Complaint, it should at minimum strike Plaintiffs' jury

12  demand pursuant to Fed. R. Civ. P. 12(f).  *See* Compl. at 43.  ERISA actions for breach of

13  fiduciary duty are equitable in nature.  Accordingly, there is no right to a jury trial.  *See Thomas*

14  *v. Oregon Fruit Prod. Co.*, 228 F.3d 991, 997 (9th Cir. 2000) (holding that "the remedies

15  available to a participant or beneficiary under ERISA are equitable in nature and the Seventh

16  Amendment does not require that a jury trial be afforded for claims made by participants or

17  beneficiaries"); *Marshall v. Northrop Grumman Corp.*, No. CV 16-06794-AB (JCX), 2018 WL

18  1406703, at *6 (C.D. Cal. Feb. 15, 2018) ("There is no right to a jury trial in claims under

19  ERISA for breach of fiduciary duty." (citation and internal quotation marks omitted)).

20    <u>**CONCLUSION**</u>

21    For the foregoing reasons, Defendants respectfully request that the Court dismiss the

22  Complaint in its entirety pursuant to Rule 12(b)(6), Fed. R. Civ. P.  If the Court does not dismiss

23  the Complaint, it should strike Plaintiffs' jury demand pursuant to Rule 12(f).

24

25

26

27

28

---

DEFENDANTS' NOTICE OF MOTION AND                    CASE NO.  3:20-CV-01753-MMC
MOTION TO DISMISS AND TO STRIKE JURY DEMAND

1   DATED:  June 15, 2020                     Respectfully submitted,

2                                             STEPTOE & JOHNSON LLP

3                                             By:   _/s/ Laurie Edelstein_____

4                                             Laurie Edelstein (CA Bar #164466)
                                              STEPTOE & JOHNSON LLP
5                                             One Market Plaza
                                              Spear Tower, Suite 3900
6                                             San Francisco, CA 94105
                                              Telephone: (415) 365-6700
7                                             Facsimile: (415) 365-6699
                                              ledelstein@steptoe.com
8
                                              Paul J. Ondrasik, Jr. (*pro hac vice*)
9                                             Eric G. Serron (*pro hac vice*)
                                              Justin Ben-Asher (*pro hac vice* to be filed)
10                                            STEPTOE & JOHNSON LLP
                                              1330 Connecticut Ave., NW
11                                            Washington, DC 20036
                                              Telephone: (202) 429-3000
12                                            Facsimile:  (202) 429-3902
                                              pondrasik@steptoe.com
13                                            eserron@steptoe.com
                                              ibenasher@steptoe.com
14
15                                            *Counsel for Defendants salesforce.com, inc.,*
                                              *Board of Directors of salesforce.com, inc.,*
16                                            *Marc Benioff, The Investment Advisory*
                                              *Committee, Joseph Allanson, Stan Dunlap,*
17                                            *and Joachim Wettermark.*

18

19

20

21

22

23

24

25

26

27

28