ROSMAN & GERMAIN LLP
Daniel L. Germain (Bar No. 143334)
16311 Ventura Boulevard
Suite 1200
Encino, CA 91436-2152
Telephone: (818) 788-0877
Facsimile: (818) 788-0885
E-Mail: Germain@Lalawyer.com

Counsel for Plaintiffs and the Putative Class

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TIM DAVIS, GREGOR MIGUEL, and AMANDA BREDLOW, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SALESFORCE.COM, INC., BOARD OF DIRECTORS OF SALESFORCE.COM, INC., MARC BENIOFF, THE INVESTMENT ADVISORY COMMITTEE, JOSEPH ALLANSON, STAN DUNLAP, and JOACHIM WETTERMARK,<br><br>Defendants. | CASE NO. 3:20-cv-01753-MMC<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT** |

Plaintiffs Tim Davis, Gregor Miguel, and Amanda Bredlow ("Plaintiffs"), by and through their attorneys, on behalf of the Salesforce 401(k) Plan (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

## I. INTRODUCTION

1.      This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Salesforce.com, Inc. ("Salesforce" or the "Company"), the Board of Directors of Salesforce ("Board") and its members during the Class Period, and the Investment Advisory Committee ("Committee") and its members during the Class Period for breaches of their fiduciary duties.

2.      To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. 29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. Dec. 30, 2016) (*en banc*).

3.      The Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices." *See, "A Look at 401(k) Plan Fees," supra*, at n.3; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

4.      Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options.  "Wasting beneficiaries' money is

---

[1] The Plan is a legal entity that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).  However, in a breach of fiduciary duty action such as this, the Plan is not a party.  Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA"), § 7.

5. "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v,. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b).[2]

6. Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees…lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

7. Most participants in 401(k) plans expect that their 401(k) accounts will be their principal source of income after retirement. Although at all times 401(k) accounts are fully funded, that does not prevent plan participants from losing money on poor investment choices by plan sponsors and fiduciaries, whether due to poor performance, high fees or both.

8. Prudent and impartial plan sponsors thus should be monitoring both the performance and cost of the investments selected for their 401(k) plans, as well as investigating alternatives in the market place to ensure that well-performing, low cost investment options are being made available to plan participants.

---

[2] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-lookat-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

9. The Plan had over a billion dollars in assets under management in 2016, $1.8 billion in assets as of the end of 2017, and over $2 billion in assets at the end of 2018 that were/are entrusted to the care of the Plan's fiduciaries. The Plan's assets under management qualifies it as a large plan in the defined contribution plan marketplace, and among the largest plans in the United States. As a large plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments. Defendants, however, did not try to reduce the Plan's expenses or exercise appropriate judgment to scrutinize each investment option that was offered in the Plan to ensure it was prudent.

10. Plaintiffs allege that during the putative Class Period (March 11, 2014 through the date of judgment) Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost;  and (2) maintaining certain funds in the Plan despite the availability of identical or similar investment options with lower costs and/or better performance histories.

11. Defendants failed to timely utilize the lowest cost share class for many of the mutual funds within the Plan, and failed to consider available collective trusts (also known as CITs) as alternatives to the mutual funds in the Plan, despite their lower fees.

12. In 2019, **five years** into the Class Period, Defendants made the decision to change many of the mutual funds at issue in this lawsuit to lower cost CITs that were materially indistinguishable from their mutual fund counterparts already in the Plan.  Specifically, the JPMorgan target date funds CITs which had been available since 2010 replaced the  JPMorgan target date mutual funds in 2019.  These changes were far too little and too late as the damages suffered by Plan participants to that point had already been baked in.

13.     The Plan's fiduciaries should have transitioned Plan funds into lower-cost share classes or collective trusts as soon as they became available.

14.     "Because the institutional share classes are otherwise *identical* to the Investor share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary.  Thus, the 'manner that is reasonable and appropriate to the particular investment action, and strategies involved…in this case would mandate a prudent fiduciary – who indisputably has knowledge of institutional share classes and that such share classes provide identical investments at lower costs – to switch share classes immediately." *Tibble, et al. v. Edison Int. et al.*, No. 07-5359, 2017 WL 3523737, at * 13 (C.D. Cal. Aug. 16, 2017).

15.     Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duties of prudence in violation of 29 U.S.C. § 1104.  Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

16.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count One) and failure to monitor fiduciaries (Count Two).

## II.     JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

18.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

19.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this

District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.    PARTIES

**Plaintiffs**

20.    Plaintiff Tim Davis ("Davis") resides in Tillamook, Oregon. During his employment, Plaintiff Davis participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

21.    Plaintiff Gregor Miguel ("Miguel") resides in Oakland, California. During his employment, Plaintiff Miguel participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

22.    Plaintiff Amanda Bredlow ("Bredlow") resides in Kirkland, Washington. During her employment, Plaintiff Bredlow participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

23.    Each Plaintiff has standing to bring this action on behalf of the Plan because each of them participated in the Plan and were injured by Defendants' unlawful conduct. Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

24.    Plaintiffs did not have knowledge of all material facts (including, among other things, the investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available alternatives within similarly-sized plans, total cost comparisons to similarly-sized plans, information regarding other available share classes, and information regarding the availability and pricing of collective trusts) necessary to understand that Defendants breached their fiduciary duties and engaged

in other unlawful conduct in violation of ERISA until shortly before this suit was filed. Further, Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing Plan investments, because this information is solely within the possession of Defendants prior to discovery. Having never managed a large 401(k) plan such as the Plan, Plaintiffs lacked actual knowledge of reasonable fee levels and prudent alternatives available to such plans. Plaintiffs did not and could not review the Committee meeting minutes (to the extent they exist) or other evidence of Defendants' fiduciary decision making, or the lack thereof.[3] For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth herein.

**Defendants**

**Company Defendant**

25. Salesforce is the Plan sponsor with a principal place of business in San Francisco, California. *See* 2018 Form 5500 at 1. Salesforce describes itself as "a customer relationship management solution that brings companies and customers together. It's one integrated CRM platform that gives all your departments — including marketing, sales, commerce, and service — a single, shared view of every customer.[4]

26. The Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) for several reasons. First, the 2019 SPD

---

[3] *See Braden v. Wal-mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.") Indeed, several weeks prior to filing the lawsuit Plaintiffs requested pursuant to ERISA §104(b)(4) that the Plan administrator produce several Plan governing documents, including any meeting minutes of the relevant Plan investment committee(s). Their request for meeting minutes was denied.

[4] *See* https://www.salesforce.com/products/what-is-salesforce/

identifies Salesforce as the "Plan Administrator." *See* Salesforce 401(k) Summary Plan Description, Effective January 2, 2019 ("SPD") at 3.

27.    Second, as part of its fiduciary responsibility, Salesforce designated Fidelity Investments Institutional ("Fidelity"), as the Plan's recordkeeper. *Id.* at 2, and *see also*, the 2018 Form 5500 at Schedule C, page 4. Salesforce also appointed other Plan fiduciaries in its role as a Plan Administrator and through the Board (see below). Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

28.    Third, Salesforce also made discretionary decisions to make matching and discretionary contributions (explained below) to Plan participants. 2019 SPD at 4.

29.    Lastly, at all times, Salesforce acted through its officers to perform Plan-related fiduciary functions. These officers were acting in the course and scope of their employment.

## Board Defendants

30.    The Company acted through the Board (defined above) to perform some of the Company's Plan-related fiduciary functions. Upon information and belief, the Board appointed members of the Committee. Investment Policy at 4. Accordingly, the Board had the fiduciary duty to monitor and supervise the Committee while it performed its role as the fiduciary responsible for selection and monitoring of the Plan's investments.

31.    The Board also had discretionary authority to make contributions to Plan participants' accounts. *See* Salesforce 401(k) Summary Plan Description, Effective January 2, 2019 ("SPD") at 6.

32.    During the Class Period, Chief Executive Officer Marc Benioff ("Benioff") served on the Board as Chairman.

33.    Mr. Benioff, and each member of the Board during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A),

29 U.S.C. § 1002(21)(A) because each exercised discretionary authority to appoint and/or monitor the Committee and other Plan fiduciaries, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

34. The members of the Board of Directors for Salesforce during the Class Period are collectively referred to herein as the "Board Defendants."

## Committee Defendants

35. The Committee "has been appointed by the organization to supervise, monitor and evaluate the investment of Plan assets." Investment Policy at 4. Among other things, the Committee is charged with the following responsibilities:

- Identifying investment options or funds which it deems appropriate and prudent to make available to Plan participants;
- Selecting qualified investment funds;
- Selecting a qualified Trustee and Recordkeeper, as required;
- Reviewing the investment results of the funds;
- Reviewing that the costs (direct and indirect) of the Plan's service providers including but not limited to investment funds, trustee, recordkeeper, auditors, attorney, and investment advisers are reasonable and disclosed to the extent required under ERISA Section 408(b)(2).
- Taking appropriate action if objectives are not being met or if policy and guidelines are not being followed.

*Id.* at 4-5.

