1

2

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

3

GREGOR MIGUEL and AMANDA BREDLOW,
Individually and on behalf of all others similarly
situated,

4

5

    Plaintiffs,

6

   v.

7

SALESFORCE.COM, INC., BOARD OF
DIRECTORS OF SALESFORCE.COM, INC.,
MARC BENIOFF, THE INVESTMENT
ADVISORY COMMITTEE, JOSEPH
ALLANSON, STAN DUNLAP, and JOACHIM
WETTERMARK,

8

9

10

11

    Defendants.

12

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 3:20-cv-01753-MMC

**DEFENDANTS' NOTICE OF**
**MOTION AND MOTION FOR**
**SUMMARY JUDGMENT**

Judge: Maxine M. Chesney
Date: February 16, 2024
Time: 9:00 a.m.
Ctrm: 7 – 19th Floor

13

14

Robyn C. Crowther (CA Bar No. 193840)
Tahir L. Boykins (CA Bar No. 323441)
STEPTOE & JOHNSON LLP
633 W. Fifth Street, Suite 1900
Los Angeles, California 90071
Tel: (213) 439-9400, Fax: (213) 439-9599
rcrowther@steptoe.com
tboykins@steptoe.com

15

16

17

18

19

20

21

22

23

24

25

Paul J. Ondrasik, Jr. (*pro hac vice*)
Eric G. Serron (*pro hac vice*)
STEPTOE & JOHNSON LLP
1330 Connecticut Ave., NW
Washington, DC 20036
Tel: (202) 429-3000, Fax: (202) 429-3902
pondrasik@steptoe.com
eserron@steptoe.com

Justin Ben-Asher (*pro hac vice*)
STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York, N.Y. 10036
Tel: (212) 506-3900, Fax: (212) 506-3950
jbenasher@steptoe.com

*Counsel for Defendants Salesforce, Inc.,*
*Board of Directors of Salesforce, Inc., Marc*
*Benioff, The 401(k) Plan Committee,*
*Joseph Allanson, Stan Dunlap, and Joachim*
*Wettermark*

26

27

28

1

## NOTICE OF MOTION AND MOTION

2

**TO THE COURT, ALL PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:**

3

**PLEASE TAKE NOTICE that** on February 16, 2024, or as soon thereafter as the matter

4

may be heard, in Courtroom 7 of the above-entitled Court, on the 19th Floor of the United States

5

Courthouse, 450 Golden Gate Avenue, San Francisco, California, Defendants Salesforce, Inc., Board

6

of Directors of Salesforce, Inc., Marc Benioff, The 401(k) Plan Committee, Joseph Allanson, Stan

7

Dunlap, and Joachim Wettermark ("Defendants") will and hereby do move for an order granting

8

Defendants summary judgment and dismissing all claims asserted by Plaintiffs Gregor Miguel and

9

Amanda Bredlow ("Plaintiffs"), pursuant to Rule 56 of the Federal Rules of Civil Procedure.

10

This Motion is based on this Notice of Motion, the attached Memorandum of Points and

11

Authorities in support of the Motion, the declaration of Eric Serron, the pleadings and papers on file

12

in this action, and on all other matters that may be judicially noticed or presented at the hearing of

13

this matter.

14

15

DATED:  November 13, 2023           Respectfully submitted,

16

STEPTOE & JOHNSON LLP

17

By:    */s/ Eric G. Serron*

18

Robyn C. Crowther (CA Bar No. 193840)

19

Tahir L. Boykins (CA Bar No. 323441)
STEPTOE & JOHNSON LLP

20

One Market Plaza
Spear Tower, Suite 3900

21

San Francisco, CA 94105
Telephone: (415) 365-6700

22

Facsimile: (415) 365-6699
rcrowther@steptoe.com

23

tboykins@steptoe.com

24

25

Paul J. Ondrasik, Jr. (*pro hac vice*)
Eric G. Serron (*pro hac vice*)

26

STEPTOE & JOHNSON LLP
1330 Connecticut Ave., NW

27

Washington, DC 20036
Telephone: (202) 429-3000

28

Facsimile: (202) 429-3902

1

pondrasik@steptoe.com
eserron@steptoe.com

Justin Ben-Asher (*pro hac vice*)
STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York, N.Y. 10036
Phone: (212) 506-3900
Facsimile: (212) 506-3950
jbenasher@steptoe.com

*Counsel for Defendants Salesforce, Inc., Board of Directors of Salesforce, Inc., Marc Benioff, The 401(k) Plan Committee, Joseph Allanson, Stan Dunlap, and Joachim Wettermark*

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................ 1

I.  STATEMENT OF ISSUES TO BE DECIDED ................................................ 1

II.  INTRODUCTION ............................................................................................ 1

III.  STATEMENT OF UNDISPUTED FACTS ..................................................... 3

    A.  The Plan ............................................................................................... 3

    B.  The Committee Followed a Prudent Process for Selecting and Monitoring Investment Options. ................................................................ 3

    C.  The Plan Transitioned Away from Paying Recordkeeping Fees Through Revenue Sharing. ............................................................... 5

    D.  The Committee Prudently Retained the JPMorgan TDFs. ..................... 7

    E.  The Committee Prudently Selected and Monitored the Fidelity Funds. ................... 11

    F.  The Committee Appropriately Considered Collective Investment Trusts. ............... 12

IV.  STANDARD OF REVIEW .............................................................................. 15

V.  ARGUMENT ................................................................................................... 16

    A.  Plaintiffs' Claims of Imprudence Lack Merit ......................................... 16

        1.  Defendants Followed a Prudent Monitoring Process ...................... 17

        2.  There Is No Genuine Dispute that Defendants Selected the Lowest-Cost Share Class of the JPMorgan TDFs .......................................... 18

        3.  Defendants Reasonably Decided Not to Replace the JPMorgan TDFs With Plaintiffs' Preferred CITs Prior to July 19, 2019 .................................. 20

        4.  Defendants Reasonably Decided Not to Replace the Fidelity Mutual Funds with Plaintiffs' Preferred CITs Prior to July 19, 2019 ....................... 22

        5.  Plaintiffs Cannot Demonstrate that the Plan Suffered a "Loss" as a Result of the Alleged Fiduciary Breaches ...................................... 24

    B.  Plaintiffs' Failure to Monitor Claim is Derivative of Their Fiduciary Breach Claim ............................................................................... 25

VI.  CONCLUSION ................................................................................................. 25

MOTION FOR SUMMARY JUDGMENT                                        3:20-cv-01753-MMC

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Anderson v. Liberty Lobby, Inc.*,
5
    477 U.S. 242 (1986)..................................................................................................16

6

*C.A.R. Transp. Brokerage Co., Inc. v. Darden Restaurants, Inc.*,
    213 F.3d 474 (9th Cir. 2000) ..................................................................................16
7

*Call v. Sumitomo Bank of Cal.*,
8
    881 F.2d 626 (9th Cir. 1989) ........................................................................3, 17, 24

9

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)..................................................................................................16
10

11

*Davis v. Salesforce.com, Inc.*,
    No. 20-cv-01753-MMC, 2020 WL 5893405 (N.D. Cal. Oct. 5, 2020) ....................21
12

*Davis v. Salesforce.com, Inc.*,
13
    No. 21-15867, 2022 WL 1055557 (9th Cir. Apr. 8, 2022).....................20, 21, 22, 25

14

*Hughes v. Nw. Univ.*,
    595 U.S. 170 (2022).....................................................................................2, 16, 17, 24
15

16

*Hughes v. Nw. Univ.*,
    63 F.4th 615 (7th Cir. 2023) ..............................................................................17, 20
17

*Kanawi v. Bechtel Corp.*,
18
    590 F. Supp. 2d 1213 (N.D. Cal. 2008) ...................................................................16

19

*Keenan v. Allan*,
    91 F.3d 1275 (9th Cir. 1996) ...................................................................................16
20

21

*Matney v. Barrick Gold of N. Am.*,
    80 F.4th 1136 (10th Cir. 2023) ................................................................................20
22

*Meiners v. Wells Fargo & Co.*,
23
    898 F.3d 820 (8th Cir. 2018) ...................................................................................22

24

*Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc.*,
    210 F.3d 1099 (9th Cir. 2000) .................................................................................16
25

26

*Smith v. CommonSpirit Health*,
    37 F.4th 1160 (6th Cir. 2022) ....................................................................................2

27

28

*Pension Ben. Guar. Corp. ex rel. St. Vincent Cath. Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*,
   712 F.3d 705 (2d Cir. 2013)...................................................................................................2, 16

*Tibble v. Edison Int'l*,
   575 U.S. 523 (2015).........................................................................................................2

*In re Unisys Savs., Plan Litig.*,
   74 F.3d 420 (3d Cir. 1996).................................................................................................16

**Statutes**

ERISA § 403(c)(1) ...............................................................................................................5

ERISA § 404(a), 29 U.S.C. § 1104(a) ....................................................................................1

1

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

2

Defendants Salesforce, Inc. ("Salesforce") and various alleged fiduciaries of the Salesforce

3   401(k) Plan ("Plan")[1] respectfully submit this Memorandum of Points and Authorities in support of

4   their Motion for Summary Judgment.

5   **I.   STATEMENT OF ISSUES TO BE DECIDED**

6

1.   Whether summary judgment should be granted dismissing Plaintiffs' claim against

7   the Committee for breach of the fiduciary duty of prudence under ERISA § 404(a), 29 U.S.C. §

8   1104(a) pursuant to Federal Rule of Civil Procedure 56 because (a) there is no genuine dispute that

9   the Committee members satisfied their duty of prudence, and (b) Plaintiffs cannot show that any

10   alleged imprudence caused a loss to the Plan.

11

2.   Whether summary judgment should be granted dismissing Plaintiffs' claim against

12   Salesforce and the Board for failure to adequately monitor the Committee pursuant to Federal Rule

13   of Civil Procedure 56 because the underlying breach of fiduciary duty claim against the Committee

14   fails as a matter of law.