36. Additionally, "[t]he Committee, along with any and all other Plan fiduciaries, is responsible for ensuring that the investment program and each investment option are managed: […] Prudently and in compliance with ERISA and all other applicable laws and regulations and […] For the exclusive benefit of Plan participants and beneficiaries." *Id.* at 4.

37.     Further, "[f]rom time to time, the Committee at its discretion, may add investment options/categories to the current core options." *Id.* at 7.

38.     Additionally, the Committee had monitoring responsibility for the brokerage window.  "If permitted by the Committee, participants may direct the investment of their Plan account through an individual brokerage window under the Plan."  *Id*. at 7.  Further, "[t]he individual brokerage window will be reviewed periodically as determined by the Committee based on criteria determined by the Committee." *Id.*

39.     Lastly, the Investment Policy gave the Committee great latitude in selecting investment fund types.  "The Committee will select investment options that are liquid, diversified and cost efficient." *Id.* at 8.  Specifically, the "Committee may select registered mutual funds, collective investment trusts or separately managed accounts for the Plan investments." *Id.*

40.     During the Class Period the following Salesforce employees served as members of the Committee:

- Joseph  Allanson  ("Allanson")  –  Executive  VP,  Chief Accounting Officer
- Stan Dunlap ("Dunlap")  – Senior VP Global Rewards
- Joachim Wettermark ("Wettermark") - SVP, Treasurer

41.     The Committee and each of its members, including Allanson, Dunlap, and Wettermark, were fiduciaries of the Plan during the Class Period, within the meaning  of  ERISA  Section  3(21)(A),  29  U.S.C.  §  1002(21)(A)  because  each exercised discretionary authority over management or disposition of Plan assets.

**Non-Defendant Fiduciaries**

**Bridgebay Financial, Inc.**

42.     Bridgebay Financial, Inc. ("Bridgebay") was the investment consultant hired to "support[] the Committee through the provision of independent, third party research and analysis.  The Investment Consultant produces quarterly reports that

integrate the [Investment Policy] with ongoing performance monitoring of the investment options." Investment Policy at 6.

43.   Although Bridgebay is a relevant party and likely to have information relevant to this action, it is not named as a defendant given that the Committee remains responsible for the overall selection and monitoring of all investment options.  Plaintiffs reserve the right to name Bridgebay as a defendant in the future if deemed necessary.

## IV.   CLASS ACTION ALLEGATIONS

44.   Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[5]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between March 11, 2014 to the date of judgment (the "Class Period").[6]

45.   The members of the Class are so numerous that joinder of all members is impractical.   The 2018 Form 5500 filed with the Dept. of Labor lists 25,849 Plan "participants with account balances as of the end of the plan year." *Id.* at p. 2.

46.   Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan.  Defendants treated Plaintiffs consistently with other Class members, and managed the Plan as a single entity.  Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

---

[5] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.
[6]  Plaintiffs reserve their right to seek modification of the close of the Class Period in the event that further investigation/discovery reveals a more appropriate end period.

47. There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

        A.     Whether Defendants are fiduciaries of the Plan;

        B.     Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;

        C.     Whether the Board Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

        D.     The proper form of equitable and injunctive relief; and

        E.     The proper measure of monetary relief.

48. Plaintiffs will fairly and adequately represent the Class, and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action, and anticipate no difficulty in the management of this litigation as a class action.

49. This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

50. In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the

Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V. THE PLAN

51. "The Plan is a multiple employer defined contribution plan that was established in 2000 by [Salesforce] to provide benefits to eligible employees." Financial Statements and Supplemental Schedules (attached to 2018 Form 5500) ("Financial Statements") at 7. With regard to the two participating companies in the Plan, "Salesforce.com, Foundation" contributes 2.7% to the Plan while Salesforce contributes 97.3%. *See* Attachment to 2018 Form 5500, Multiple-Employer Plan Information.

52. "The purpose of the plan is to enable eligible Employees to save for retirement." SPD at 1.

53. The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

### *Eligibility*

54. In general, all employees are eligible to participate in the Plan. SPD at 4.

### *Contributions*

55. There are several types of contributions that can be added to a participant's account, including: an employee salary deferral contribution, employer paid bonuses, an employee after-tax contribution, catch-up contributions for employees aged 50 and over, rollover contributions, and employer matching contributions. SPD at 6. Additionally, Salesforce "may make discretionary

nonelective contributions in an amount to be determined by the Board of Directors for each Plan Year." *Id.*

56. With regard to employee contributions, the percentage a participant defers "is subject to an annual limit of the lesser of 50.00% of eligible compensation or $19,000 (in 2019)." *Id.* at 5.

57. "Discretionary matching contributions, if made, will be computed by [Salesforce] based on [the participant's] eligible compensation deferred into the Plan each Plan Year." *Id.* at 6.

58. "Prior to March 1, 2017, the Company matched the lesser of 50 percent of each eligible participant's contributions up to a maximum of 6 percent of eligible annual compensation or $4,000 per calendar year." Financial Statements at 7. "Effective March 1, 2017, the Company increased the amount in which a participant's contributions would be matched to 100 percent of each eligible participant's contributions up to the lesser of 6 percent of eligible annual compensation or $5,000 per calendar year." *Id.*

59. Like other companies that sponsor 401(k) plans for their employees, Salesforce enjoys both direct and indirect benefits by providing matching contributions to Plan participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

60. Salesforce also benefits in other ways from the Plan's matching program. It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

61. Given the size of the Plan, Salesforce likely enjoyed a significant tax and cost savings from offering a match.

*Vesting*

62. A participant is 100 percent vested at all times in their "Rollover Contributions, Employer Matching Contributions, After-Tax Contributions, Qualified Nonelective Contributions, Deferral Contributions and any earnings thereon." *Id.* at 8-9. Nonelective Contributions are vested in accordance with a sliding scale depending on years of service (between less than 1 and 5 years of service. *Id.* at 9. Those with less than a year of service have zero percent vested while those with 5 years of service have 100% vested. *Id.*

*The Plan's Investments*

63. Several funds were available to Plan participants for investment each year during the putative Class Period. As of December 31, 2018, the Plan held twenty-seven investment options which were all mutual funds. Plan participants also had access to additional investment options through a brokerage link. Financial Statements at 13.

64. The Plan's assets under management for all funds as of December 31, 2018 was $2,018,134,000 and $1,800,084,000 as of December 31, 2017. Financial Statements at 5.

## VI.   THE PLAN'S FEES DURING THE CLASS PERIOD WERE UNREASONABLE

### A. The Totality of Circumstances Demonstrate that the Plan Fiduciaries Failed to Administer the Plan in a Prudent Manner

65. As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

66. ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to

monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828.

67. Here, the Plan's fiduciaries ran the Plan in an imprudent manner as demonstrated by numerous factors.

### 1. The Expense Ratios of Plan Investments Were More Expensive than that of Comparable Investments

68. Investment options have a fee for investment management and other services. With regards to investments like mutual funds, like any other investor, retirement plan participants pay for these costs via the fund's expense ratio evidenced by a percentage of assets. For example, an expense ratio of .75% means that the plan participant will pay $7.50 annually for every $1,000 in assets. However, the expense ratio also reduces the participant's return and the compounding effect of that return. This is why it is prudent for a plan fiduciary to consider the effect that expense ratios have on investment returns because it is in the best interest of participants to do so.

69. Taking one year of the Class Period as an example, in 2018, almost half of the Plan's core investments (including all but one of the target date funds) were much more expensive than comparable investments found in similarly-sized plans (plans having over a billion dollars in assets). The expense ratios for these funds were in some cases up to ***135%*** (in the case of the Fidelity Contra Class K) above the median expense ratios in the same category. The high cost of the Plan's funds is also evident when comparing the Plan's funds to the average fees of funds in similarly-sized plans given that all the fund fees were considerably above the average fees: [7]

---

[7] *See* See BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2017 (August 2020) (hereafter, "ICI Study") available at https://www.ici.org/pdf/20_ppr_dcplan_profile_401k.pdf

| Fund | Expense Ratio[8] | ICI Category | ICI Median Fee[9] | ICI Avg. Fee[10] |
|---|---|---|---|---|
| JPMorgan SmartRetirement 2020 Institutional | 0.66 % | Target Date | 0.36% | .39% |
| JPMorgan SmartRetirement 2025 Institutional | 0.69% | Target Date | 0.36% | .39% |
| JPMorgan SmartRetirement 2030 Institutional | 0.70% | Target Date | 0.36% | .39% |
| JPMorgan SmartRetirement 2035 Institutional | 0.70% | Target Date | 0.36% | .39% |
| JPMorgan SmartRetirement 2040 Institutional | 0.71% | Target Date | 0.36% | .39% |
| JPMorgan SmartRetirement 2045 Institutional | 0.72% | Target Date | 0.36% | .39% |
| JPMorgan SmartRetirement 2050 Institutional | 0.71% | Target Date | 0.36% | .39% |
| JPMorgan SmartRetirement 2055 Institutional | 0.71% | Target Date | 0.36% | .39% |
| JPMorgan SmartRetirement Income Fund Institutional | 0.61% | Domestic Equity | 0.30% | .35% |
| Fidelity Contra Class K | 0.73% | Domestic Equity | 0.30% | .35% |
| Fidelity Diversified International Class K | 0.69% | International Equity | 0.50% | .48% |

---

[8]  The listed expense figures are from 2019.