15   **II.   INTRODUCTION**

16

The plaintiffs in this ERISA fiduciary breach class action—current and former participants

17   ("Plaintiffs") in the Salesforce 401(k) Plan ("Plan")—claim that the Defendants violated their

18   prudence duty between March 11, 2014 and July 19, 2019 (the "Class Period") by failing to replace

19   certain investment options on the Plan's menu with allegedly cheaper alternatives.  Specifically,

20   Plaintiffs claim that Defendants acted imprudently by failing to:  (1) select lower-fee share classes of

21   the JPMorgan SmartRetirement® mutual fund series of target date funds ("JPMorgan TDFs"); (2)

22   replace the JPMorgan TDFs with the JPMCB SmartRetirement® Passive Blend CF series of

23   collective investment trust target date funds ("Passive Blend CITs"); and (3) replace two Fidelity

24   mutual funds—the Contrafund K class ("Contrafund K") and the Diversified International Fund K

25   class ("International K")—with two allegedly similar Fidelity collective investment trusts, the

26   Contrafund Commingled Pool ("Contrafund CIT") and the Diversified International Commingled

27   _____

[1] In addition to Salesforce, these alleged fiduciaries include the Company's Board of Directors ("Board"), the Plan's 401(k) Plan Committee (the "Committee"), a member of the Board, and

28   members of the Committee (collectively, "Defendants").

_____

1  Pool ("International CIT"), respectively.[2]  Plaintiffs also assert that certain Defendants are liable

2  derivatively for failing to monitor the Plan's fiduciaries and prevent these alleged breaches.

3     It is well-settled that ERISA requires "prudence, not prescience."  *See, e.g.*, *Pension Ben.*

4  *Guar. Corp. ex rel. St. Vincent Cath. Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712

5  F.3d 705, 716 (2d Cir. 2013) (citation omitted).  A fiduciary is required to "discharge his

6  responsibility 'with the care, skill, prudence, and diligence' that a prudent person 'acting in a like

7  capacity and familiar with such matters' would use."  *Tibble v. Edison Int'l*, 575 U.S. 523, 528

8  (2015) (quoting 29 U.S.C. § 1104(a)(1)(B)).  Although that duty includes an obligation to "monitor

9  trust investments and remove imprudent ones," *id*. at 529; *Hughes v. Nw. Univ.*, 595 U.S. 170, 176

10  (2022) (same), ERISA "does not give the federal courts broad license to second-guess the

11  investment decisions of retirement plans."  *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1162 (6th

12  Cir. 2022).  Rather, satisfaction of that duty "turns on 'the circumstances . . . prevailing' at the time

13  the fiduciary acts," and courts "must give due regard to the range of reasonable judgments a

14  fiduciary may make based on her experience and expertise."  *Hughes*, 595 U.S. at 177.

15     The undisputed evidence makes clear that Plaintiffs' prudence claims are meritless and that

16  Defendants are entitled to summary judgment.  As to the claim that Defendants failed to include the

17  lowest-fee share class of the JPMorgan TDFs, there is simply no genuine dispute that (i) the Plan in

18  fact offered the R5, formerly named "Institutional," class from the outset of the Class Period, and

19  never offered the higher-fee "I," formerly named "Select," class on which Plaintiffs' claim is based;

20  and (ii) the R5 class was actually cheaper on a "net cost" basis than the R6 class due to the Plan's

21  receipt of .15% (15 basis points) in revenue sharing from the R5 class that was used to pay Plan

22  expenses.  Further, Defendants' decision to forego replacing the JPMorgan TDFs, the Contrafund K

23  and the International K (collectively, the "Challenged Funds") with Plaintiffs' preferred CIT

24  alternatives prior to July 19, 2019, was well within the "range of reasonable judgments" that

25  Defendants were entitled to make based on their investment consultant's advice regarding the lack of

26  transparency and the short track records of Plaintiffs' preferred CITs, which made them questionable

27  options under the Plan's own investment policy.  *Hughes*, 595 U.S. at 177.  Moreover, Plaintiffs

28  [2] *See* Dkt. 38 (First Amended Complaint ¶¶ 11-13, 75-78, 113).

1  cannot demonstrate, as they must, that the Plan suffered a loss from any of the alleged fiduciary

2  breaches.  *See Call v. Sumitomo Bank of Cal.*, 881 F.2d 626, 632-33 (9th Cir. 1989).

3  **III.    STATEMENT OF UNDISPUTED FACTS**

4      **A.    The Plan**

5      Salesforce sponsors the Salesforce 401(k) Plan (the "Plan"), a participant-directed defined

6  contribution retirement plan.[3]  In such plans, a participant chooses, based on his or her personal

7  investment preferences, from a range of investment options available on the plan's investment

8  menu.[4]  From year-end 2014 to year-end 2021, the Plan's participants increased from approximately

9  10,000 to 50,000, and Plan assets increased from $665 million to over $6 billion.[5]

10     **B.    The Committee Followed a Prudent Process for Selecting and Monitoring
11         Investment Options.**

12     The 401(k) Plan Committee ("Committee") was the Plan's named fiduciary and was

13 responsible for the "day-to-day oversight and administration" of the Plan, including selecting and

14 monitoring the Plan's core investment options.[6]

15     In 2013, the Committee adopted an Investment Policy Statement ("IPS") setting forth

16 guidelines for the Plan's investment program, which was updated in 2016.[7]  Under the IPS, the

17 Committee was to, among other things, offer participants a diversified range of funds, identify

18 appropriate investment options to make available, and select qualified investment funds.[8]

19     Regarding the selection of funds for inclusion on the Plan's menu, the 2013 IPS provides that

20 unless specifically exempted by the Committee, "[e]ach investment option chosen should have at

21 least $100 million in assets under management, be well-diversified and have a minimum of 5 years

22

23 [3] Ex. 1, "Salesforce 401(k) Plan Form 5500," 2021, Notes to Financial Statements, p. 10; Ex. 13, Statement of Investment Policy, Objectives and Guidelines for Salesforce 401(k) Plan, updated Sept.
24 9, 2016 ("2016 IPS"), SALESFORCE_0000993, at 1000.  Citations in the form "Ex. __" refer to the exhibits to the accompanying Declaration of Eric G. Serron.
25 [4] *See* "Fiduciary Requirements for Disclosure in Participant-Directed Individual Account Plans," 75 Fed. Reg. 64910 (Oct. 20, 2010).
26 [5] Exs. 1, 3-9, Salesforce.com, Inc. Retirement Savings Plans Form 5500 Filings, 2014–2021; Ex. 10, Expert Report of Steven C. Case ("Case Rep."), Ex. 1.
27 [6] Ex. 11, "401(k) Plan Committee Charter (Minutes of a Meeting of the 401k Committee of Salesforce.com, Inc., Exhibit A)," June 18, 2015, SALESFORCE_0051293-299, at 297.
28 [7] Ex. 12, 2013 IPS, Feb. 12, 2013, SALESFORCE_0060743; Ex. 13, 2016 IPS.
   [8] Ex. 12, 2013 IPS at 746; Ex. 13, 2016 IPS at 996.

of verifiable investment performance."[9]  The 2016 IPS increased the assets under management criterion to a $1 billion minimum, while retaining the requirement that the option have at least 5 years of verifiable investment performance.[10]  The 2013 and 2016 IPSs further provide that "the Committee will, on a periodic basis, review the actual results achieved by the Plans' investment options . . . to verify that each fund is being managed in compliance with the investment guidelines and the performance objectives stated herein," and will use relevant "performance benchmarks, both market indices and peer universes."[11]  The 2013 and 2016 IPSs provide that the Committee will evaluate an option's performance against its relevant benchmarks "over trailing quarter- and year-to-date, one- three-, five- and ten-year periods."[12]  The IPSs further suggest that the Committee prepare a Watch List on a quarterly basis and place funds on the Watch List for potential removal if they meet certain underperformance criteria, such as if a fund underperforms its benchmark for three consecutive quarters.[13]

In 2018, the Committee also developed an Investment Beliefs Statement that articulates the core beliefs of the Committee members regarding the nature of financial markets and how their decision-making could add value to participants, with assistance from an investment consultant, Willis Towers Watson.  The Committee adopted the Investment Beliefs Statement after consideration of multiple drafts.[14]

The Committee met at least quarterly, and more frequently in most years during the Class Period.[15]  It included members with expertise relevant to the selection of investments,[16] who also relied on the advice of expert consultants.  The Plan's investment consultant, Bridgebay Financial Inc. ("Bridgebay"), attended Committee meetings and prepared quarterly reports that evaluated, among other things, the performance, risk, and fees of the Plan's investment options, and addressed

---

[9] Ex. 12, 2013 IPS at 750.
[10] Ex. 13, 2016 IPS at 999.
[11] Ex. 12, 2013 IPS at 750; Ex. 13, 2016 IPS at 1001.
[12] Ex. 12, 2013 IPS at 751; Ex. 13, 2016 IPS at 1001.
[13] Ex. 12, 2013 IPS at 751-52; Ex. 13, 2016 IPS at 1002.
[14] Ex. 14, "Minutes of a Meeting of the 401k Committee of Salesforce.com, Inc.," Feb. 2, 2018, SALESFORCE_0060889-890 at 889; Ex. 15, "Minutes of a Meeting of the 401k Committee of Salesforce.com, Inc.," Feb. 20, 2018, SALESFORCE_0060872-873 at 872.
[15] Ex. 16, Wettermark Tr. at 34:23-35:3, 35:12-25; Ex. 10, Case Rep., Ex. 4.
[16] Ex. 10, Case Rep. at 30-32.

4

1   other topics, including: regulatory developments, a plan overview, and a market review.[17]  The

2   reports also included a section that compared the expense ratios of the Plan's investment options to

3   those of their peers.[18]  Each Committee member received and was expected to review the quarterly

4   reports prior to the meetings.[19]  Committee members received annual ERISA fiduciary training from

5   an outside ERISA attorney, who attended meetings and provided updates on important ERISA

6   fiduciary developments.[20]  The Plan's recordkeeper, Fidelity Retirement Services ("Fidelity"), also

7   made regular presentations to the Committee on ERISA fiduciary developments.[21]

8   ### C.   The Plan Transitioned Away from Paying Recordkeeping Fees Through Revenue Sharing.