[9]  The expense ratios are from 2017.  *See* ICI Study at 74.

[10]   The expense ratios are from 2017.  *See* ICI Study at 67.

70.     The above comparisons understate the excessiveness of fees in the Plan throughout the Class Period.  That is because both the ICI median and average fees are based on a study conducted in 2017 when expense ratios would have been higher than today given the downward trend of expense ratios the last few years. Accordingly, the median and average expense ratios utilized by similar plans in 2019 would be lower than indicated above, demonstrating a greater disparity between the 2019 expense ratios utilized in the above chart for the Plan's current funds and the median and average expense ratios in the same category.

71.     The above described price discrepancies remained true for each year of the Class Period.

## 2. Failure to Utilize Lower Fee Share Classes Cost Plan Participants

72.     Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors.  Generally, more expensive share classes are targeted at smaller investors with less bargaining power, while lower cost shares are targeted at institutional investors with more assets, generally $1 million or more, and therefore greater bargaining power.  There is no difference between share classes other than cost—the funds hold identical investments and have the same manager.

73.     Large defined contribution plans such as the Plan have sufficient assets to qualify for the lowest cost share class available.  Even when a plan does not yet meet the investment minimum to qualify for the cheapest available share class, it is well-known among institutional investors that mutual fund companies will typically waive those investment minimums for a large plan adding the fund in question to the plan as a designated investment alternative.  Simply put, a fiduciary to a large defined contribution plan such as the Plan can use its asset size and negotiating power to invest in the cheapest share class available.  For this reason, prudent retirement plan fiduciaries will search for and select the lowest-priced share class available.

74.     Indeed, recently a court observed that "[b]ecause the institutional share classes are otherwise *identical* to the Investor share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary. Thus, the 'manner that is reasonable and appropriate to the particular investment action, and strategies involved…in this case would mandate a prudent fiduciary – who indisputably has knowledge of institutional share classes and that such share classes provide identical investments at lower costs – to switch share classes immediately." *Tibble, et al. v. Edison Int. et al.*, No. 07-5359, 2017 WL 3523737, at * 13 (C.D. Cal. Aug. 16, 2017) (*Tibble III*).

75.     In several instances during the Class Period, Defendants failed to prudently monitor the Plan to determine whether the Plan was invested in the lowest-cost share class available for the Plan's mutual funds.

76.     In other words, given the size of the Plan, Defendants made investments with higher costs (higher expense ratios) available to participants while the same investments with lower costs (lower expense ratios) were available to the detriment of the compounding returns that participants should have received.  This reduces the likelihood that participants achieve their preferred lifestyle in retirement.

77.     Defendants' decision cost the Plan and its participants close to $10 million  in damages measured in simple share cost alone from 2014 to 2018.

78.     The chart below uses 2019 expense ratios to demonstrate how much more expensive (difference between the lower expense ratio of the "I-Class" shares, and that of the share class of the fund in the Plan, as a percentage of the lower expense ratio) the funds were than their identical counterparts:

| Fund in Plan | 2019 Exp Ratio | Lower Cost Share Class | 2019 Exp. Ratio | % Fee Excess |
|---|---|---|---|---|
| JPMorgan SmartRetirement 2020 Institutional | 0.66 % | JPMorgan Smart Retirement 2020 R6 | 0.45% | 47% |
| | | JPMorgan Smart Retirement 2020 R5 | 0.55% | 20% |
| JPMorgan SmartRetirement 2025 Institutional | 0.69% | JPMorgan Smart Retirement 2025 R6 | 0.47% | 47% |
| | | JPMorgan Smart Retirement 2025 R5 | 0.57% | 21% |
| JPMorgan SmartRetirement 2030 Institutional | 0.70% | JPMorgan Smart Retirement 2030 R6 | 0.48% | 46% |
| | | JPMorgan Smart Retirement 2030 R5 | 0.58% | 21% |
| JPMorgan SmartRetirement 2035 Institutional | 0.70% | JPMorgan Smart Retirement 2035 R6 | 0.48% | 46% |
| | | JPMorgan Smart Retirement 2035 R5 | 0.58% | 21% |
| JPMorgan SmartRetirement 2040 Institutional | 0.71% | JPMorgan Smart Retirement 2040 R6 | 0.48% | 48% |
| | | JPMorgan Smart Retirement 2040 R5 | 0.59% | 20% |
| JPMorgan SmartRetirement 2045 Institutional | 0.72% | JPMorgan Smart Retirement 2045 R6 | 0.50% | 44% |
| | | JPMorgan Smart Retirement 2045 R5 | 0.60% | 20% |
| JPMorgan SmartRetirement 2050 Institutional | 0.71% | JPMorgan Smart Retirement 2050 R6 | 0.49% | 45% |
| | | JPMorgan Smart Retirement 2050 R5 | 0.59% | 20% |
| JPMorgan SmartRetirement 2055 Institutional | 0.71% | JPMorgan Smart Retirement 2055 R6 | 0.49% | 45% |
| | | JPMorgan Smart Retirement 2055 R5 | 0.59% | 20% |
| JPMorgan SmartRetirement Income Fund | 0.61% | JPMorgan Smart Retirement Income Fund R6 | 0.42% | 45% |

| Institutional | | JPMorgan Smart Retirement Income Fund R5 | 0.52% | 17% |
|---|---|---|---|---|
| Fidelity Contra Class K | 0.73% | Fidelity Contra Commingled Pool | 0.43% | 70% |
| Fidelity Diversified International Class K | 0.69% | Fidelity Diversified International Commingled Pool | 0.58% | 19% |

79.    During the Class Period, the lower-cost share classes had higher returns than their higher-cost counterparts:

| Funds | Average Annual Return | | | |
|---|---|---|---|---|
| | 1 | 3 | 5 | 10 |
| JPMorgan SmartRetirement 2020 Institutional | 5.11% | 6.31% | 5.36% | 7.62% |
| JPMorgan Smart Retirement 2020 R5 | 5.22% | 6.42% | 5.48% | 7.76% |
| JPMorgan Smart Retirement 2020 R6 | 5.33% | 6.71% | na | na |
| JPMorgan SmartRetirement 2025 Institutional | 4.68% | 7.13% | 5.88% | 8.28% |
| JPMorgan Smart Retirement 2025 R5 | 4.80% | 7.25% | 6.00% | 8.43% |
| JPMorgan Smart Retirement 2025 R6 | 5.85% | 7.36% | na | na |
| JPMorgan SmartRetirement 2030 Institutional | 4.08% | 7.98% | 6.29% | 8.79% |
| JPMorgan Smart Retirement 2030 R5 | 4.15% | 8.10% | 6.42% | 8.94% |
| JPMorgan Smart Retirement 2030 R6 | 4.30% | 8.21% | na | na |
| JPMorgan SmartRetirement 2035 Institutional | 2.87% | 8.15% | 6.39% | 9.08% |
| JPMorgan Smart Retirement 2035 R5 | 2.99% | 8.28% | 6.52% | 9.23% |
| JPMorgan Smart Retirement 2035 R6 | 3.04% | 8.39% | na | na |
| JPMorgan SmartRetirement 2040 Institutional | 2.22% | 8.58% | 6.62% | 9.30% |
| JPMorgan Smart Retirement 2040 R5 | 2.39% | 8.72% | 6.76% | 9.45% |
| JPMorgan Smart Retirement 2040 R6 | 3.04% | na | na | na |
| JPMorgan SmartRetirement 2045 Institutional | 2.01% | 8.61% | 6.66% | 9.29% |
| JPMorgan Smart Retirement 2045 R5 | 2.13% | 8.75% | 6.78% | 9.44% |
| JPMorgan Smart Retirement 2045 R6 | 2.24% | 8.86% | na | na |
| JPMorgan SmartRetirement 2050 Institutional | 2.01% | 8.60% | 6.66% | 9.30% |
| JPMorgan Smart Retirement 2050 R5 | 2.09% | 8.73% | 6.78% | 9.54% |
| JPMorgan Smart Retirement 2050 R6 | 2.23% | 8.84% | na | na |

| | | | | |
|---|---|---|---|---|
| JPMorgan SmartRetirement 2055 Institutional | 2.07% | 8.60% | 6.66% | 9.22% |
| JPMorgan Smart Retirement 2055 R5 | 2.19% | 8.74% | 6.79% | 9.37% |
| JPMorgan Smart Retirement 2055 R6 | 2.29% | 8.84% | na | na |
| JPMorgan SmartRetirement Income Fund Institutional | 5.49% | 5.34% | 4.45% | 5.82% |
| JPMorgan Smart Retirement Income Fund R5 | 5.58% | 5.42% | 4.55% | 5.96% |
| JPMorgan Smart Retirement Income Fund R6 | 5.69% | 5.53% | na | na |

80. Defendants knew or should have known of the existence of cheaper share classes and therefore also should have immediately identified the prudence of transferring the Plan's funds into these alternative investments. They failed to choose or switch to the R5 share classes from 2014 to 2018 and again failed to choose or switch to the R6 share classes from 2015 to 2018.