9

10      The governing Plan document does not obligate Salesforce to pay the expenses of

11  administering the Plan.  Instead, as permitted by ERISA § 403(c)(1), the Plan's governing document

12  allows all reasonable Plan administration expenses to be charged to the Plan and its participants.[22]

13  Plaintiffs do not allege that the Plan's recordkeeping fees or other administration expenses during the

14  Class Period were excessive or unreasonable.

15      At the beginning of the Class Period, the Plan used revenue sharing—a common arrangement

16  under which payments received from a plan's investment options are used to compensate a plan

17  service provider—to pay recordkeeping fees owed to the Plan's recordkeeper, Fidelity, along with

18  other administrative expenses.[23]  Fidelity's fees at that time were capped at 14 basis points (0.14%)

19  of the Plan's total assets.[24]  In 2015, Fidelity presented two revised recordkeeping fee proposals to

20  the Committee: an asset-based fee arrangement reduced to 10 basis points (equivalent to $57 per

21

22  ---

    [17] *See, e.g.*, Ex. 17, "3Q 2016 Review of the Salesforce.com inc. 401(k) Savings Plan," Sept. 30, 2016, SALESFORCE_0004561-658.
23  [18] *See, e.g.*, *id.* at 591-94.
    [19] Ex. 16, Wettermark Tr. at 38:20-23; Ex. 18, Allanson Tr. at 39:2-13, 44:21-24.
24  [20] *See* Ex. 10, Case Rep. at 33-34.
    [21] *See id.*
25  [22] Dkt 24-9, Serron MTD Decl., Ex. 8, (Plan) §§ 19.05, 20.14.
    [23] Ex. 19, "Fidelity Investments Retirement Plan Service Agreement," July 13, 2015,
26  SALESFORCE_0002672-698 at 673; Ex. 20, "Fidelity Transparency Report," Mar. 31, 2014, SALESFORCE_0002465; Ex. 12, 2013 IPS, at 744; Ex. 13, 2016 IPS, at 994; *see* Ex. 10, Case Rep.
27  at 36-37.
    [24] Ex. 19, "Fidelity Investments Retirement Plan Service Agreement," July 13, 2015,
28  SALESFORCE_0002672-698 at 673.

MOTION FOR SUMMARY JUDGMENT                                    3:20-cv-01753-MMC

1   participant), and a fixed-dollar per-participant annual fee of $49 per participant collected through

2   revenue sharing.[25]  After considering the revised proposals and discussing them with Bridgebay, the

3   Committee voted to adopt the latter option, effective October 1, 2015.[26]

4        In July 2017, Fidelity agreed to reduce the Plan's recordkeeping fees from $49 to $37 per

5   participant ($12 in savings per participant), effective October 1, 2017, which Bridgebay calculated

6   would result in a 24.5% reduction in recordkeeping expenses.[27]  That recordkeeping fee reduction

7   facilitated the Plan's transition away from revenue-sharing, and instead toward charging participant

8   accounts directly for Plan administration expenses.  In mid-2017, Bridgebay noted that "Salesforce

9   is seeking to reduce or eliminate revenue sharing from the plan by selecting fund share classes with

10  zero or very little revenue share" in order to increase transparency to Plan participants.[28]  Bridgebay

11  analyzed the potential impact on the Plan of converting many investment options to "lower-fee,

12  zero-revenue share versions of the same funds."[29]  Recognizing that "to remove revenue share from

13  all of the funds is not completely possible as some funds are only available with revenue share

14  payments," Bridgebay recommended that the Committee rebate the revenue share generated by

15  remaining funds that still paid revenue sharing back to the Plan participants.[30]  With the proposed

16  transition of the JPMorgan TDFs and eight other funds to zero-revenue share classes, Bridgebay

17  concluded that the asset-weighted average expense ratio of the Plan's investment options would fall

18  from 53 basis points to 43 basis points, with the Plan's revenue share as a percentage of total Plan

19  assets being reduced from 13 basis points to 2 basis points as of June 30, 2017.[31]  Bridgebay

20  recommended that the change to zero-revenue share classes be implemented wherever possible, and

21  that Fidelity's $37 per participant recordkeeping fee and other Plan administration expenses be

22     [25] Ex. 21, "Recordkeeping Re-Pricing of the Salesforce.com and Foundation 401(k) Plan," June 30, 2015, SALESFORCE_0029309-319 at 311.

23     [26] Ex. 22, "Minutes of a Meeting of the 401k Committee of Salesforce.com, Inc.," Oct. 2, 2015,
24  SALESFORCE_0048048-051 at 049; Ex. 23, "Fidelity Investments Retirement Plan Service Agreement," May 19, 2016, SALESFORCE_0002699-726 at 700.

25     [27] Ex. 24, "2Q 2017 Review of the Salesforce.com Inc. 401(k) Savings Plan," June 30, 2017, SALESFORCE_0013864, at 13867, 13876; Ex. 25, "Minutes of a Meeting of the 401k Committee of Salesforce.com, Inc.," July 12, 2017, SALESFORCE_0060868.

26     [28] Ex. 24, "2Q 2017 Review of the Salesforce.com Inc. 401(k) Savings Plan," June 30, 2017, SALESFORCE_0013864, at 13880.

27     [29] *Id.* at 13868.

   [30] *Id.* at 13878, 13880.

28     [31] *Id.* at 13878, 13879.

1  charged directly to participants' accounts.[32]  At its September 13, 2017 meeting the Committee

2  approved the recommendation.[33]

3  **D.    The Committee Prudently Retained the JPMorgan TDFs.**

4  During the second quarter of 2013, following a request for proposals ("RFP"), the Committee

5  selected the JPMorgan TDFs as the Plan's replacement for the Fidelity Freedom Funds.[34]  Bridgebay

6  assisted with the RFP and recommended the JPMorgan TDFs because, at that time, JPMorgan was

7  "honored as asset allocator of the year by Morningstar and most of the funds were four- and five-

8  star-rated funds by Morningstar."[35]  The Committee carefully monitored the JPMorgan TDFs

9  throughout the Class Period.  At the Committee's December 9, 2014 meeting, representatives of

10  JPMorgan gave a presentation to the Committee regarding the JPMorgan TDFs' philosophy,

11  investment strategy, management, organization, and JPMorgan's participant education practices.[36]

12  In addition, every quarterly report that Bridgebay provided to the Committee during the Class Period

13  contained an entire section devoted to the JPMorgan TDFs, which included each TDF's Morningstar

14  rating, portfolio composition, returns compared to benchmark and peer group median over 1-year, 3-

15  year, 5-year and 10-year periods, calendar year returns for the last ten years, as well as each

16  vintage's risk metrics.[37]

17  Bridgebay also conducted exhaustive annual due diligence reviews of the JPMorgan TDFs,

18  which included (1) ERISA regulatory guidance on target date funds ("TDFs"), (2) a TDF market

19  background, (3) information regarding the JPMorgan TDFs' investment approach, asset allocation,

20  glide path, underlying strategies and management team, (4) information regarding JPMorgan

21  participant communications, (5) peer TDF comparisons (with respect to investment strategies, asset

22

23  [32] *Id.* at 0013868, 13878, 13879.
    [33] Ex. 26, "Minutes of a Meeting of the 401k Committee of Salesforce.com, Inc.," Sept. 13, 2017, SALESFORCE_0079169-171 at 170; *see also* Ex. 27, "4Q 2017 Review of the Salesforce.com Inc. 401(k) Savings Plan," Dec. 31, 2017, SALESFORCE_0016377-471 at 380-81.

24

25  [34] Ex. 28, Bridgebay Financial, "Salesforce.com Inc. 401(k) Savings Plan," Mar. 31, 2014, SALESFORCE_0003495-606 at 497; Ex. 29, Ruiz-Zaiko Tr. at 42:14-43:7; Ex. 10, Case Rep. ¶ 102.
    [35] Ex. 29, Ruiz-Zaiko Tr. at 43:14-44:4.

26  [36] Ex. 30, "Minutes of a Meeting of the 401k Committee of Salesforce.com, Inc.," Dec. 9, 2014, SALESFORCE_0048778-780 at 780.

27  [37] *See, e.g.*, Ex. 28, Bridgebay Financial, "Salesforce.com Inc. 401(k) Savings Plan," Mar. 31, 2014, SALESFORCE_0003495-606 at 563-586; Ex. 31, Bridgebay Financial, "4Q 2018 Review of the Salesforce.com Inc. 401 (k) Savings Plan," Apr. 19, 2019, SALESFORCE_0003130-224, 197-208.

28

7

classes, and fees), (6) glide path comparisons, and (7) peer TDF performance comparisons.[38]  At the

Committee's June 9, 2017 meeting, three representatives from JPMorgan provided an overview of

the JPMorgan TDFs in connection with Bridgebay's annual due diligence review for that year.[39]

Bridgebay then presented its analysis of the funds' fees and investment allocation positioning

compared to the other TDF providers and outlined the pros and cons of JPMorgan's conservative

approach.  The Committee members proceeded to review the performance of the underlying funds of

the JPMorgan TDFs, the total assets and participants invested in the JPMorgan TDFs, and the TDFs

offered by other providers.[40]

The Institutional class of the JPMorgan TDFs was renamed the R5 class as of April 3, 2017.