81. Given the discrepancy in prices of the share classes to the tune of nearly **$10 million** there was no benefit to choosing a more expensive share class. Due to compounding interest, Plan participants were even worse of over time than just losing $10 million.

82. Moreover, because the more expensive share classes chosen by Defendants were the same in every respect other than price to their less expensive counterparts, the more expensive share class funds ***could not have*** (1) a potential for higher return, (2) lower financial risk, (3) more services offered, (4) or greater management flexibility. *See Tibble*, 729 F.3d 1110, at 1134 (9th Cir. 2013).

83. Qualifying for lower share classes usually requires only a minimum of a million dollars for individual funds, although the initial investment minimum generally is waived for financial intermediaries and retirement plans. *See, e.g., Davis et al. v.* Washington *Univ. et al.*, 960 F.3d 478, 483 (8th Cir. 2020) ("minimum investment requirements are 'routinely waived' for individual investors in large retirement-savings plans"); *Sweda v. Univ. of Pennsylvania,* 923 F.3d 320, 329 (3d Cir. 2019) (citing *Tibble II*, 729 F.3d at 1137 n.24) (confirming that investment

minimums are typically waived for large plans).

84.    The following is a sampling of the assets under management as of the end of 2018:

| Fund in Plan | 2018 Assets Under Management |
|---|---|
| JPMorgan SmartRetirement 2020 Institutional | $20, 959,000 |
| JPMorgan SmartRetirement 2025 Institutional | $56,841,000 |
| JPMorgan SmartRetirement 2030 Institutional | $105,720,000 |
| JPMorgan SmartRetirement 2035 Institutional | $149,758,000 |
| JPMorgan SmartRetirement 2040 Institutional | $182,232,000 |
| JPMorgan SmartRetirement 2045 Institutional | $191,127,000 |
| JPMorgan SmartRetirement 2050 Institutional | $183,385,000 |
| JPMorgan SmartRetirement 2055 Institutional | $104,786,000 |
| JPMorgan SmartRetirement Income Fund Institutional | $12,382,000 |
| Fidelity Contra Class K | $159,651,000 |
| Fidelity Diversified International Class K | $38,195,000 |

85.    All of the lower share class alternatives were available during the Class Period:

| Fund | Inception Date |
| --- | --- |
| JPM SR 2020 R5 | May 15, 2006 |
| JPM SR 2020 R6 | November 3, 2014 |
| | |
| JPM SR 2025 R5 | May 15, 2006 |
| JPM SR 2025 R6 | July 2, 2012 |
| | |
| JPM SR 2030 R5 | May 15, 2006 |
| JPM SR 2030 R6 | July 2, 2012 |
| | |
| JPM SR 2035 R5 | May 15, 2006 |
| JPM SR 2035 R6 | November 3, 2014 |
| | |
| JPM SR 2040 R5 | May 15, 2006 |
| JPM SR 2040 R6 | November 3, 2014 |
| | |
| JPM SR 2045 R5 | July 31, 2007 |
| JPM SR 2045 R6 | November 3, 2014 |
| | |
| JPM SR 2050 R5 | July 31, 2007 |
| JPM SR 2050 R6 | November 3, 2014 |
| | |
| JPM SR 2055 R5 | January 31, 2012 |
| JPM SR 2055 R6 | November 3, 2014 |
| | |
| JPM SR Income R5 | May 15, 2006 |
| JPM SR Income R6 | November 3, 2014 |

86.     A prudent fiduciary conducting an impartial review of the Plan's investments would have identified the cheaper share classes available and transferred the Plan's investments, including the above-referenced funds, into the lower share classes at the earliest opportunity.

87.     Failure to utilize lower share classes during the Class Period violates long-standing DOL guidance which has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices." *See,* "*A Look at 401(k) Plan Fees,*" *supra*, at n.3.

88.     Also, failure to utilize lower share classes violates the Restatement of Trusts, which puts cost-conscious management above all else while administering a retirement plan. "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (en banc) (quoting Restatement (Third) of Trusts, § 90, cmt. B.

89.     Defendants failed in their fiduciary duties either because they did not negotiate aggressively enough with their service providers to obtain better pricing or they were asleep at the wheel and were not paying attention.   Either reason is inexcusable.

### 3.     The Plan's Fiduciaries Failed to Adequately Consider Passively managed fund alternatives

90.     While higher-cost mutual funds may outperform a less-expensive option, such as a passively-managed index fund, over the short term, they rarely do so over a longer term.[11]

---

[11] *See* Jonnelle Marte, *Do Any Mutual Funds Ever Beat the Market? Hardly*, The Washington                Post,                available                at

- 25 -
FIRST AMENDED CLASS ACTION COMPLAINT

91.    Indeed, funds with high fees on average perform worse than less expensive funds, even on a pre-fee basis.[12]

92.    The majority of U.S. equity funds did not outperform their index counterparts in the five years ending June 30, 2019.

| Fund Category | Comparison Index | Percentage of Funds That Underperformed Their Benchmark 5 Yr (%) |
|---|---|---|
| Large-Cap | S&P 500 | 78.52 |
| Mid-Cap | S&P MidCap 400 | 63.56 |
| Small-Cap | S&P SmallCap 600 | 75.09 |
| Multi-Cap | S&P Composite 1500 | 82.79 |
| Domestic Equity | S&P Composite 1500 | 81.66 |
| Large-Cap Value | S&P Value | 84.74 |
| Mid-Cap Value | S&P MidCap 400 Value | 92.31 |

https://www.washingtonpost.com/news/getthere/wp/2015/03/17/do-any-mutual-funds-ever-beat-the-market-hardly/ (citing a study by S&P Dow Jones Indices which looked at 2,862 actively managed mutual funds, focused on the top quartile in performance and found most did not replicate performance from year to year); *see also Index funds trounce actively managed funds: Study*, available at http://www.cnbc.com/2015/06/26/index-funds-trounce-actively-managed-funds-study.html ("long-term data suggests that actively managed funds "lagged their passive                                                                counterparts across nearly all asset classes, especially over the 10-year period from 2004 to 2014.")

[12] Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. Econ. Behav. & Org. 871, 873 (2009) (hereinafter "*When Cheaper is Better*"); *see also* Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. Pa. L. Rev. 1961, 1967-75 (2010) (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio")

93. Digging deeper, other statistics bear out the vast underperformance of actively managed funds over passively managed funds over different stretches of 5 to 10 year periods beginning in 2008.

94. 77.97% of large-cap mutual fund managers and 73.21% of institutional accounts underperformed the S&P 500® on a gross-of-fees basis over the 10 year horizon between 2008 and 2018.[13]

95. The following chart denotes Domestic Equity-Percentage of Managers Underperforming over ten years as of December 31, 2018.[14]

| Category | Benchmark | Mutual Funds (%) Net/ Gross of Fees |
|---|---|---|
| All Domestic | S&P Comp 1500 | 84.49/75.58 |
| All L/C | S&P 500 | 85.14/ 77.97 |
| All M/C | S&P M/C 400 | 88.03/ 76.25 |
| All S/C | S&P S/C 600 | 85.67/ 76.01 |
| All Multi/C | S&P Comp 1500 | 86.36/ 77.90 |

96. It is the same story looking at different five-year intervals over the last decade. In 2015, over 76.23% of mutual fund managers and 85.81% of institutional accounts in the large-cap equity space underperformed the S&P 500®. In the mid-cap space, 65.81% of mutual funds and 64.71% of institutional accounts underperformed the S&P MidCap 400®. In the small-cap space, over 80% of managers on both fronts underperformed the S&P SmallCap 600®. The findings in the small-cap space dispel the myth that small-cap equity is an inefficient asset class that is best accessed via active management.

---

[13] *See* SPIVA® Institutional Scorecard– How Much Do Fees Affect the Active Versus Passive Debate?, September 18th, 2019 p. 1.

[14] Data obtained from SPIVA® Institutional Scorecard– How Much Do Fees Affect the Active Versus Passive Debate?, September 18th, 2019, Exhibit 2, p.6

97. The following chart denotes Domestic Equity-Percentage of Managers Underperforming over five years as of December 31, 2015.[15]

| Category | Benchmark | Mutual Funds (%) Net of Fees | Mutual Funds % Gross of Fees | Inst. Accts % |
|---|---|---|---|---|
| All Domestic | S&P Comp 1500 | 88.43 | 79.85 | 85.00 |
| All L/C | S&P 500 | 84.13 | 76.23 | 85.51 |
| All M/C | S&P M/C 400 | 76.69 | 65.81 | 64.71 |
| All S/C | S&P S/C 600 | 90.13 | 81.11 | 81.82 |
| All Multi/C | S&P Comp 1500 | 88.56 | 79.67 | 83.20 |

98. In 2016, in the large-cap equity space, 84.60% of mutual fund managers and 79.58% of institutional accounts underperformed the S&P 500® on a net-of-fees basis. When measured on a gross-of-fees basis, 68.16% of large-cap mutual funds and 69.20% of institutional accounts underperformed.

99. Similarly, in the mid-cap space, 96.03% (86.24%) of mutual funds and 92.02% (82.51%) of institutional accounts underperformed the S&P MidCap 400® on a net (gross) basis. In the small-cap space, over 80% of managers on both fronts underperformed the S&P SmallCap 600®, regardless of fees.