Each vintage of the Institutional/R5 class retained the same ticker symbol before and after the name

change.[41]  The Plan included the Institutional/R5 class of the JPMorgan TDFs on its menu at all

times between the start of the Class Period and December 29, 2017, when the Plan switched to the

R6 class.[42]  The JPMorgan TDFs were also available in a Select class, which was renamed the I class

as of April 3, 2017.[43]  The Plan never offered the Select/I class of the JPMorgan TDFs.[44]

JPMorgan announced the creation of the R6 class for its TDFs in November 2014, stating

that "[t]he availability of the R6 share class offers advisers and plan sponsors … a non revenue share

---

[38] Ex. 32, "Target Date Fund Review," Dec. 31, 2015, SALESFORCE_0038442-508; Ex. 33, "Target Date Fund Review," Mar. 31, 2017, SALESFORCE_0042867-971; Ex. 34, "Target Date Fund Evaluation," Apr. 17, 2018, SALESFORCE_0011833-884.

[39] Ex. 33, "Target Date Fund Review," Mar. 31, 2017, SALESFORCE_0042867-971; Ex. 35, "Minutes of a Meeting of the 401k Committee of Salesforce.com, Inc.," June 9, 2017, SALESFORCE_0060869-871 at 869-870.

[40] Ex. 35, "Minutes of a Meeting of the 401k Committee of Salesforce.com, Inc.," June 9, 2017, SALESFORCE_0060869-871 at 870.

[41] Ex. 84, "JPMorgan SmartRetirement Funds, Supplement to the Summary Prospectus," Nov. 1, 2016; Ex. 86, "JPMorgan SmartRetirement 2040 Fund, Summary Prospectus November 1, 2016, as supplemented April 10, 2017," Apr. 10, 2017; Ex. 85, "JPMorgan SmartRetirement 2040 Fund, Summary Prospectus," Nov. 1, 2017; Ex. 83, "JPMorgan SmartRetirement® 2030 R5 JSMIX," Morningstar, Oct 3, 2022; see Ex. 36, Conner Tr. at 174:21-176:14, 184:19-186:7.

[42] See Ex. 6, 2017 Form 5500 at 4, 7, 8-11 (showing that the R5 Class of the JPMorgan TDFs paid indirect compensation to the Plan's recordkeeper, Fidelity, in 2017); Ex. 88, Fidelity Investment Retirement Plan Service Agreement, Feb. 11, 2014, SALESFORCE_0002553-585 at 564; Ex. 89, "Fidelity Transparency Report," Q3 2017; Ex. 91, Summary Plan Description, 2015, SALESFORCE_0014428-459 at 457-459; Ex. 10, Case Rep. ¶ 76; Ex. 37, Heavner Rep. ¶ 27; Ex. 38, Miguel Tr. at 39:20-24, 43:1-44:4; Ex. 39, Bredlow Tr. at 47:6-50:9.

[43] Ex. 90, "JPMorgan, Supplement to the Prospectuses and Statements of Additional Information," Sept. 8, 2016; Ex. 36, Conner Tr. at 179:10-180:8.

[44] Ex. 36, Conner Tr. at 179:10-180:15; Ex. 10, Case Rep. ¶ 76; Ex. 37, Heavner Rep. ¶ 28.

8

1   class."[45]  The R6 class had a nominally lower expense ratio (*i.e.*, fee) than the Institutional/R5 class,

2   in an amount that varied by date and fund vintage.[46]  However, the Institutional/R5 class also paid 15

3   basis points in revenue sharing to cover Plan recordkeeping fees and other administrative expenses,

4   which would otherwise be charged directly to participants—unlike the R6 class, which paid no

5   revenue sharing.[47]  Because the revenue sharing paid by the Institutional/R5 class exceeded the fee

6   differential between the Institutional/R5 class and the R6 class, the Institutional/R5 class was

7   actually cheaper on a net cost basis than the R6 class.[48]

8           The revenue sharing that the Plan received from the Institutional/R5 class of the JPMorgan

9   TDFs was used to compensate Fidelity for recordkeeping services provided to the Plan.[49]  Any

10  revenue sharing that exceeded the amount necessary to compensate Fidelity for its recordkeeping

11  services was deposited in a Revenue Credit Account, which could be used only for payment of other

12  Plan administration expenses or rebated to participants.[50]  There is no evidence that any amounts

13  held in the Revenue Credit Account were used for any other purpose.[51]  Nor have Plaintiffs alleged

14  or come forward with any evidence that the Plan's administrative expenses were unreasonable.[52]

15          Around the second quarter of 2017, in connection with the reduction of Fidelity's

16  recordkeeping fees to $37 per participant, Bridgebay suggested that the Committee switch from the

17  R5 class of the JPMorgan TDFs to the R6 class.[53]  Along with the other fund share class changes that

18  accompanied Fidelity's recordkeeping fee reduction, Bridgebay concluded that the conversion to the

19  R6 class would contribute to an overall reduction in the asset weighted-average expense ratio of the

20  Plan's investment options.[54]  At its September 13, 2017 meeting the Committee approved the

---

[45] Dkt. 24-15 (JPMorgan Press Release).
[46] Ex. 37, Heavner Rep. ¶ 29.
[47] Ex. 36, Conner Tr. at 189:6-15.
[48] *Id.* at 187:11-188:23.
[49] Ex. 19, "Fidelity Investments Retirement Plan Service Agreement," July 13, 2015, SALESFORCE_0002672-698 at 673; Ex. 20, "Fidelity Transparency Report," Mar. 31, 2014, SALESFORCE_0002465; Ex. 88, Fidelity Investment Retirement Plan Service Agreement, Feb. 11, 2014, SALESFORCE_0002553-585 at 580-582; Ex. 10, Case Rep. ¶ 69.
[50] Ex. 10, Case Rep. ¶ 69; Ex. 21, "Recordkeeping Re-Pricing of the Salesforce.com and Foundation 401(k) Plan," June 30, 2015, SALESFORCE_0029309-319 at 309; *see supra* note 49.
[51] Ex. 36, Conner Tr. at 87:22-88:8; 108:22-109:1.
[52] *Id.* at 61:6-19.
[53] Ex. 24, "2Q 2017 Review of the Salesforce.com Inc. 401(k) Savings Plan," June 30, 2017, SALESFORCE_0013864, at 13878, 13879.
[54] *Id.*

MOTION FOR SUMMARY JUDGMENT                                3:20-cv-01753-MMC

recommended share class change,[55] which became effective on December 29, 2017.[56]  Bridgebay subsequently informed the Committee that, effective November 1, 2017, the expense ratios of the JPMorgan SmartRetirement Fund R6 class had been further reduced by between 2 basis points and 8 basis points, depending on the fund vintage.[57]

In January 2018, at the Committee's request, Bridgebay sent a comprehensive RFP to six alternative TDF providers, including Capital Group, American Century, BlackRock, Fidelity, T. Rowe Price, and Vanguard.[58]  Bridgebay presented a report to the Committee comparing the six TDF candidates' underlying asset classes, underlying investment funds, performance, and fees.[59] Upon selection of three finalists (Capital Group (American Funds), BlackRock, and JPMorgan), Bridgebay, again at the Committee's request, performed additional analysis of the three finalists' TDF products and provided a "lengthy and detailed written report," including information about the three TDFs' glide paths, underlying asset classes, their respective 1-year, 3-year, 5-year, and 10-year performance, risk metrics, and fees.[60]  On August 21, 2018, representatives from Capital Group (American Funds), BlackRock, and JPMorgan attended a Committee meeting, during which the Committee and Bridgebay interviewed the three finalists.[61]  The Committee members and Bridgebay representatives then discussed the interviews, and the Committee requested that Bridgebay prepare a scorecard to assist in deciding which of the three finalists to select.[62]  At the November 16, 2018 Committee meeting, Bridgebay presented the requested scorecard and advised that any of the candidates would be a prudent choice for the Plan, before ultimately recommending JPMorgan.[63]

---

[55] Ex. 26, "Minutes of a Meeting of the 401k Committee of Salesforce.com, Inc.," Sept. 13, 2017, SALESFORCE_0079169-171 at 170.

[56] Ex. 37, Heavner Rep. ¶ 27; Participant Notice, Nov. 2017, Dkt. 24-10.

[57] Ex. 27, "4Q 2017 Review of the Salesforce.com Inc. 401(k) Savings Plan," Dec. 31, 2017, SALESFORCE_0016377-471 at 380.

[58] Ex. 40, "Minutes of a Meeting of the 401k Committee of Salesforce.com, Inc.," May 17, 2018, SALESFORCE_0067803-804 at 803; Ex. 29, Ruiz-Zaiko Tr. at 62:2-15.

[59] Ex. 34, "Target Date Fund Evaluation," Apr. 17, 2018, SALESFORCE_0011833-884.

[60] Ex. 42, "Summary of Target Date Fund Finalists," Aug. 21, 2018, SALESFORCE_0011821-832; Ex. 40, "Minutes of a Meeting of the 401k Committee of Salesforce.com, Inc.," May 17, 2018, SALESFORCE_0067803-804 at 803; Ex. 43, SALESFORCE_0060891, at 60892.

[61] Ex. 43, "Minutes of a Meeting of the 401k Committee of Salesforce.com, Inc.," Aug. 21, 2018, SALESFORCE_0060891-894 at 891-892.

[62] Id.

[63] Ex. 44, "Minutes of a Meeting of the 401k Committee of Salesforce.com, Inc.," Nov. 16, 2018, SALESFORCE_0006050-052 at 050.