100. The following chart denotes Domestic Equity-Percentage of Managers Underperforming over five years as of December 31, 2016.[16]

---

[15] Data obtained from SPIVA® Institutional Scorecard– How Much Do Fees Affect the Active Versus Passive Debate?, July 31st, 2016, Exhibit 2, p.5.
[16] Data obtained from SPIVA® Institutional Scorecard– How Much Do Fees Affect the Active Versus Passive Debate?, August 8th, 2017, Exhibit 2, p.5

| Category | Benchmark | Mutual Funds (%) Net of Fees | Mutual Funds % Gross of Fees | Inst. Accts % N/G |
|---|---|---|---|---|
| All Domestic | S&P Comp 1500 | 82.87 | 67.11 | 76.31/65.52 |
| All L/C | S&P 500 | 84.60 | 68.16 | 79.58/69.20 |
| All M/C | S&P M/C 400 | 96.03 | 86.24 | 92.02/82.51 |
| All S/C | S&P S/C 600 | 95.64 | 81.40 | 90.61/78.91 |
| All Multi/C | S&P Comp 1500 | 89.31 | 77.67 | 81.31/70.33 |

101.  In 2017, the majority of equity managers in 15 out of 17 categories underperformed their respective benchmarks over the 10-year horizon, gross-of-fees.[17]  In the preceding ten years in the large-cap equity space, 89.51% of mutual fund managers and 73.61% of institutional accounts lagged the S&P 500® on a net-of-fees basis. When measured on a gross-of-fees basis, 71.97% of large-cap mutual funds and 62.88% of institutional accounts underperformed.  Over 80% of mutual funds underperformed the S&P SmallCap 600® (net- and gross-of-fees) over the last decade, while 86.80% (72.92%) of institutional accounts underperformed on a net (gross) basis.

102.  The following chart denotes Domestic Equity-Percentage of Managers Underperforming over ten years as of December 31, 2017.[18]

| Category | Benchmark | Mutual Funds (%) Net of Fees | Mutual Funds % Gross of Fees | Inst. Accts % N/G |
|---|---|---|---|---|
| All Domestic | S&P Comp 1500 | 86.65 | 71.20 | 71.11/ 59.88 |
| All L/C | S&P 500 | 89.51 | 71.97 | 73.61/ 62.88 |
| All /C | S&P M/C 400 | 96.48 | 85.37 | 85.16/ 77.01 |

[17] *See* SPIVA® Institutional Scorecard– How Much Do Fees Affect the Active Versus Passive Debate?, January 8th, 2019, p. 1.

[18] Data obtained from SPIVA® Institutional Scorecard– How Much Do Fees Affect the Active Versus Passive Debate?, January 8th, 2019, Exhibit 2, p.5.

| | | | | |
|---|---|---|---|---|
| All S/C | S&P S/C 600 | 95.71 | 82.00 | 86.80/ 72.92 |
| All Multi/C | S&P Comp 1500 | 90.70 | 78.77 | 79.00/ 68.59 |

103.   Undeniably, fees play a major role in the active versus passive debate. After subtracting fees, returns from active management tend to be less than those from passive management, as the latter costs less.[19]

104.   Vanguard's white paper on investment management fees, "Vanguard's Principles for Investing Success," talks about the importance of minimizing costs. Importantly, "[m]arkets are unpredictable.  Costs are forever." *Id.* at 17.[20]  Vanguard lays out four bullet points all investors must keep in mind: higher costs can significantly depress a portfolio's growth over long periods; costs create an inevitable gap between what the markets return and what investors actually earn – but keeping expenses down can help narrow that gap; lower-cost mutual funds have tended to perform better than higher-cost funds over time; and indexed investments can be a useful tool for cost control. *Id.*

105.   The Plan fiduciaries' clear bias in favor of selecting actively managed funds instead of constructing a balanced Plan investment menu – or even one weighted in favor of passively managed funds - reveals the fiduciary's belief that they could outperform what most active managers cannot and what passively managed funds do on a consistent basis.  The Defendants' actions in overwhelmingly favoring actively managed funds, plausibly show that they failed to consider the pros and cons of offering actively managed investments vs. passively managed investments.

---

[19] Sharpe, William F., "The Arithmetic of Active Management" Financial Analysts Journal, January/February 1991, Volume 47 Issue 1. "Properly measured, the average actively managed dollar must underperform the average passively managed dollar, net of costs."

[20] Available at https://about.vanguard.com/what-sets-vanguard-apart/principles-for-investing-success/

106. Indeed, JPMorgan offered a target date blend series that had some passive funds underlying it and had an overall lower cost structure than the purely actively managed SmartRetirement counterparts:

| Fund in Plan | 2019 Exp Ratio | Lower Cost Passive Blend | 2019 Exp. Ratio | % Fee Excess |
|---|---|---|---|---|
| JPMorgan SmartRetirement 2020 Institutional | 0.66 % | JPMorgan Smart Retirement Bl 2020 Inst. | 0.54% | 22% |
| | | JPMorgan Smart Retirement Bl 2020 R6 | 0.29% | 128% |
| | | JPMorgan Smart Retirement Bl 2020 R5 | na | |
| JPMorgan SmartRetirement 2025 Institutional | 0.69% | JPMorgan Smart Retirement Bl 2025 Inst. | 0.54% | 28% |
| | | JPMorgan Smart Retirement Bl 2025 R6 | 0.29% | 137% |
| | | JPMorgan Smart Retirement Bl 2025 R5 | 0.39% | 77% |
| JPMorgan SmartRetirement 2030 Institutional | 0.70% | JPMorgan Smart Retirement Bl 2030 Inst. | 0.54% | 30% |
| | | JPMorgan Smart Retirement Bl 2030 R6 | 0.29% | 141% |
| | | JPMorgan Smart Retirement Bl 2030 R5 | 0.39% | 79% |
| JPMorgan SmartRetirement 2035 Institutional | 0.70% | JPMorgan Smart Retirement Bl 2035 Inst. | 0.54% | 30% |
| | | JPMorgan Smart Retirement Bl 2035 R6 | 0.29% | 141% |
| | | JPMorgan Smart Retirement Bl 2035 R5 | 0.39% | 79% |
| JPMorgan SmartRetirement 2040 | 0.71% | JPMorgan Smart Retirement Bl 2040 Inst. | 0.54% | 30% |
| | | JPMorgan Smart Retirement Bl 2040 R6 | 0.29% | 145% |

| | | | | |
|---|---|---|---|---|
| Institutional | | JPMorgan Smart Retirement Bl 2040 R5 | 0.39% | 82% |
| JPMorgan SmartRetirement 2045 Institutional | 0.72% | JPMorgan Smart Retirement Bl 2045 Inst. | 0.54% | 33% |
| | | JPMorgan Smart Retirement Bl 2045 R6 | 0.29% | 148% |
| | | JPMorgan Smart Retirement Bl 2045 R5 | 0.39% | 85% |
| JPMorgan SmartRetirement 2050 Institutional | 0.71% | JPMorgan Smart Retirement Bl 2050 Inst. | 0.54% | 31% |
| | | JPMorgan Smart Retirement Bl 2050 R6 | 0.29% | 145% |
| | | JPMorgan Smart Retirement Bl 2050 R5 | 0.39% | 82% |
| JPMorgan SmartRetirement 2055 Institutional | 0.71% | JPMorgan Smart Retirement Bl 2055 Inst. | 0.54% | 31% |
| | | JPMorgan Smart Retirement Bl 2055 R6 | 0.29% | 14% |
| | | JPMorgan Smart Retirement Bl 2055 R5 | 0.39% | 82% |
| JPMorgan SmartRetirement Income Fund Institutional | 0.61% | JPMorgan Smart Retirement Bl 2020 Inst. | Na | - |
| | | JPMorgan Smart Retirement Bl Income Fund R6 | Na | - |
| | | JPMorgan Smart Retirement Bl Income Fund R5 | Na | - |