1  The scorecard showed that Bridgebay gave JPMorgan the highest qualitative score (based on nine

2  factors), the second highest quantitative score (based on five factors including fees), and the highest

3  weighted total core (weighting the qualitative and quantitative scores equally).[64]  The Committee

4  ultimately accepted Bridgebay's recommendation and approved retaining JPMorgan.[65]

5  **E.     The Committee Prudently Selected and Monitored the Fidelity Funds.**

6  At the beginning of the Class Period, the Plan offered the Contrafund K and the Diversified

7  International Fund K on its investment menu.[66]  In May 2017, Fidelity introduced lower fee versions

8  of these funds—the Contrafund K6 and the Diversified International K6—that did not pay revenue

9  sharing.[67]  Although the expense ratio of the K6 funds was lower, the K funds paid 20 basis points in

10  revenue sharing, resulting in a net-of-revenue-sharing expense ratio difference between the K and

11  the K6 funds that was smaller or even negative.[68]

12  Around the second quarter of 2017, concurrently with its recommendation that the

13  Committee convert the JPMorgan TDFs to the R6 class, Bridgebay conducted an analysis of the

14  potential impact on the Plan of "switching 8 [other] funds, including the Fidelity Contrafund [and]

15  the Fidelity Diversified International Fund . . . to zero-revenue share classes."[69]  Bridgebay

16  recommended the conversions, concluding that the move to the zero-revenue share funds would

17  contribute to reducing the asset-weighted average expense ratio of the Plan's investment options.[70]

18  As noted previously, Bridgebay also recommended that the Plan's recordkeeping fee and other

19  administrative expenses be charged directly to participants' accounts.[71]  At its September 13, 2017

---

[64] Ex. 45, Bridgebay, "Score Card Summary - Target Date Providers," Sep. 5, 2018, SALESFORCE_0008097.
[65] Ex. 44, "Minutes of a Meeting of the 401k Committee of Salesforce.com, Inc.," Nov. 16, 2018, SALESFORCE_0006050-052 at 050-051.
[66] Ex. 20, "Fidelity Transparency Report," Mar. 31, 2014, SALESFORCE_0002465.
[67] Ex. 76, Fidelity Contrafund K6, Quarterly Fund Review, Sept. 30, 2023; Ex. 77, Fidelity Diversified International K6 Fund, Quarterly Fund Review, Sept. 30, 2023.
[68] Ex. 10, Case Rep., p. 46.
[69] Ex. 24, "2Q 2017 Review of the Salesforce.com Inc. 401(k) Savings Plan," June 30, 2017, SALESFORCE_0013864.
[70] *Id.* at 13878, 13879.
[71] *Id*. at 0013868, 13878, 13879.

11

1    meeting, the Committee approved the conversion of the Contrafund K and the International K to the

2    K6 versions as part of the overall change to the Plan's recordkeeping fee arrangement.[72]

3         By the fourth quarter of 2017, Bridgebay recommended that the Committee place the

4    International K6 Fund on the Plan's Watch List because its returns were lagging behind its peer

5    group.[73]  In early 2019, on Bridgebay's recommendation, the Committee removed the fund from the

6    Watch List due to its improved performance.[74]

7         **F.    The Committee Appropriately Considered Collective Investment Trusts.**

8         The Committee regularly considered offering CITs during the Class Period.  When

9    Bridgebay proposed amendments to the Plan's IPS in early 2016, Bridgebay provided the Committee

10   with a document describing CITs, which was discussed at the Committee's March 18, 2016 meeting.

11   Bridgebay highlighted that CITs have high minimum requirements—"generally $50 million in assets

12   per investment strategy"—and the challenge presented by the fact that many CITs had only three- to

13   five-year performance track records.[75]  Bridgebay further noted that "according to SEC regulations,

14   the CIT portfolios can only publish the performance of the assets managed in the CIT," and could

15   not publish the track record of their mutual fund counterparts.[76]  Both the 2013 and 2016 versions of

16   the Plan's IPS stated that "[e]ach investment option chosen should have […] a minimum of 5 years

17   of verifiable investment performance."[77]  The 2016 IPS allowed the Committee to use the track

18   record of a "registered mutual fund with the same investment management team and [that] follows

19

20

---

21   [72] Ex. 26, "Minutes of a Meeting of the 401k Committee of Salesforce.com, Inc.," Sept. 13, 2017, SALESFORCE_0079169-171 at 170.

22   [73] Ex. 27, "4Q 2017 Review of the Salesforce.com Inc. 401(k) Savings Plan," Dec. 31, 2017, SALESFORCE_0016377-471 at 382.

23   [74] Ex. 47, "1Q 2019 Review of the Salesforce.com Inc. 401(k) Savings Plan," Mar. 31, 2019, SALESFORCE_0003885-974 at 888-889; Ex 48, "Minutes of a Meeting of the 401k Committee of

24   Salesforce.com, Inc.," Apr. 19, 2019, SALESFORCE_0060861-864 at 862-863.

25   [75] Ex. 49, "4Q 2015 Review of the Salesforce.com Inc. 401(k) Savings Plan," Dec. 31, 2015, SALESFORCE_0004739-839 at 753-754; *see also* Ex. 50, Email from Nickolas Zaiko to Stacy Fox and Linda Ruiz-Zaiko, Subject: RE: Salesforce 401(k) Plan IPS, Mar. 2, 2016,

26   SALESFORCE_0037400-405; Ex. 51, "Minutes of a Meeting of the 401k Committee of Salesforce.com, Inc.," Mar. 18, 2016, SALESFORCE_0060886-887 at 887.

27   [76] Ex. 49, "4Q 2015 Review of the Salesforce.com Inc. 401(k) Savings Plan," Dec. 31, 2015, SALESFORCE_0004739-839 at 754.

28   [77] Ex. 12, 2013 IPS at 750; Ex. 13, 2016 IPS at 999.

MOTION FOR SUMMARY JUDGMENT                                    3:20-cv-01753-MMC

1  the same investment strategy" as a CIT in the evaluation process, but recommended "specialized

2  review and analysis of the investment manager and strategy."[78]

3       Fidelity offered a CIT that was similar to the Contrafund K—the Contrafund CIT.  However,

4  the Contrafund K and the Contrafund CIT are entirely different investment vehicles with entirely

5  separate underlying investment portfolios.[79]  Although the Contrafund CIT had a lower expense ratio

6  than the Contrafund K, the Contrafund K paid 20 bps in revenue sharing, whereas the CIT paid no

7  revenue sharing.[80]  Thus, the Contrafund K had an effective expense ratio of 41 basis points (net of

8  recordkeeping offset), which was lower than the Contrafund CIT's expense ratio of 43 basis points.[81]

9       At the same March 2016 meeting at which Bridgebay discussed CITs with the Committee,

10  Fidelity provided a comparison of the Contrafund K to the Contrafund CIT.  Fidelity highlighted

11  similar issues to those noted by Bridgebay, including the relative lack of a performance history for

12  the Contrafund CIT and the lack of a Morningstar rating.[82]  Fidelity's comparison also highlighted

13  that the Contrafund K was cheaper than the Contrafund CIT after accounting for revenue sharing.[83]

14       Bridgebay informed the Committee at its December 16, 2016 meeting that the Plan's assets

15  in the Contrafund K had exceeded the minimum fund asset level of $50 million to qualify for the

16  Contrafund CIT.[84]  However, Bridgebay highlighted that the Contrafund CIT's "inception date is

17  1/17/2014," that "[t]he investment policy currently requires that an investment option have a

18  minimum of 5 years' track record to be considered," and that "[t]he CIT currently does not have a

19  Morningstar Rating."[85]

20       Similarly, Fidelity also offered a CIT that was similar to the International K Fund—

21

22

---

23  [78] Ex. 13, 2016 IPS at 1000.

[79] *See* Ex. 37, Heavner Rep. ¶ 42.

[80] Ex. 52, Fidelity Presentation, Mar. 18, 2016, SALESFORCE_0074558-592 at 579.

24  [81] Ex. 17, "3Q 2016 Review of the Salesforce.com Inc. 401(k) Savings Plan," Sept. 30, 2016, SALESFORCE_0004561-658 at 563.

25  [82] Ex. 52, Fidelity Presentation, Mar. 18, 2016, SALESFORCE_0074558-592 at 579.

[83] *Id.*

26  [84] Ex. 17, "3Q 2016 Review of the Salesforce.com inc. 401(k) Savings Plan," Sept. 30, 2016,

27  SALESFORCE_0004561-658 at 563; *see* Ex 53, "Minutes of a Meeting of the 401k Committee of Salesforce.com, Inc.," Dec. 16, 2016, SALESFORCE_0079189-191 at 191.

[85] Ex. 17, "3Q 2016 Review of the Salesforce.com inc. 401(k) Savings Plan," Sept. 30, 2016,

28  SALESFORCE_0004561-658 at 563.

13

1   the International CIT.  But like the Contrafund, the International K Fund and International CIT are

2   entirely different investment vehicles with entirely separate underlying investment portfolios.[86]

3   Likewise, although the International CIT had a lower expense ratio, the International K Fund paid 20

4   basis points in revenue sharing, whereas the CIT paid no revenue sharing.[87]  Further, the inception

5   date of the International CIT was December 13, 2013;[88] and the International K Fund had a

6   Morningstar rating,[89] while the International CIT did not.

7        As for the JPMorgan TDFs, Bridgebay's annual due diligence review, presented at the

8   Committee's June 17, 2016 meeting, noted that the Plan "now qualifies for the CIT version" of the

9   JPMorgan TDFs—the JPMCB SmartRetirement CF-10 class.[90]  Bridgebay indicated, however, that

10  the JMPCB SmartRetirement CF-10 class then had only $1.2 billion in assets under management,

11  along with an inception date of September 30, 2015, which meant that it had a track record of less

12  than a year.  Ms. Ruiz-Zaiko of Bridgebay further testified that the Committee was particularly

13  concerned with the lack of publicly available information about CITs in situations where the CIT

14  had a relatively short track record.[91]

15        A different JPMorgan CIT series, the Passive Blend CITs, had an earlier inception date of

16  December 31, 2010,[92] but the Passive Blend CITs are a different TDF strategy than the JPMorgan

17  TDFs that the Plan had on its investment menu.  A fact sheet shows that the 2025 Passive Blend

18  CIT, for example, has only 18 holdings, and that four of the fund's top ten holdings are passively

19  managed index funds.[93]  Furthermore, at the time the Committee selected the JPMorgan TDFs to

20

21

---

[86] *See* Dkt. 82-4 (Declaration of D. Lee Heavner) ¶¶ 9-10.
[87] Ex. 89, "Fidelity Transparency Report," Q3 2017; Ex. 92, "Fidelity Transparency Report," Q3 2019.
[88] Ex. 59, "2Q 2020 Review of the Salesforce.com Inc. 401(k) Savings Plan," Sept. 15, 2020, SALESFORCE_0049206-387 at 353.
[89] *See id.*; Ex. 17, "3Q 2016 Review of the Salesforce.com inc. 401(k) Savings Plan," Sept. 30, 2016, SALESFORCE_0004561-658 at 620-621.
[90] Ex. 32, "Target Date Fund Review," Dec. 31, 2015, SALESFORCE_0038442-508; Ex. 44, "Minutes of a Meeting of the 401k Committee of Salesforce.com, Inc.," June 17, 2016, SALESFORCE_0060884-885 at 885.
[91] Ex. 29, Ruiz-Zaiko Tr. at 71:24-73:10; 77:8-78:19.
[92] *See* Dkt. 38 (First Am. Compl.) ¶ 112.
[93] Dkt. 40-8, Fact Sheet, JPMCB SmartRetirement® Passive Blend 2025 Fund CF-B, Sept. 30, 2020), at 3.