107. In addition to having a lower cost structure than the purely actively managed funds, the blended funds also had higher returns than the actively managed funds:

| Funds | Average Annual Return | | | |
|---|---|---|---|---|
| | 1 | 3 | 5 | 10 |
| JPMorgan SmartRetirement 2020 Institutional | 5.11% | 6.31% | 5.36% | 7.62% |
| JPMorgan Smart Retirement Bl 2020 R6 | 5.66% | 6.44% | 5.61% | na |
| JPMorgan SmartRetirement 2025 Institutional | 4.68% | 7.13% | 5.88% | 8.28% |
| JPMorgan Smart Retirement Bl 2025 R6 | 5.01% | 7.25% | 6.14% | na |
| JPMorgan SmartRetirement 2030 Institutional | 4.08% | 7.98% | 6.29% | 8.79% |
| JPMorgan Smart Retirement Bl 2030 R6 | 4.29% | 7.96% | 6.57% | na |
| JPMorgan SmartRetirement 2035 Institutional | 2.87% | 8.15% | 6.39% | 9.08% |
| JPMorgan Smart Retirement Bl 2035 R6 | 3.72% | 8.43% | 6.87% | na |
| JPMorgan SmartRetirement 2040 Institutional | 2.22% | 8.58% | 6.62% | 9.30% |
| JPMorgan Smart Retirement Bl 2040 R6 | 3.25% | 8.91% | 7.17% | na |
| JPMorgan SmartRetirement 2045 Institutional | 2.01% | 8.61% | 6.66% | 9.29% |
| JPMorgan Smart Retirement Bl 2045 R6 | 2.99% | 8.93% | 7.18% | na |
| JPMorgan SmartRetirement 2050 Institutional | 2.01% | 8.60% | 6.66% | 9.30% |
| JPMorgan Smart Retirement Bl 2050 R6 | 3.02% | 8.95% | 7.18% | na |
| JPMorgan SmartRetirement 2055 Institutional | 2.07% | 8.60% | 6.66% | 9.22% |
| JPMorgan Smart Retirement Bl 2055 R6 | 3.03% | 8.90% | 7.20% | na |
| JPMorgan SmartRetirement Income Fund Institutional | 5.49% | 5.34% | 4.45% | 5.82% |
| JPMorgan Smart Retirement Bl Income Fund R6 | 5.77% | 5.48% | 4.71% | na |

108.  Defendants should have given due consideration to switching to the above JPMorgan blended funds given their lower fees and higher performance net of fess compared to their fully actively managed counterparts, which were also managed

by JPMorgan and had materially similar underlying securities. Defendants failed in their duty to consider these funds to replace the actively managed funds in the Plan costing the Plan and its participants millions of dollars.

### 4. Defendants Failed to Timely Investigate Availability of Lower Cost Collective Trusts

109. Plan fiduciaries such as Defendants here must be continually mindful of investment options to ensure they do not unduly risk plan participants' savings and do not charge unreasonable fees. Some of the best investment vehicles for these goals are collective trusts (also referred to as CITs), which pool plan participants' investments further and provide lower fee alternatives to even institutional shares of mutual funds.[21]

110. Indeed, fiduciary best practices requires that fiduciaries inquire as to the availability of lower-cost investment alternatives like collective trusts. "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[22] The use of collective trusts is also endorsed under trust law from which ERISA is derived. *Tibble*, 135 S. Ct. at 1828. Trust law states to determine whether a fiduciary has selected appropriate funds for the trust, appropriate comparators may include "return rates of one or more **suitable common trust funds**, or suitable index mutual funds or market indexes (with such adjustments as may be appropriate)." Restatement (Third) of Trusts § 100 cmt. b(1) (emphasis added).

---

[21] Collective trusts are administered by banks or trust companies, which assemble a mix of assets such as stocks, bonds and cash. Regulated by the Office of the Comptroller of the Currency rather than the Securities and Exchange Commission, collective trusts have simple disclosure requirements, and cannot advertise or issue formal prospectuses. As a result, their costs are much lower, with lower or no administrative costs, and lower or no marketing or advertising costs. *See* Powell, Robert, "Not Your Normal Nest Egg," The Wall Street Journal, March 2013, available at http://www.wsj.com/articles/SB10001424127887324296604578177291881550144.

[22] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain=false.

111. The Plan's own investment policy gave the Committee great latitude in selecting investment fund types, including "collective investment trusts." *Id.* at 8.

112. Given all these factors, the fiduciaries' decision to switch the Plan's JPMorgan target date funds in 2019 to JPMorgan target date CITs was an unjustified delay that cost Plan participants millions of dollars. As demonstrated below, the JPMorgan target date funds were available prior to the start of the Class Period, had a lower net expense ratio than the mutual funds, and had better annual returns:

| Plan Fund | Incep Date | Net Exp Ratio% | Av Annual Ret % 1/3/5/10 |
|---|---|---|---|
| JPM SR 2020 Inst | 5/15/06 | .66% | 5.11%/6.31%/5.36%/7.62% |
| **JPMCB SR Pas Bl 2020 CF** | **12/31/10** | **.25%** | **5.28%/6.38%/5.75%** |
| JPM SR 2025 Inst | 5/15/06 | .69% | 4.68%/7.13%/5.88%/8.28% |
| **JPMCB SR Pas Bl 2025 CF** | **12/31/10** | **.25%** | **4.79%/7.14%/6.26%** |
| JPM SR 2030 Inst | 5/15/06 | .70% | 4.08%/7.98%/6.29%/8.79% |
| **JPMCB SR Pas Bl 2030 CF** | **12/31/10** | **.25%** | **4.11%/7.86%/6.70%** |
| JPM SR 2035 Inst | 5/15/06 | .70% | 2.87%/8.15%/6.39%/9.08% |
| **JPMCB SR Pas Bl 2035 CF** | **12/31/10** | **.25%** | **3.64%/8.36%/6.98%** |
| JPM SR 2040 Inst | 5/15/06 | .71% | 2.22%/8.58%/6.62%/9.30% |
| **JPMCB SR Pas Bl 2040 CF** | **12/31/10** | **.25%** | **3.01%/8.82/7.24%** |
| JPM SR 2045 Inst | 7/31/07 | .72% | 2.01%/8.61%/6.66%/9.29% |
| **JPMCB SR Pas Bl 2045 CF** | **12/31/10** | **.25%** | **2.80%/8.84%/7.24%** |
| JPM SR 2050 Inst | 7/31/07 | .71% | 2.01%/8.60%/6.66%/9.30% |
| **JPMCB SR Pas Bl 2050 CF** | **12/31/10** | **.25%** | **2.84%/8.89%/7.28%** |
| JPM SR 2055 Inst | 1/31/12 | .71% | 2.07%/8.60%/6.66%/9.22% |
| **JPMCB SR Pas Bl 2055 CF** | **2/8/13** | **.26%** | **2.84%/8.82%/7.23%** |
| JPM SR Income Inst | 5/15/06 | .61% | 5.49%/5.34%/4.45%/5.82% |
| **JPMCB SR Pas Bl Inc CF** | **12/31/10** | **.26%** | **5.69%/5.46%/4.84%** |

113. The collective trusts had the same underlying investments and asset allocations as their mutual fund counterparts. Defendants' failure to investigate the availability of the lower cost JPMorgan collective trusts during the Class Period cost the Plan and its participants millions of dollars and is further evidence of their

breaches of fiduciary duty.

### 5. Defendants failed to Adhere to the Plan's Own Investment Policy

114. The Plan's Investment Policy states "[t]he Committee will select investment options that are liquid, diversified, and cost efficient." Investment Policy at 8.

115. With respect to cost efficiency, the Committee utterly failed to select the most prudent investments for the Plan based on several criteria under the Modern Portfolio Theory.

116. Modern trust law applies the "Modern Portfolio Theory" in evaluating a trustee's or fiduciary's investment choices and overall strategy. UPIA § 2(b) (Unif. Law Comm'n 1995); Restatement (Third) of Trusts § 90(a) (2007) ("This standard requires the exercise of reasonable care, skill, and caution, and is to be applied to investments not in isolation but in the context of the trust portfolio and as a part of an overall investment strategy, which should incorporate risk and return objectives reasonably suitable to the trust."). *See Birse v. CenturyLink, Inc.*,2019 WL 9467530, * 5 (D. Col. Oct. 23, 2019).

117. Some of the metrics used to evaluate investments under the Modern Portfolio Theory are as follows:

- Returns - Absolute, relative to its peers, and against its respective benchmark.
- Beta - A measure of a fund's sensitivity to market movements.
- Standard Deviation - This statistical measurement of dispersion about an average, depicts how widely a mutual fund's returns varied over a certain period of time. Investors use the standard deviation of historical performance to try to predict the range of returns that are most likely for a given fund. When a fund has a high standard deviation, the predicted range of performance is wide, implying greater volatility.

- R squared - R-squared measures the relationship between a portfolio and its benchmark. It is simply a measure of the correlation of the portfolio's returns to the benchmark's returns

- Sharpe Ratio - It is calculated by using standard deviation and excess return to determine reward per unit of risk. The higher the Sharpe ratio, the better the fund's historical risk-adjusted performance.

- Upside/Downside Capture Ratio - Upside/downside capture ratio show you whether a given fund has outperformed--gained more or lost less than--a broad market benchmark during periods of market strength and weakness, and if so, by how much.