14

1   replace the Fidelity Freedom Funds in the second quarter of 2013,[94] the Passive Blend CITs had only

2   two years of performance history.  The Committee did not expand the search to include passive

3   blend funds until late 2018 or early 2019.  In November 2018, Bridgebay recommended that the

4   Committee consider switching from the JPMorgan TDFs to the Passive Blend CIT series, which

5   Bridgebay found to have "similar investment profiles and strategies but … had lower fees."[95]

6           At an April 19, 2019 Committee meeting, following the completion of the target date fund

7   RFP, the Committee renewed its discussion about switching the Plan's TDF series and three core

8   funds from mutual fund versions to CIT versions.[96]  A Fidelity representative presented materials

9   regarding the company's CITs and Bridgebay representatives assisted Fidelity in answering the

10  Committee's CIT questions, including concerns about "regulators, transparency, and adherence to

11  the same investment philosophy as the mutual fund counterparts."[97]  Bridgebay also circulated a

12  detailed analysis comparing the R6 class of the JPMorgan TDFs to the Passive Blend CITs.[98]  After

13  further discussions, the Committee approved the recommended changes from the JPMorgan TDFs to

14  the Passive Blend CITs; from the Contrafund K6 to the Contrafund CIT; and from the International

15  K6 to the International CIT, effective July 20, 2019.[99]  As of April 2019, the track records of the

16  Contrafund CIT and the International CIT had exceeded five years by just a few months.[100]

17  ## IV.    STANDARD OF REVIEW

18          Under Rule 56 of the Federal Rules of Civil Procedure, a "party may move for summary

19  judgment, identifying each claim or defense—or the part of each claim or defense—on which

20  summary judgment is sought."   Fed. R. Civ. P. 56(a).  "Summary judgment must be granted if the

21  movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

---

22  [94] *See* Ex. 28, Bridgebay Financial, "Salesforce.com Inc. 401(k) Savings Plan," Mar. 31, 2014,
    SALESFORCE_0003495-606 at 497; Ex. 10, Case Rep. ¶ 102.

23  [95] Ex. 44, "Minutes of a Meeting of the 401k Committee of Salesforce.com, Inc.," Nov. 16, 2018,
    SALESFORCE_0006050-052 at 050-051.

24  [96] Ex. 48, "Minutes of a Meeting of the 401k Committee of Salesforce.com, Inc.," Apr. 19, 2019,
    SALESFORCE_0060861-864 at 863; Ex. 18, Allanson Tr. at 72:19-73:15.

25  [97] Ex. 48, "Minutes of a Meeting of the 401k Committee of Salesforce.com, Inc.," Apr. 19, 2019,
    SALESFORCE_0060861-864 at 862.

26  [98] *Id*. at 863.

27  [99] *Id.* at 862-863; Ex. 58, "2Q 2019 Review of the Salesforce.com Inc. 401(k) Savings Plan," June
    30, 2019, SALESFORCE_0004243-349 at 246.

28  [100] Ex. 59, "2Q 2020 Review of the Salesforce.com Inc. 401(k) Savings Plan," Sept. 15, 2020,
    SALESFORCE_0049290-387 at 349, 353.

15

1   judgment as a matter of law." *Id.*

2       A principal purpose of summary judgment "is to isolate and dispose of factually unsupported

3   claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  The party moving for summary

4   judgment has the initial burden of demonstrating the absence of a genuine issue of material fact.  *Id.*

5   at 323.  Where, as in this case, the nonmoving party bears the ultimate burden of proof at trial, the

6   moving party can meet its initial burden on summary judgment by "showing . . . that there is an

7   absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325 (cleaned up).

8   Once this initial burden of production has been met, the burden then shifts to the nonmoving party to

9   "produce evidence to support its claim or defense." *Nissan Fire & Marine Ins. Co., Ltd., v. Fritz*

10  *Cos., Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000); *see also C.A.R. Transp. Brokerage Co., Inc. v.*

11  *Darden Restaurants, Inc.* , 213 F.3d 474, at 480 (9th Cir. 2000) .  "If the nonmoving party fails to

12  produce enough evidence to create a genuine issue of material fact, the moving party wins the

13  motion for summary judgment." *Nissan Fire*, 210 F.3d at 1103 (citing *Celotex*, 477 U.S. at 322).

14      A fact is material if it could affect the outcome of the suit.  *Anderson v. Liberty Lobby, Inc.*,

15  477 U.S. 242, 248-49 (1986).  In deciding whether a material fact is genuinely disputed, the court

16  must view the evidence in the light most favorable to the non-moving party, drawing all justifiable

17  inferences in that party's favor.  *Id.* at 255.  However, it is not the Court's task "to scour the record

18  in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996)

19  (cleaned up).  The Court is entitled to rely on the nonmoving party to "identify with reasonable

20  particularity the evidence that precludes summary judgment." *Id.*

21  **V.    ARGUMENT**

22      **A.    Plaintiffs' Claims of Imprudence Lack Merit**

23      The undisputed facts show that Defendants are entitled to summary judgment on Plaintiffs'

24  claims of imprudence.  ERISA's prudence standard focuses on the fiduciary's process in making a

25  decision; it examines how the fiduciary "arriv[ed] at an investment decision," not on results*.  In re*

26  *Unisys Savs., Plan Litig.*, 74 F.3d 420, 434 (3d Cir. 1996).[101]  As *Hughes* makes clear, satisfaction of

---

[101] *See also*, *e.g.*, *Kanawi v. Bechtel Corp.*, 590 F. Supp. 2d 1213, 1221, 1229-30 (N.D. Cal. 2008) (key to prudence is "the thoroughness of the fiduciary's decision making process"); *PBGC ex rel. St. Vincent Catholic Med. Ctrs., v. Morgan Stanley Inv. Mgmt., Inc.*, 712 F.3d 705, 716 (2d Cir. 2013)

MOTION FOR SUMMARY JUDGMENT                                    3:20-cv-01753-MMC

1   ERISA's duty of prudence "turns on 'the circumstances . . . prevailing' at the time the fiduciary

2   acts," and courts "must give due regard to the range of reasonable judgments a fiduciary may make

3   based on her experience and expertise."  595 U.S. at 177.  The record in this case establishes that:

4   (1) Defendants followed a prudent process for monitoring the Plan's investment options; (2) the Plan

5   included the R5 (formerly "Institutional") class of the JPMorgan TDFs on its menu, and not the I

6   (formerly "Select") class; and (3) Defendants' decisions to retain the R5 class of the JPMorgan

7   TDFs until December 29, 2017, and to forego replacing the JPMorgan TDFs and the mutual versions

8   of the Fidelity Contrafund and Diversified International Fund with Plaintiffs' preferred CITs until

9   July 19, 2019, were all within the "range of reasonable judgments" Defendants could make under the

10   circumstances prevailing at the time.  *Hughes v. Nw. Univ.*, 63 F.4th 615, 630 (7th Cir. 2023) ("a

11   plaintiff must plausibly allege fiduciary decisions outside a range of reasonableness").  Furthermore,

12   Plaintiffs have failed to established that the Plan suffered a loss as a result of any of the alleged

13   fiduciary breaches.  *See Call*, 881 F.2d at 632-33.

14   **1.      Defendants Followed a Prudent Monitoring Process**

15      The record shows that the Defendants had a robust process for monitoring the Plan's

16   investment options.  The Committee met regularly, kept minutes of its meetings, and employed the

17   services of an independent, fiduciary investment consultant (Bridgebay) as well as outside legal

18   counsel (Mr. Aguirre), both of whom regularly attended Committee meetings.  With Bridgebay's

19   assistance, the Committee adopted an IPS in 2013, which it updated in 2016.  The IPS described the

20   Plan's investment objectives and the roles and responsibilities of Committee members, Plan service

21   providers, and consultants; and provided broad guidelines regarding how the Committee should

22   execute its duties (*e.g*., selecting and monitoring investment options).  With assistance from another

23   third-party consultant, the Committee also developed an Investment Beliefs Statement, which the

24   Committee adopted in 2018 after review and discussion of multiple drafts.

25      Bridgebay's assistance in monitoring the cost and performance of the Plan's investment

26   options provides strong evidence that the Committee followed a prudent process in making its

27   _____

28   (fiduciaries are judged "upon information available . . . at the time," not "hindsight" (quotation
     omitted)).

MOTION FOR SUMMARY JUDGMENT                                    3:20-cv-01753-MMC

decisions.  Bridgebay provided the Committee with quarterly investment evaluation reports and other periodic targeted analyses, reported on the performance and fees of the Plan's investment options, and attended the Committee's quarterly meetings to answer questions and provide further explanation if there were any issues.  Each Committee member was expected to review Bridgebay's quarterly reports prior to scheduled meetings.  Bridgebay also conducted separate, in-depth annual "due diligence" reviews of the JPMorgan TDFs' performance, glide path construction, underlying investments, investment management, and fees, which were also presented at Committee meetings. When the Committee considered whether to add, remove or replace investment options, it sought and reviewed detailed analyses from Bridgebay, questioned Bridgebay regarding the data provided, and considered and discussed such information at length before reaching a decision.