- Information Ratio - A ratio of portfolio returns in excess of the returns of a benchmark (usually an index) to the volatility of those returns. Similar to Sharpe Ratio. The information ratio (IR) measures a portfolio manager's ability to generate excess returns relative to a benchmark, but also attempts to identify the consistency of the portfolio manager. [23]

118. According to a recent article, among the top ten modern portfolio criteria used in selecting core fund line-ups are:[24]

- Performance v. benchmarks
- Total performance (5-yr return)
- Fee structure for plan
- Alpha, beta and standard deviations
- Upside/Downside capture ratio
- Sharpe ratio

---

[23] The definition of these terms are available at https://www.morningstar.com/InvGlossary
[24] *See* 2020 Pladadviser Retirement Plan Adviser Survey, available at *https://www.planadviser.com/research/2020-planadviser-retirement-plan-adviser-survey/?pagesec=2*

119. The following 5-Year Risk/Return Statistics as of third quarter 2019 demonstrate that the JPMorgan institutional funds in the Plan lagged behind the identical lower-cost share funds as well as other materially similar funds in criteria used by investment fiduciaries to evaluate investments:

| Fund | Return | S/D | S/R | I/R | Beta | Up/down Capture | R2 |
|---|---|---|---|---|---|---|---|
| JPM SR 2020 I | 5.36 | 6.10 | 0.71 | -0.29 | 0.97 | 95.27/96.39 | 96.57 |
| JPM SR 2020 R5 | 5.48 | 6.10 | 0.73 | -0.20 | 0.97 | 96.02/95.88 | 96.71 |
| JPM SR BL 2020 R6 | 5.61 | 5.90 | 0.78 | -0.08 | 0.97 | 95.07/91.85 | 97.13 |
| JPMCB SR Pas Bl 2020 CF | 5.75 | 5.91 | 0.80 | 0.06 | 0.94 | 95.55/90.28 | 97.35 |
| FIAM Bl TD 2020 Q | 6.00 | 7.00 | 0.71 | 0.24 | 1.11 | 111.02/116.47 | 97.86 |
| Fid Free Ind 2020 Inv | 5.96 | 6.57 | 0.75 | 0.39 | 1.05 | 105.77/106.95 | 99.21 |
| Van Tar Ret 2020 Inv | 5.97 | 6.40 | 0.77 | 0.47 | 1.03 | 103.14/101.67 | 99.27 |
| S&P TD 2020 | 5.70 | 6.21 | 0.75 | | | | |
| JPM SR 2025 I | 5.88 | 7.26 | 0.67 | -0.18 | 1.00 | 98.49/100.31 | 97.25 |
| JPM SR 2025 R5 | 6.00 | 7.27 | 0.69 | -0.08 | 1.00 | 99.27/99.97 | 97.33 |
| JPM SR BL 2025 R6 | 6.14 | 7.06 | 0.73 | 0.05 | 0.98 | 98.68/96.92 | 98.20 |
| JPMCB SR Pas Bl 2025 CF | 6.26 | 7.05 | 0.74 | 0.16 | 0.98 | 98.41/94.78 | 98.12 |
| FIAM Bl TD 2025 Q | 6.31 | 7.78 | 0.68 | 0.17 | 1.07 | 107.37/110.72 | 97.88 |
| Fid Free Ind 2025 Inv | 6.31 | 7.32 | 0.72 | 0.32 | 1.02 | 102.47/101.69 | 99.26 |
| Van Tar Ret 2025 Inv | 6.39 | 7.36 | 0.73 | 0.45 | 1.02 | 103.10/101.68 | 99.28 |
| S&P TD 2025 | 6.10 | 7.16 | 0.71 | | | | |
| JPM SR 2030 I | 6.29 | 8.49 | 0.62 | -0.13 | 1.03 | 101.39/104.66 | 97.31 |
| JPM SR 2030 R5 | 6.42 | 8.48 | 0.64 | -0.04 | 1.03 | 101.58/103.42 | 97.32 |
| JPM SR BL 2030 R6 | 6.57 | 8.13 | 0.68 | 0.10 | 0.99 | 99.96/98.77 | 98.56 |
| JPMCB SR Pas Bl 2030 CF | 6.70 | 8.14 | 0.70 | 0.22 | 1.00 | 99.91/97.10 | 98.41 |
| FIAM Bl TD 2030 Q | 6.97 | 9.21 | 0.65 | 0.28 | 1.12 | 112.09/115.55 | 97.47 |
| Fid Free Ind 2030 Inv | 7.03 | 8.79 | 0.68 | 0.51 | 1.08 | 108.33/108.17 | 99.00 |
| Van Tar Ret 2030 Inv | 6.67 | 8.22 | 0.69 | 0.26 | 1.01 | 101.23/99.90 | 99.21 |
| S&P TD 2030 | 6.48 | 8.12 | 0.67 | | | | |
| JPM SR 2035 I | 6.39 | 9.34 | 0.57 | -0.29 | 1.02 | 100.20/104.95 | 97.58 |
| JPM SR 2035 R5 | 6.52 | 9.35 | 0.59 | -0.20 | 1.03 | 100.91/104.76 | 97.59 |
| JPM SR BL 2035 R6 | 6.87 | 9.01 | 0.65 | 0.05 | 0.99 | 99.92/99.29 | 98.78 |
| JPMCB SR Pas Bl 2035 CF | 6.98 | 9.03 | 0.66 | 0.15 | 1.00 | 99.62/97.60 | 98.60 |
| FIAM Bl TD 2035 Q | 7.33 | 10.47 | 0.60 | 0.26 | 1.15 | 114.09/118.74 | 98.14 |
| Fid Free Ind 2035 Inv | 7.51 | 10.11 | 0.64 | 0.51 | 1.12 | 111.71/112.79 | 99.28 |
| Van Tar Ret 2035 Inv | 6.92 | 9.11 | 0.65 | 0.12 | 1.01 | 100.85/100.37 | 99.06 |
| S&P TD 2035 | 6.82 | 9.01 | 0.64 | | | | |
| JPM SR 2040 I | 6.62 | 10.16 | 0.55 | -0.29 | 1.05 | 101.63/107.13 | 97.88 |
| JPM SR 2040 R5 | 6.76 | 10.16 | 0.56 | -0.19 | 1.05 | 102.04/106.43 | 97.84 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| JPM SR BL 2040 R6 | 7.17 | 9.77 | 0.63 | 0.10 | 1.01 | 101.38/101.28 | 98.89 |
| JPMCB SR | | | | | | | |
| Pas Bl 2040 CF | 7.24 | 9.81 | 0.63 | 0.17 | 1.02 | 101.21/100.25 | 98.81 |
| FIAM Bl TD 2040 Q | 7.26 | 10.81 | 0.58 | 0.12 | 1.12 | 110.08/115.03 | 98.56 |
| Fid Free Ind 2040 Inv | 7.52 | 10.38 | 0.63 | 0.43 | 1.08 | 107.68.108.48 | 99.47 |
| Van Tar Ret 2040 Inv | 7.15 | 9.97 | 0.61 | 0.09 | 1.03 | 103.05/104.24 | 99.03 |
| S&P TD 2040 | 7.06 | 9.60 | 0.63 | | | | |
| | | | | | | | |
| JPM SR 2045 I | 6.66 | 10.36 | 0.54 | -0.39 | 1.03 | 99.71/104.73 | 98.17 |
| JPM SR 2045 R5 | 6.78 | 10.34 | 0.56 | -0.29 | 1.03 | 100.01/104.01 | 98.10 |
| JPM SR BL 2045 R6 | 7.18 | 9.98 | 0.62 | -0.03 | 1.00 | 99.51/99.44 | 99.08 |
| JPMCB SR | | | | | | | |
| Pas Bl 2045 CF | 7.24 | 10.03 | 0.62 | 0.03 | 1.00 | 99.36/98.65 | 98.98 |
| FIAM Bl TD 2045 Q | 7.27 | 10.77 | 0.58 | 0.05 | 1.07 | 106.13/109.61 | 98.71 |
| Fid Free Ind 2045 Inv | 7.52 | 10.40 | 0.62 | 0.37 | 1.04 | 104.22/104/13 | 99.50 |
| Van Tar Ret 2045 Inv | 7.23 | 10.37 | 0.60 | 0.02 | 1.03 | 102.55/104.04 | 99.31 |
| S&P TD 2045 | 7.21 | 9.98 | 0.62 | | | | |
| | | | | | | | |
| JPM SR 2050 I | 6.66 | 10.37 | 0.54 | -0.47 | 1.00 | 96.90/101.10 | 98.06 |
| JPM SR 2050 R5 | 6.78 | 10.34 | 0.56 | -0.39 | 0.99 | 97.28/100.59 | 98.04 |
| JPM SR BL 2050 R6 | 7.18 | 9.97 | 0.62 | -0.15 | 0.96 | 96.69/95.96 | 99.00 |
| JPMCB SR | | | | | | | |
| Pas Bl 2050 CF | 7.28 | 10.02 | 0.62 | -0.06 | 0.97 | 96.69/95.07 | 98.90 |
| FIAM Bl TD 2050 Q | 7.29 | 10.79 | 0.58 | -0.04 | 1.04 | 103.28/105.93 | 98.74 |
| Fid Free Ind 2050 Inv | 7.52 | 10.41 | 0.62 | 0.24 | 1.01 | 101.25/100.45 | 99.48 |
| Van Tar Ret 2050 Inv | 7.24 | 10.38 | 0.60 | -0.12 | 1.00 | 99.85/100.69 | 99.30 |
| S&P TD 2050 | 7.34 | 10.30 | 0.61 | | | | |
| | | | | | | | |
| JPM SR 2055 I | 6.66 | 10.34 | 0.54 | -0.52 | 0.98 | 95.53/99.37 | 98.03 |
| JPM SR 2055 R5 | 6.79 | 10.32 | 0.56 | -0.43 | 0.98 | 95.92/98.82 | 98.09 |
| JPM SR BL 2055 R6 | 7.20 | 9.96 | 0.62 | -0.19 | 0.95 | 95.32/94.17 | 98.96 |
| JPMCB SR | | | | | | | |
| Pas Bl 2055 CF | 7.23 | 10.03 | 0.62 | -0.16 | 0.96 | 95.22/93.75 | 98.86 |
| FIAM Bl TD 2055 Q | 7.27 | 10.79 | 0.58 | -0.12 | 1.03 | 101.97/104.54 | 98.78 |
| Fid Free Ind 2055 Inv | 7.51 | 10.38 | 0.63 | 0.13 | 0.99 | 99.81/98.79 | 99.47 |
| Van Tar Ret 2055 Inv | 7.21 | 10.36 | 0.60 | -0.24 | 0.99 | 98.29/99.03 | 99.31 |
| S&P TD 2055 | 7.41 | 10.43 | 0.61 | | | | |
| | | | | | | | |
| JPM SR Inc I | 4.45 | 4.81 | 0.71 | 0.07 | 1.22 | 115.32/132.13 | 96.20 |
| JPM SR Inc R5 | 4.55 | 4.80 | 0.74 | 0.16 | 1.22 | 115.86/130.35 | 96.30 |
| JPM SR Bl Inc R6 | 4.71 | 4.64 | 0.79 | 0.33 | 1.18 | 115.22/124.46 | 97.29 |
| JPMCB SR | | | | | | | |
| Pas Bl Inc CF | 4.84 | 4.64 | 0.82 | 0.47 | 1.18 | 116.69/123.88 | 97.33 |
| FIAM Bl TD Inc Q | 4.02 | 3.26 | 0.92 | -0.24 | 0.78 | 85.89/77.71 | 87.14 |
| Fid Free Ind Inc Inv | 3.75 | 2.81 | 0.97 | -0.42 | 0.69 | 77.21/65.70 | 91.78 |
| Van Tar Ret Inc Inv | 4.57 | 3.72 | 0.95 | 0.39 | 0.95 | 98.27/89.91 | 98.01 |
| S&P TD Ret Inc | 4.36 | 3.87 | 0.86 | | | | |