Plaintiffs have yet to identify *any* deficiency in the Committee's monitoring process. Instead, Plaintiffs have attempted to infer a deficient process from factually unsupported claims that Defendants failed to (i) select the lowest-cost share class of the JPMorgan TDFs; and (ii) timely replace the JPMorgan TDFs and the mutual fund versions of the Fidelity Contrafund and Diversified International Fund with allegedly lower-cost CITs that purportedly had substantially identical underlying assets.  For the reasons described in further detail below, the undisputed factual record refutes Plaintiffs' claims.  This Court should therefore grant Defendants' motion for summary judgment on Plaintiffs' duty of prudence claim.

### 2. There Is No Genuine Dispute that Defendants Selected the Lowest-Cost Share Class of the JPMorgan TDFs

There is no genuine dispute that the Plan included the Institutional/R5 class of the JPMorgan TDFs on its investment menu prior to December 29, 2017.  The Plan's business records—including the Plan's recordkeeping agreements with Fidelity, Fidelity's fee disclosures to the Plan, the Plan's 2015 summary plan description, Bridgebay's reports, and the named Plaintiffs' individual account statements—demonstrate that the Plan in fact included the Institutional/R5 class of the JPMorgan TDFs on its investment menu from the beginning of the Class Period through December 29, 2017.[102] There is no evidence to the contrary.  In those instances where a Plan record utilizes both the

---

[102] *See supra* notes 41 and 42.

MOTION FOR SUMMARY JUDGMENT                                      3:20-cv-01753-MMC

1    "Institutional" nomenclature and a ticker symbol to identify the JPMorgan TDF share class on the

2    Plan's menu, the ticker symbol is the same as that of the "R5" class.  SEC prospectuses confirm that

3    the "Institutional" and "R5" designations used to identify the JPMorgan TDFs on the Plan's menu

4    prior to December 29, 2017, were in fact successive names for the same share class.  Plaintiffs'

5    supposed expert, Mr. Conner, grudgingly conceded the point when confronted with the SEC

6    prospectuses confirming the name change.[103]  Indeed, the named Plaintiffs themselves admitted that

7    their own account statements showed they were invested in the R5 class of the JPMorgan TDFs

8    during periods in which they faulted the Plan for not investing in that same share class.

9           The Plan's records also establish that the Institutional/R5 class of the JPMorgan TDFs

10   provided 0.15% (15 basis points) in revenue sharing that could be used to offset the Plan's

11   administrative expenses, including Fidelity's fees for recordkeeping services, whereas the R6 class

12   provided *no* revenue sharing.  SEC prospectuses for the Institutional/R5 and R6 JPMorgan TDF

13   classes further establish that the revenue sharing provided by the Institutional/R5 class exceeded the

14   fee differential between the Institutional/R5 class and the R6 class throughout the relevant period.[104]

15   Thus, the Institutional/R5 class was actually cheaper on a "net cost" basis than the R6 class.

16          Further, Bridgebay's Q3 2017 investment review reflects that the Committee's decision to

17   switch to the zero-revenue sharing R6 class was directly related to the $12 per participant reduction

18   in Fidelity's recordkeeping fees.  That fee reduction, which became effective as of October 1, 2017,

19   had the effect of reducing the total revenue sharing needed to offset Fidelity's recordkeeping fee.

20   The Plan's switch to the zero-revenue-share R6 class also corresponded with the Plan's transition

21   away from revenue sharing, and toward instead charging participant accounts directly for Plan

22   administration expenses.

23          Accordingly, the 0.15% (15 basis points) in revenue sharing provided by the R5 class of the

24   JPMorgan TDFs provides a compelling justification for their inclusion on the Plan's investment

25   menu prior to December 29, 2017.  Indeed, for this very reason, the Tenth Circuit recently rejected

26   allegations that the exact funds at issue here—the R5 class of the JPMorgan TDFs—should have

27   [103] Ex. 36, Conner Tr. at 170:15-171:14; 171:22-172:9; 173:18-176:14; 179:10-180:15; 182:3-13; 184:9-186:11.

28   [104] *Id.* at 186:12-189:22.

MOTION FOR SUMMARY JUDGMENT                                          3:20-cv-01753-MMC

1   been replaced with the nominally lower-cost R6 class on a retirement plan's investment menu. *See*

2   *Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1150-51 (10th Cir. 2023) (affirming dismissal of

3   ERISA claims of imprudence because while plaintiffs alleged "the R5 funds offered by the Plan

4   were more expensive than the R6 funds," "the Plan applied a 15 basis-point revenue credit to the

5   overall cost of the R5 funds" and therefore "the R5 funds are actually less expensive than the R6

6   funds"). Moreover, the Ninth Circuit itself recognized that revenue sharing may provide a

7   "plausible" explanation for Defendants' alleged failure to offer the R6 class of the JPMorgan TDFs.

8   *Davis v. Salesforce.com, Inc.*, No. 21-15867, 2022 WL 1055557, at *1 (9th Cir. Apr. 8, 2022).

9   Because the undisputed facts show that the decision to include the Institutional/R5 class on the

10  Plan's menu was within the "range of reasonable judgments" that a prudent fiduciary could make,

11  Defendants are entitled to summary judgment on this claim. *See Hughes*, 63 F.4th at 630.

### 3.   Defendants Reasonably Decided Not to Replace the JPMorgan TDFs With Plaintiffs' Preferred CITs Prior to July 19, 2019

14         The record shows that Defendants' decision to retain the JPMorgan TDFs on the Plan's

15  investment menu prior to July 19, 2019 was well within the "range of reasonable judgments" that a

16  prudent fiduciary could make under the circumstances prevailing at the time. *Hughes*, 63 F.4th at

17  630. First, there is no dispute that the Committee regularly reevaluated whether to retain JPMorgan

18  as the Plan's TDF provider and concluded, in conjunction with Bridgebay, that doing so was

19  warranted by the JPMorgan TDFs' track records. The evidence shows that the JPMorgan TDFs

20  were sound investments that performed well in comparison to their peer group throughout the Class

21  Period. Bridgebay's quarterly reviews from Q1 2014 through Q1 2019 reflect that all but one or two

22  of the JPMorgan TDF TDF vintages had 4-star or 5-star Morningstar ratings at the end of every

23  quarter.[105] Indeed, at the end of 14 of the 21 quarters during that period, every vintage of the

24  JPMorgan TDFs had either a 4-star or 5-star rating from Morningstar.[106] As for the remaining 7

25  quarters, only one vintage of the JPMorgan TDFs had a 3-star rating at the end of 6 of those quarters,

---

[105] *See* Exs. 17, 24, 27, 28, 31, 47, 49, 60-73 (Bridgebay Quarterly Review of the Salesforce.com Inc. 401(k) Savings Plan, Q1 2014-Q1 2019).
[106] *See* Exs. 17, 24, 27, 49, 61, 62-70, (Bridgebay Quarterly Review of the Salesforce.com Inc. 401(k) Savings Plan, Q3 2014-Q4 2017).

MOTION FOR SUMMARY JUDGMENT                                3:20-cv-01753-MMC

1    and two vintages had a 3-star rating at the end of 1 quarter.[107]  Data published in a May 2019

2    Morningstar Report further shows that the 10-year trailing performance of the JPMorgan TDFs

3    through the end of 2018 put them in the top 10 percent of their peers; and that the JPMorgan TDFs

4    were one of only four out of 28 series of TDFs analyzed by Morningstar that earned Morningstar's

5    highest "Gold" analyst rating as of December 31, 2018.[108]

6           Second, the undisputed facts show that Plaintiffs' preferred Passive Blend CITs had only a

7    three-year track record at the beginning of the Class Period.  As explained previously, the Plan's IPS

8    required that each investment option on the Plan's menu have "a minimum of 5 years of investment

9    performance, unless specifically exempted by the Committee."[109]  The Committee was particularly

10   concerned with the relatively short track records of CITs and their inability to use the performance

11   histories of their mutual fund counterparts in disclosures made to investors.[110]  At the beginning of

12   the Class Period, the Passive Blend CITs had only a three-year track record, two years less than the

13   five-year minimum required by the IPS.

14          As the Ninth Circuit recognized, "the different regulatory regimes governing mutual funds

15   and collective investment trusts" could "justif[y] defendants' delay in making the switch [to CITs]

16   earlier."  *Davis*, 2022 WL 1055557, at *2; *see also Davis v. Salesforce.com, Inc.*, No. 20-cv-01753-

17   MMC, 2020 WL 5893405, at *6 (N.D. Cal. Oct. 5, 2020) (noting that CITs lack important regulatory

18   safeguards of mutual funds, including investment diversification requirements, limitations on

19   leverage, and mandatory oversight by a largely independent board of directors).  The factual record

20   bears this out:  the Committee hesitated to switch to CITs given concerns about the investment

21   vehicles' different regulatory regimes and lack of transparency to participants, among other factors.

22   As Ms. Ruiz-Zaiko of Bridgebay testified, the Committee was particularly concerned with the lack

23   of publicly available information about CITs where the CIT had a relatively short track record.[111]

24   [107] *See* Exs. 28, 31, 47, 60, 71, 72, 73, (Bridgebay Quarterly Review of the Salesforce.com Inc.,
     401(k) Savings Plan, Q1 2014, Q2 2014, Q1 2018-Q1 2019).

25   [108] Ex. 82, Morningstar, "2019 Target-Date Fund Landscape," May 9, 2019, at 32-33, 52; *see also*
     Ex. 74, Rebuttal Expert Report of Robert E. Conner, Ex. 4 (showing that the R5 class of the

26   JPMorgan 2040 TDF had a "Gold" analyst rating from Morningstar as of Mar. 15, 2019).
     [109] *See* Ex. 13, 2016 IPS at 999.