120. Taking JPMorgan target date 2020I as an example, we learn the following from the above criteria. First, the returns for this fund is clearly the lowest

among the funds. After all, it had a higher expense ratio than the other funds.

121. Next, Sharpe Ratio, which factors in Standard Deviation but adds excess return to determine the amount of reward the fund is getting per unit of risk shows the fund is tied for the lowest which is undesirable.

122. The higher the IR, the more consistent the manager is. This particular I share has a low IR relative to the other funds by far.

### 6. The Cumulative Facts Demonstrate Fiduciary Breaches

123. Defendants have a fiduciary duty to choose and review investment options that are in the best interests of the participants and that increase the likelihood that participants reach their required lifestyle in retirement.

124. The foregoing allegations identified the tools that fiduciaries utilize in their methodologies and which affords them a multi-dimensional viewpoint in determining prudence and what lays in the best interests of the Plan's participants.

125. Plaintiffs have compared the Plan funds to other alternative funds on the basis of:

| Returns | a. Actual Returns over different time periods;<br>b. Relative Returns, against a benchmark, alternative (lower cost) same fund share class, respective category, CIT alternative, industry medians, over different time periods. |
|---|---|
| Expense Ratios/Investment Costs | a. Actual (in isolation)<br><br>b. Gross vs Net<br><br>c. Imbedded in return/after cost return over different time periods<br><br>d. After cost relative returns against a benchmark, alternative (lower cost) same fund share class, respective category, CIT alternative, industry |

| | |
|---|---|
| | medians, over different time frames |
| After cost sensitivity to market movements (Beta) | a. Actual (in isolation) b. Relative to alternative (lower cost) same fund share class, "same money manager" passive/active blend CIT and Mutual Fund, competitor index/passively managed mutual fund, competitor active/passive blend CIT over 5-year time period (3rd quarter 2015 – 3rd quarter 2020). c. Relative to Standard Deviation, R Squared, Sharpe Ratio, Upside/Downside Capture, Information Ratio |
| After cost return dispersion about an average/return variable (standard deviation | a. Actual (in isolation) b. Relative to alternative (lower cost) same fund share class, "same money manager" passive/active blend CIT and Mutual Fund, competitor index/passively managed mutual fund, competitor active/passive blend CIT over 5-year time period (3rd quarter 2015 – 3rd quarter 2020). c. Relative to Beta, R Squared. Sharpe Ratio, Upside/Downside Capture, Information Ratio |
| Correlation of the portfolio's returns | a. Actual (in isolation) |

| to the benchmark's returns (R Squared) | b. Relative to alternative (lower cost) same fund share class, "same money manager" passive/active blend CIT and Mutual Fund, competitor index/passively managed mutual fund, competitor active/passive blend CIT over 5-year time period (3rd quarter 2015 – 3rd quarter 2020). |
|---|---|
| | c. Relative to Beta, Standard Deviation, Sharpe Ratio, Upside/Downside Capture, Information Ratio |
| Reward Per Unit of Risk; this includes Standard Deviation (Sharpe Ratio) | a. Actual (in isolation) |
| | b. Relative to alternative (lower cost) same fund share class, "same money manager" passive/active blend CIT and Mutual Fund, competitor index/passively managed mutual fund, competitor active/passive blend CIT over 5-year time period (3rd quarter 2015 – 3rd quarter 2020). |
| | c. Relative to Beta, Standard Deviation, R Squared, Upside/Downside Capture, Information Ratio |
| Performance vs Benchmark during periods of positive (up) and negative returns(down) (Upside/Downside Capture) | a. Actual (in isolation) |
| | b. Relative to alternative (lower cost) same fund share class, "same money |

| | |
|---|---|
| | manager" passive/active blend CIT and Mutual Fund, competitor index/passively managed mutual fund, competitor active/passive blend CIT over 5-year time period (3rd quarter 2015 – 3rd quarter 2020).<br><br>c. Relative to Beta, Standard Deviation, R Squared, Sharpe Ratio, Information Ratio |
| Ability to generate excess returns relative to a benchmark and the consistency of the investment manager to do so (Information Ratio) | a. Actual (in isolation)<br>b. Relative to alternative (lower cost) same fund share class, "same money manager" passive/active blend CIT and Mutual Fund, competitor index/passively managed mutual fund, competitor active/passive blend CIT over 5-year time period (3rd quarter 2015 – 3rd quarter 2020).<br>c. Relative to Beta, Standard Deviation, R Squared, Sharpe Ratio, Upside/Downside Capture |

126.  Taken as a whole, the foregoing facts plausibly demonstrate Defendants did not apply a viable and prudent methodology to choose and review Plan investments.

/////

/////

/////

**FIRST CLAIM FOR RELIEF**

**Breaches of Fiduciary Duty of Prudence**

**(Asserted against the Committee Defendants)**

127. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

128. At all relevant times, the Committee Defendants ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

129. As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

130. The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. They did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the best interest of Plan participants. Instead, the Prudence Defendants selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments. The Prudence Defendants also failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plan.

131. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had the Prudence Defendants complied with their

fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

132.   Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

133.   The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

**SECOND CLAIM FOR RELIEF**

**Failure to Adequately Monitor Other Fiduciaries**

**(Asserted against Salesforce and the Board Defendants)**

134.   Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

135.   Salesforce and the Board Defendants (the "Monitoring Defendants") had the authority to appoint members of the Committee, and the duty to monitor the Committee.  Further, they were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plan.

136.   In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee Defendants were not fulfilling those duties.

137. The Monitoring Defendants also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties (or used qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Monitoring Defendants.

138. The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

    (a)    Failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee Defendants' imprudent actions and omissions;

    (b)    failing to monitor the processes by which Plan investments were evaluated,  their failure to investigate the availability of lower-cost share classes, and their failure to investigate the availability of lower-cost collective trust vehicles; and

    (c)    failing to remove Committee members whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, all to the detriment of the Plan and Plan participants' retirement savings.

139. As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses.  Had Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

140. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee Defendants.  In addition, Plaintiffs are entitled to

equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## **PRAYER FOR RELIEF**

141. **WHEREFORE,** Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.    A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.    An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.    Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.    An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.    Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

I.    An award of pre-judgment interest;

J.    An award of costs pursuant to 29 U.S.C. § 1132(g);

K.    An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.    Such other and further relief as the Court deems equitable and just.

Dated: October 23, 2020                    Respectfully submitted,

By: *Mark K. Gyandoh*
Mark K. Gyandoh
(*admitted pro hac vice*)
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
Tel: (610) 890-0200
Email: markg@capozziadler.com

Donald R. Reavey
(*admitted Pro hac vice*)
**CAPOZZI ADLER, P.C.**
2933 North Front Street
Harrisburg, PA 17110
(717) 233-4101
Fax (717) 233-4103
Email: donr@capozziadler.com

Daniel L. Germain (State Bar No. 143334)
**ROSMAN & GERMAIN LLP**
16311 Ventura Boulevard, Suite 1200
Encino, CA  91436-2152
Telephone: (818) 788-0877
Facsimile: (818) 788-0885
Email: germain@lalawyer.com

Counsel for Plaintiffs and the Putative Class