27   [110] *See* Ex. 49, "4Q 2015 Review of the Salesforce.com Inc. 401(k) Savings Plan," Dec. 31, 2015,
     SALESFORCE_0004739-839 at 753-754.

28   [111] *See* Ex. 50, Ruiz-Zaiko Tr. at 71:24-73:10.

According to Ms. Ruiz-Zaiko, the Committee "didn't want to have the participant look at a fact sheet with only two-year track record and wonder, wait a minute, was is the CIT?  I've never heard about this before. ... I can't look this up. ... What happened to my Morningstar rating?  So they always wanted to be sure it had at least a five-year track record."[112]  Plaintiffs' supposed expert, Mr. Conner, admitted that it would be reasonable to consider such concerns in deciding whether to switch from a mutual fund to a CIT version of the same strategy.[113]

Furthermore, the Passive Blend CITs pursue an entirely different investment strategy from the JPMorgan TDFs by investing a significant percentage of their underlying assets in *passively* managed index funds.  *See Davis,* 2021 WL 1428259, at *5; *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822 (8th Cir. 2018) ("To show that a prudent fiduciary in like circumstances would have selected a different fund based on the cost or performance of the selected fund, a plaintiff must provide a sound basis for comparison—a meaningful benchmark." (cleaned up)).  The record shows that the JPMorgan TDFs actually outperformed the Passive Blend CITs net of fees in 2014, 2017 and 2019.[114]  That the JPMorgan TDFs' annualized net returns exceeded those of the Passive Blend CITs over multiple periods not only refutes Plaintiffs' claim that their underlying assets are "substantially identical," but also demonstrates the absence of any compelling performance-based reason to replace them.  In fact, Defendants' expert D. Lee Heavner has found that Plaintiff Miguel would have earned $25.20 *less* during the Class Period had his money been invested in the Passive Blend 2055 CF fund,[115] meaning he would have been worse off with Plaintiffs' preferred Passive Blend CITs.

### 4.   Defendants Reasonably Decided Not to Replace the Fidelity Mutual Funds with Plaintiffs' Preferred CITs Prior to July 19, 2019

The record likewise demonstrates that the Defendants reasonably decided not to replace the mutual fund versions of the Fidelity Contrafund and Diversified International Fund with the Contrafund CIT and International CIT prior to July 19, 2019.  As noted above, the Plan's IPS required that "[e]ach investment option chosen should have […] a minimum of 5 years of verifiable

---

[112] *Id.* at 77:8-78:19.
[113] Ex. 36, Conner Tr. at 250:21-252:18; *see also* Ex. 10, Case Rep. ¶ 94.
[114] *See* Dkt. 82-4 (Declaration of D. Lee Heavner), Ex. 1.
[115] *Id.* ¶ 13 & Exs. 2A, 2B.

investment performance."[116]  The Contrafund CIT and International CIT were both formed less than three months before the beginning of the Class Period, and thus lacked any meaningful performance history.  The evidence also shows that the lack of any real track record, combined with the lack of a Morningstar rating, were the main reasons the Committee did not consider including these CITs on the Plan's menu at an earlier time.  Bridgebay's Q4 2015 investment review referenced the "challenge" then presented by the limited performance history of CITs and the impact of that limited history on the performance data CITs are allowed to publish.[117]  A slide deck presented by Fidelity at the Committee's March 18, 2016 meeting also included a specific comparison of the Fidelity Contrafund K to the Contrafund CIT, which indicated that the Contrafund CIT's inception date was January 17, 2014, that the tracking of its performance began on that date, and that it lacked a Morningstar rating.[118]  Bridgebay's Q3 2016 investment review reiterated those concerns.[119]

Notably, the Contrafund K and Diversified International K mutual funds also provided 0.20% (20 basis points) in revenue sharing to offset the Plan's expenses.  No revenue sharing was provided by the Contrafund CIT or the International CIT.  In fact, the slide deck that Fidelity presented at the Committee's March 18, 2016 meeting shows that the revenue sharing provided by the Contrafund K *exceeded* the fee differential between the Contrafund K (0.61% or 61 basis points) and Contrafund CIT (0.43% or 43 basis points) by 0.02% (2 basis points).[120]  Taking these revenue-sharing offsets into account, the Contrafund K outperformed the Contrafund CIT by 0.53% (53 basis points) in 2015 and 0.16% (16 basis points) in 2016.[121]  Similarly, the International K Fund outperformed the International CIT by 0.12% (12 basis points) in 2014 and 0.28% (28 basis points) in 2017.[122]

Even without considering revenue sharing, the Contrafund K outperformed the Contrafund CIT by 0.33% (33 basis points) in 2014, and the International K Fund outperformed the International

---

[116] Ex. 12, 2013 IPS at 750; Ex. 13, 2016 IPS at 999.
[117] Ex. 49, "4Q 2015 Review of the Salesforce.com Inc. 401(k) Savings Plan," Dec. 31, 2015, SALESFORCE_0004739-839 at 753-754.
[118] Ex. 52, Fidelity Presentation, Mar. 18, 2016, at [22].
[119] Ex. 17, "3Q 2016 Review of the Salesforce.com inc. 401(k) Savings Plan," Sept. 30, 2016, SALESFORCE_0004561-658 at 563.
[120] Ex. 52, Fidelity Presentation, Mar. 18, 2016, at [22].
[121] *See* Dkt. 82-4 (Declaration of D. Lee Heavner), Ex. 1.
[122] *See id.*

MOTION FOR SUMMARY JUDGMENT                                   3:20-cv-01753-MMC

1   CIT by 0.08% (8 basis points) in 2017.[123]  The relative outperformance of the Contrafund K and the

2   International K Fund during those periods once again refutes Plaintiffs' claim that the underlying

3   assets of these funds are "substantially identical" to Plaintiffs' preferred CIT replacements.

4        Finally, as the Court has recognized, mutual funds offer greater transparency than CITs, as

5   well as important regulatory safeguards.  The record shows that the Committee was well aware of

6   these differences in transparency and regulatory oversight, and that it took them into account in

7   making its decisions.  *See Hughes*, 142 S. Ct. at 742 ("courts must give due regard to the range of

8   reasonable judgments a fiduciary may make based on her experience and expertise").

9        **5.   Plaintiffs Cannot Demonstrate that the Plan Suffered a "Loss" as a
         Result of the Alleged Fiduciary Breaches**

10

11        Plaintiffs have failed not only to demonstrate any imprudence on the part of the Defendants,

12   but also to demonstrate any *losses* resulting from the alleged violations.  *See Call*, 881 F.2d at 632-

13   33 ("to recover under [ERISA] § 409(a), appellants must show that appellees' alleged breaches

14   caused a 'loss' to the plans").  With regard to the prudence claim based on the failure to replace the

15   JPMorgan TDFs with the Passive Blend CITs at the inception of the Class Period, Plaintiffs have

16   come forward with *no* evidence of loss whatsoever.  Indeed, their purported expert Mr. Connor

17   offers *no* opinion or calculation regarding any losses resulting from the failure to switch to the

18   Passive Blend CITs at any time prior to July 19, 2019.   Plaintiffs' claims based on the failure to

19   switch to the R6 class of the JPMorgan TDFs, the Contrafund CIT, and the International CIT fare no

20   better.  Although Mr. Conner purports to calculate "share class" losses allegedly caused by the

21   failure to make those moves in 2015, 2016 and 2017,[124] the report submitted by Defendants' expert

22   D. Lee Heavner shows that, after correcting the multitude of errors made by Mr. Conner, Mr.

23   Conner's analysis results in total alleged "share class" losses of ***negative*** $1.1 million—indicating

24   that the Plan and its participants would have been *worse off* if they had been invested in Plaintiffs'

25   supposed "lower cost" share classes.[125]  The Court should therefore grant summary judgment on the

26

27   _____
     [123] *See id.*
     [124] *See* Ex. 75, Conner Rep. ¶¶ 35-43.
28   [125] Ex. 37, Heavner Rep. ¶¶ 39-40, Ex. 2.A.

additional ground that Plaintiffs have failed to sustain their burden of proving that the alleged breaches caused a "loss" to the Plan.

**B.      Plaintiffs' Failure to Monitor Claim is Derivative of Their Fiduciary Breach Claim**

Plaintiffs' failure to monitor claim is derivative of the underlying breach claim, and fails along with that claim. *Davis*, 2021 WL 1428259, at **7-8. Because the undisputed facts cannot support an underlying fiduciary breach, as discussed above, Plaintiffs' failure to monitor claim also lacks any merit.

**VI.      CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court grant Defendants' Motion for Summary Judgment.

DATED:  November 13, 2023                    Respectfully submitted,

                                             STEPTOE & JOHNSON LLP

                                    By:      /s/ Eric G. Serron
                                             _____

                                             Robyn C. Crowther (CA Bar No. 193840)
                                             Tahir L. Boykins (CA Bar No. 323441)
                                             STEPTOE & JOHNSON LLP
                                             One Market Plaza
                                             Spear Tower, Suite 3900
                                             San Francisco, CA 94105
                                             Telephone: (415) 365-6700
                                             Facsimile: (415) 365-6699
                                             rcrowther@steptoe.com
                                             tboykins@steptoe.com

                                             Paul J. Ondrasik, Jr. (*pro hac vice*)
                                             Eric G. Serron (*pro hac vice*)
                                             STEPTOE & JOHNSON LLP
                                             1330 Connecticut Ave., NW
                                             Washington, DC 20036
                                             Telephone: (202) 429-3000
                                             Facsimile: (202) 429-3902
                                             pondrasik@steptoe.com
                                             eserron@steptoe.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Justin Ben-Asher (*pro hac vice*)
STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York, N.Y. 10036
Phone: (212) 506-3900
Facsimile: (212) 506-3950
jbenasher@steptoe.com

*Counsel for Defendants Salesforce, Inc., Board of Directors of Salesforce, Inc., Marc Benioff, The 401(k) Plan Committee, Joseph Allanson, Stan Dunlap, and Joachim Wettermark*