ROSMAN & GERMAIN APC
Daniel L. Germain (Bar No. 143334)
5959 Topanga Canyon Boulevard
Suite 360
Woodland Hills, CA  91367-7503
phone: (818) 788-0877
facsimile: (818) 788-0885
E-mail: Germain@Lalawyer.com

*Counsel for Plaintiffs and the Putative Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TIM DAVIS, GREGOR MIGUEL, and AMANDA BREDLOW, individually and on behalf of all others similarly situated,<br><br>                    Plaintiffs,<br><br>        v.<br><br>SALESFORCE.COM, INC., BOARD OF DIRECTORS OF SALESFORCE.COM, INC., MARC BENIOFF, THE INVESTMENT ADVISORY COMMITTEE, JOSEPH ALLANSON, STAN DUNLAP, and JOACHIM WETTERMARK,<br><br><br>                    Defendants. | Case No. 3:20-cv-01753-MMC<br><br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**<br><br>Judge:  Maxine M. Chesney |

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................1

II.    PLAINTIFFS' RESPONSES TO DEFENDANTS STATEMENT OF FACTS AND
COUNTER STATEMENT OF FACTS ...............................................................2

Plaintiffs' Response to Defendants Facts ...............................................................2

    A.    The Plan .....................................................................................................2

    B.    The Committee Followed a Prudent Process for Selecting and Monitoring
Investment Options ..................................................................................2

    C.    The Plan Transitioned Away from Paying Recordkeeping Fees Through Revenue
Sharing .....................................................................................................3

    D.    The Committee Prudently Retained the JPMorgan TDFs .........................5

    E.    The Committee Prudently Selected and Monitored the Fidelity Funds....................6

    F.    The Committee Appropriately Considered Collective Investment Trust ..................7

Plaintiffs' Statement of Undisputed Facts ...............................................................9

    G.    CITs are nearly identical to their Mutual Fund Counterparts ....................................9

    H.    The Committee's Flawed Process Included Failing to Consider Lower Cost
Versions of the Plan's Funds ..................................................................9

        i.    The Committee Should Have Switched to The R6 Share Class Sooner........9

        ii.    The Committee did not thoroughly consider switching to CIT versions of
funds in the Plan...................................................................................11

    I.    The Committee Breached Their Fiduciary Duty by Overly Relying On Their
Third Party Advisor ..............................................................................12

    J.    Defendants Did Not Adequately Diversity the Plan's Investment Menu ................13

III.    LEGAL STANDARD...........................................................................................14

    a.    Summary Judgment Standard ................................................................14

    b.    ERISA's Prudence Standard ..................................................................15

IV.   SUMMARY JUDGMENT IS INAPPROPRIATE BECAUSE PLAINTIFFS HAVE
      OFFERED EVIDENCE DEMONSTRATING THE COMMITTEE DID NOT
      FOLLOW A PRUDENT PROCESS RELATING TO THE PLAN'S INVESTMENTS ....16

      A.    The Prudence of Defendants' Processes And Decisions Hinges
            on Questions of Reasonableness That Are Inappropriate at The Summary
            Judgment Stage ..........................................................................................16

      B.    Plaintiffs Have Shown There Is a Genuine Dispute as to Whether The
            Committee Independently Reviewed The Plan's Investments .................................17

      C.    Plaintiffs Have Shown There is a Material Dispute as to Whether Revenue
            Sharing Justified Defendants' Decisions to Select More Expensive Funds ............19

      D.    Whether CITs are Appropriate alternative funds is a question of fact ....................21

      E.    Plaintiffs Can Prove the Plan Suffered Damages as a Result of Defedants'
            Imprudent Investment Processes...........................................................................23

      F.    Plaintiffs' Duty to monitor claim is derivative of Plaintiffs claims........................24

V.    CONCLUSION....................................................................................................24

1

2
## TABLE OF AUTHORITIES

3
PAGE(S)

4

5
**Cases**

6
*Anderson ex rel. Bd. of Trs. v. DePhillips,*
No. 02 C 7685, 2004 U.S. Dist. LEXIS 4264 (N.D. Ill. Mar. 15, 2004) ................................. 2, 16

7

8
*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986)................................................................................................................ 14

9

10
*Board of Trs. of S. California IBEW-NECA Defined Contribution Plan v. Bank of N.Y. Mellon Corp.,*
No. 09 Civ. 6273 (RMB), 2011 WL 6130831 (S.D.N.Y. Dec. 9, 2011) ...................................... 15

11

12
*Brotherston v. Putnam Invs., LLC,*
907 F.3d 17 (1st Cir. 2018)....................................................................................................... 21

13

14
*Cates v. Trs. of Columbia Univ. in City of New York,*
No. 1:16-cv-06524 (GBD) (SDA) 2019 WL 8955333 (S.D.N.Y. Oct. 25, 2019)
R. & R. adopted, 2020 WL 1528124 (S.D.N.Y. Mar. 30, 2020). .................................................. 15

15

16
*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986)................................................................................................................ 14

17

18
*Cryer v. Franklin Res., Inc.,*
No. 16-cv-04265, 2018 WL 6267856,
2018 U.S. Dist. LEXIS 224010 (N.D. Cal. Nov. 16, 2018)...................................................... 2, 16

19

20
*Davis et al. v. Magna et al.,*
No. 20-11060, (E.D. Mich. June 5, 2023)................................................................................. 17

21

22
*Davis v. Salesforce.com, Inc.,*
No. 21-15867, 2022 WL 1055557 (9th Cir. Apr. 8, 2022) ................................................... 10, 21

23

24
*Donovan v. Mazzola,*
716 F.2d 1226 (9th Cir. 1983) ................................................................................................. 18

25

26
*England et al. v. Denso Int'l America, Inc.,*
2023 WL 4851878 (E.D. Mich. July 28, 2023) ......................................................................... 19

27

28
*Feinberg v. T. Rowe Price Group, Inc.,*
2021 WL 488631 (D. Md. Feb. 10, 2021) ................................................................................. 17

*Fink v. Nat'l Sav. & Tr. Co.*,
772 F.2d 951 (D.C. Cir. 1985) ............................................................................ 18

*Garthwait, et al. v. Eversource Energy Co.*,
2022 WL 3019633 (D. Conn. July 9, 2022) ........................................................ 21

*Harris v. Koening*,
815 F. Supp. 2d 6 (D.D.C. 2011) .......................................................................23

*Hughes v. Nw. Univ.*,
142 S. Ct. 737 (2022) .......................................................................... 1, 2, 15, 20

*Hunt v. Cromartie*,
526 U.S. 541 (1999) ............................................................................................ 15

*Keach v. U.S. Trust Co.*,
419 F.3d 626 (7th Cir.2005) .............................................................................. 18

*Kong v. Trader Joe's Co.*,
No. 20-56415, 2022 WL 1125667 (9th Cir. Apr. 15, 2022) ............................... 20

*Lauderdale v. NFP Ret., Inc.*,
No. 8:21-CV-301-JVS-KES, 2022 WL 17260510 (C.D. Cal. Nov. 17, 2022)........................... 15

*Liss v. Smith*,
991 F.Supp. 278 (S.D.N.Y.1998) ...................................................................... 18

*Matney v. Barrick Gold of N. Am.*,
80 F.4th 1136 (10th Cir. 2023) .......................................................................... 20

*McCool v. AHS Mgmt. Co., Inc.*,
No. 3:19- CV-01158 (M.D. Tenn. Mar. 31, 2023) ............................................. 17

*Nunez et al., v. B. Braun Medical, Inc. et al.*,
No. 20-4195 (E.D. Pa. Apr. 21, 2023) ........................................................... 2, 21

*Pension Ben. Guar. Corp ex rel. St. Vincent Catholic Medical Center*,
712 F.3d 705 (2d Cir. 2013)............................................................................... 17

*Pension Fund-Mid Jersey Trucking Industry-Local 701 v. Omni Funding Group*,
731 F. Supp. 161, 169 (D.N.J. 1990) ................................................................ 16

*Pizarro v. Home Depot, Inc.*,
634 F.Supp.3d 1260 (N.D. Ga. Sep. 30, 2022) .................................................17

*Sacerdote v. New York Univ.*,
9 F.4th 95 (2d Cir. 2021) .......................................................................17, 19, 21

*Sellers v. Trs. of Bos. Coll.*,
No. 22-cv-10912-WGY, 2022 WL 17968685 (D. Mass. Dec. 27, 2022)........................20

*Smith v. Commonspirit Health*,
37 F.4th 1160 (6th Cir. 2022) ....................................................................... 23

*Sweda et al. v. Univ. of Penn.*,
No. 17-3244, 2019 WL 1941310 (3rd Cir. May 2, 2019)........................................17

*Tibble v. Edison Int'l*,
575 U.S. 523 (2015)............................................................................... 1, 15

*Tibble v. Edison Int'l*,
135 S. Ct. 1823 (2015).................................................................................15

*Tibble v. Edison Int'l*,
843 F.3d 1187, 1198 (9th Cir. 2016) *(Tibble IV)* ......................................... 1, 15

*Tibble v. Edison Int'l*,
2010 WL 2757153 2010 U.S. Dist. LEXIS 69119 *(Tibble II)*.............................1

*Tibble v. Edison Int'l*,
2017 WL 3523737 (C.D. Cal. Aug. 16, *2017*)..............................................19

*Tolan v. Cotton*,
572 U.S. 650, 655–59 (2014).........................................................................14

*Troud tv. Oracle Corp.*,
No. 1:16-cv-00175-REB-CBS, 2017 WL 1100876 (D. Colo. Mar. 22, 2017)................20

*Tussey v. ABB, Inc.*,
746 F.3d 327 (8th Cir. 2014) ...................................................................16, 19

*Unisys Corp. Sav. Plan Litig.*,
74 F.3d 420 (3d Cir.1996)...........................................................................18

**Statutes**

29 U.S.C. § 1104(a)(1)................................................................................15

Fed. R. Civ. P. 56(a) .................................................................................14

**Other Sources**

Uniform Prudent Investor Act (the "UPIA") ...................................................1

## I.  INTRODUCTION

Plaintiffs, Gregor Miguel and Amanda Bredlow ("Plaintiffs"), by and through their undersigned counsel, respectfully submit this Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment.  It is widely accepted throughout fiduciary circles "[w]asting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA") § 7. Per the Ninth Circuit:

> Beneficiaries subject to higher fees for materially identical funds lose not only the money spent on higher fees, but also "lost investment opportunity"; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time. *Tibble II* , 2010 WL 2757153, at \*37–38, 2010 U.S. Dist. LEXIS 69119, at \*124–25. Pursuant to the aforementioned trust law principles, a trustee cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical—other than their lower cost—to products the trustee has already selected.

*Tibble v. Edison Int'l*, 843 F.3d 1187, 1198 (9th Cir. 2016).

Defendants here breached their duties in failing to identify and make a timely switch to lower cost funds that were identical, or nearly identical, to funds already in the Plan based on improper assumptions about revenue sharing. *See* Dkt. 112-Ex. 75, Expert Report of Robert E. Conner ("Conner Rpt."). Defendants' breach of their fiduciary duties resulted in damages to the Plaintiffs and similarly situated participants in the Plan. *Id*. at ¶¶ 25-26, 43.

Defendants' Motion for Summary Judgment (ECF No. 112) ("Defs. Mem.") repeatedly quotes the motion to dismiss decision in *Hughes v. Nw. Univ*, stating "courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Hughes v. Nw. Univ.*, 142 S. Ct. 737, 742 (2022). However, Defendants' arguments actually fail under *Hughes*. The Supreme Court in *Hughes* upheld the plaintiffs' allegations that the defendants "neglect[ed] to provide cheaper and otherwise-identical alternative investments" and reiterated the rule of law laid out in *Tibble v. Edison Int'l*, 575 U.S. 523 (2015), holding that "plan fiduciaries are required to conduct their own independent evaluation to determine which investments may be prudently included in the plan's menu of options. If

the fiduciaries fail to remove an imprudent investment from the plan within a reasonable time, they breach their duty." *Hughes,* 142 S. Ct. at 741- 42 (citations omitted).

The evidence in this case overwhelmingly demonstrates that the Committee and its members breached their fiduciary duties to the Plan and its participants. The opinions of Plaintiffs' expert Robert Conner, coupled with the deposition testimony of the Committee members, Defendants' own experts, and Plan documents demonstrate that Defendants' imprudent investment monitoring processes resulted in tangible damages to the Plan and participants. Mr. Conner opines "recurrent failure to notice, adequately review, investigate, or remedy such a glaring share class deficiency is proof in itself of a fundamental flaw in their overall decision-making and review processes." Conner Rpt. at ¶ 25.

Defendants' factual arguments are either inaccurate or do not indisputably prove Defendants acted prudently. Because of the fact-intensive questions involved in ERISA breach of fiduciary duty actions, courts routinely deny motions for summary judgment. *Cryer v. Franklin Res., Inc*., No. 16-cv-04265, 2018 WL 6267856, at *10, 2018 U.S. Dist. LEXIS 224010, at *30 (N.D. Cal. Nov. 16, 2018) (The "reasonableness" of a fiduciary's action is a "fact-intensive inquiry," and courts have recognized that "rarely will such a determination be appropriate on a motion for summary judgment.") (internal citations omitted); *see also, Anderson ex rel. Bd. of Trs. v. DePhillips*, No. 02 C 7685, 2004 U.S. Dist. LEXIS 4264 at *27 (N.D. Ill. Mar. 15, 2004) ("Whether ERISA fiduciaries acted 'prudently' involves a question of fact precluding summary judgment."); *Nunez et al., v. B. Braun Medical, Inc. et al*., ECF No. 112, No. 20-4195 at 1-2 (E.D. Pa. Apr. 21, 2023) (same).

## II. PLAINTIFFS' RESPONSES TO DEFENDANTS STATEMENT OF FACTS AND COUNTER STATEMENT OF FACTS

### Plaintiffs' Response to Defendants Facts
#### A. The Plan

Plaintiffs do not dispute Defendants' statements about the Plan.

#### B. The Committee Followed a Prudent Process for Selecting and Monitoring Investment Options.

It is disputed "the Committee Followed a Prudent Process for Selecting and Monitoring Investment Options." *See* below, Plaintiffs' Statement of Undisputed Facts, Fact H. Specifically, it is

disputed that the 2013 and 2016 IPSs had "the requirement that the option have at least 5 years of verifiable investment performance." Defs. Mem. at 4. First, the 2013 IPS stated the 5-year minimum could be "exempted by the Committee." Document 112-12, 2013 IPS at 750. Second, the 2016 IPS stated "If a CIT has less than a 5-year track record yet uses the same investment management team and follows the same investment strategy as its registered mutual fund counterpart, the long-term track record of the registered mutual fund may be used in the evaluation process to meet the 5-year track record requirement." Document 112-13, 2016 IPS at 1000; *see also* Case Tr.151:17-25. Indeed, Mr. Conner opined "the Committee has repeatedly ignored the 5-year guideline recommended by the IPS" when choosing to implement CITs for the Plan. Conner Rpt. at ¶ 9.

It is further disputed that the Committee "included members with expertise relevant to the selection of investments." Defs. Mem. at 4.  Mr. Conner testified that he did not believe that any Committee had the requisite qualifications or expertise to make investment decisions, including the "understanding conceptually, not just the credentials." Conner Tr. 227:21-25; 231:15-20. Committee Member Joachim Wettermark testified that he does not hold any relevant certifications and his full-time role is not related to investment management. Wettermark Tr. 15: 16-20. Lastly, it is disputed as vague that "The Plan's recordkeeper, Fidelity Retirement Services ("Fidelity"), also made *regular* presentations to the Committee on ERISA fiduciary developments." Defs. Mem. at 5 (emphasis added). Defendants cite to the Expert report of Mr. Case, which only shows Fidelity made ERISA commentary once a year. *Id*. at n.21.

The rest is undisputed as the stated materials speak for themselves.

### C.  The Plan Transitioned Away from Paying Recordkeeping Fees Through Revenue Sharing.

Plaintiffs dispute that revenue sharing is "a common arrangement under which payments received from a plan's investment options are used to compensate a plan service provider—to pay recordkeeping fees owed to the Plan's recordkeeper." Defs. Mem. at 5. First, Plaintiffs dispute Defendants' definition of the revenue sharing process. Revenue sharing is "money that's coming from the participants as paying

expenses for the fund. The plan can be looked at as an intermediary. They're [recordkeepers are] receiving participant's funds and applying it toward expenses with the fund that the participant is in." Conner Tr. 188:13-17. In other words, revenue share uses the participants money to pay for recordkeeping fees through the participant's investments, albeit less directly than a flat recordkeeping fee structure. *See* Conner Tr. 187:16-17. Moreover, Defendants' experts agree that the Participants would have more money in their accounts if Defendants selected share classes of the same fund without the revenue sharing fee component built into the investments. *See* Heavner Tr. 97:6-98:3; Case Tr. 131: 20-24; Conner Rebuttal Rpt. P 20(c) ("Rather, the return will be lower, because a portion of their funds will have been extracted to fund revenue sharing."). Also, the Parties' experts agree that revenue sharing rebates would be rightfully credited back to Participants as the owner-investors of the investment fund shares. *See* Heavner Tr. 92: 8-20 ("Today some recordkeepers can rebate or credit back revenue sharing and make sure that it imposed fees that are the same percentage of assets, for example, regardless of which investment you're invested in, that was not always possible."). Thus, revenue sharing is paid with participants' money through their investments; the investments do not pay revenue sharing independently.

Second, the fact that revenue sharing was more "common" is irrelevant and vague. Mr. Case testified that toward the beginning of the class period "maybe half the 401(k) plans out there" used revenue sharing when the Plan used revenue sharing. Case Tr. 105:7-10. Further, Mr. Conner testified "the criteria of deciding whether you're doing it is always what's best for the participant. The mere fact that it's common really has nothing to do with it." Conner Tr. 83:13-18.

It is undisputed that "In July 2017, Fidelity agreed to reduce the Plan's recordkeeping fees from $49 to $37 per participant ($12 in savings per participant), effective October 1, 2017" and the Plan began "charging participant accounts directly for Plan administration expenses." Defs. Mem. at 6.  The rest of Fact C is undisputed as the stated materials speak for themselves.

**D.  The Committee Prudently Retained the JPMorgan TDFs.**

It is disputed that "[t]he Committee carefully monitored the JPMorgan TDFs throughout the Class Period." Defs. Mem. at 7. *See* below, Fact H.ii. Mr. Conner demonstrates the Committee's failure to monitor the JP Morgan TDFs was one example of how "[t]hey were negligent in using poor processes of decision-making and failing to monitor and manage the portfolio's performance and minimizing the costs inherent in doing so." Conner Rpt. at p. 21.

It is disputed that "The R class had a ***nominally*** lower expense ratio (i.e., fee) than the Institutional/R class" Defs. Mem. at 8 (emphasis added). The fact that the R had a lower expense ratio than the Institutional/R class at all times and across all vintages is undisputed. *Id*. Plaintiffs' expert demonstrated quantifiable damages based on the degree of difference between the fund's expense ratios. Conner Rpt. at ¶ 42. Mr. Conner also opined the differences between fees led to the "detriment of the higher compounded returns that plan participants should have earned instead of the lesser return they did." *Id*. at ¶ 43.

It is disputed that the "**Institutional/R class also paid** 15 basis points in revenue sharing to cover Plan recordkeeping fees and other administrative expenses, which would otherwise be charged directly to participants—unlike the R class, which paid no revenue sharing." Defs. Mem. at 9 (emphasis added). As discussed above, revenue sharing does not mean the share class pays recordkeeping and administrative fees, it is merely an indirect way for participants to pay for recordkeeping and administrative fees. Conner Tr. 188:13-17. Hence, it is also disputed that "[b]ecause the revenue sharing paid by the Institutional/R5 class exceeded the fee differential between the Institutional/R5 class and the R6 class, the Institutional/R5 class was actually cheaper on a net cost basis than the R6 class." Defs. Mem. at 9. It is further unclear that the "'net cost basis' of the than Institutional/R5 class was less than the R6 class," because the per participant recordkeeping fees ***decreased*** by 24.5% when moving away from revenue sharing to a flat fee

structure (and therefore replacing the funds with the higher fees). Defs. Mem. at 6. Defendants proffer no evidence that revenue sharing resulted in lower, or even equal, recordkeeping fees than the flat fees. *See* Heavner Tr. 98:6-11 ("I did not evaluate whether the recordkeeping fees were reasonable in this case."); Case Tr. 106:12-15 (the plan sponsor could determine that they want to take a flat fee out of each participant's account and it could be more or less).

It is disputed as immaterial that "[t]he Institutional class of the JPMorgan TDFs was renamed the R5 class as of April 3, 2017" and "[t]he Plan included the Institutional/R5 class of the JPMorgan TDFs on its menu at all times between the start of the Class Period and December 29, 2017, when the Plan switched to the R6 class." Defs. Mem. at 8. The heart of Plaintiffs' JPMorgan TDF allegations revolves around Defendants failure to switch from the R5/institutional share class to the lower cost R6 share class. Any mistakes regarding the R5/institutional share class name change did not impact Mr. Conner's damages calculations or substantive process-based opinions. *See* Conner Tr. 177:8-9; Conner Rpt. at ¶ 17.

### E. The Committee Prudently Selected and Monitored the Fidelity Funds.

It is disputed that "[t]he Committee Prudently Selected and Monitored the Fidelity Funds." Defs. Mem. at 11. Mr. Conner opines that from 2015-2017, the Committee chose the Fidelity Contrafund Class K and the Fidelity Diversified International Class K "despite the availability at all times of identical options of lower-cost institutional share classes." Conner Rpt. at ¶ 35. Specifically, "The Fidelity Contra Commingled Pool (CIT) was established 1/17/2014 and the Fidelity Contra Fund K6 was established 5/25/2017. Both of these versions of Contrafund had a lower expense ratio than the Fidelity Contra K Fund that was held instead." *Id*. at ¶ 40. Over the course of several years, the Fidelity Contra K Fund shares averaged about 30 bps higher than the Contra CIT version, and the K6 shares averaged about 25-28 bps higher than the Fidelity Contra K Fund before being implemented in the Plan. *Id*. at ¶ 41. As with the CIT and JP Morgan funds, Mr. Conner opines "[i]n the case of both the Target Date Funds and non-

Target date Funds, Salesforce's fund selection methodology failed to identify and acquire the least-cost TDF share class to the detriment of the higher compounded returns that plan participants should have earned instead of the lesser return they did. This ill-advised investment decision violated the sole interest criterion of fiduciary duty to which Salesforce's fiduciaries were to adhere on behalf of the retirement plan participants." *Id.* at ¶ 42.

It is disputed as immaterial that "[a]lthough the expense ratio of the K6 funds was lower, the K funds paid 20 basis points in revenue sharing, resulting in a net-of-revenue-sharing expense ratio difference between the K and the K6 funds that was smaller or even negative." Defs. Mem. at 11. Mr. Conner opines that because Participants are still bearing the cost of fees under a revenue sharing arrangement, revenue sharing rebates do not provide actual net cost-benefits. Conner Tr. 93:2-8. Moreover, as discussed in the next section, the net share class is not lower in the case of the Fidelity Contra K Fund CITs, a fact the Committee should have noticed if they independently reviewed the Fidelity performance report. *See* 113-02 Ex 52. Fidelity Presentation, Mar. 18, 2016, SALESFORCE_0074558-592 at 579.

**F.  The Committee Appropriately Considered Collective Investment Trusts.**

It is disputed that "[t]he Committee Appropriately Considered Collective Investment Trusts." Defs. Mem. at 12. Specifically, it is disputed that "[t]he Committee regularly considered offering CITs during the Class Period." *Id.* As Defendants' expert admitted, there was no evidence of the Committee discussing CITs between 2016 and 2018. Case. Tr. 145:20 -146:3. It is disputed in part that "[b]oth the 2013 and 2016 versions of the Plan's IPS stated that "[e]ach investment option chosen should have […] a minimum of 5 years of verifiable investment performance." Defs. Mem. at 12.  The 2013 IPS stated the 5-year minimum could be "exempted by the Committee." *Id.* (citing Document 112-12, 2013 IPS at 750). It

is undisputed that the 2016 IPS allowed the Committee to use the track record of the CIT version of a mutual fund. Defs. Mem. at 12.

It is disputed that "the Contrafund K and the Contrafund CIT are entirely different investment vehicles with entirely separate underlying investment portfolios." Defs. Mem. at 13. Defendants support this fact with a cite to Mr. Heavner's report that only opines the two differ based on "returns after fees" and makes no comment about the fund's actual underlying investments. Heavner Rep. at ¶ 42. Heavner does note that "some CITs are designed to invest similarly to a mutual fund." *Id*. Furthermore, Committee Member Joseph Allanson testified CITs "were marketed and pitched as similar asset strategies to the underlying mutual fund with similar performance track records but with a lower cost in terms of expenses." Allanson Tr. 16:8-13. As Defendants point out, the 2016 IPS stated CITs have "the same investment strategy as its registered mutual fund counterpart" and comparable track records. Defs. Mem. at 12; Document 112-13, 2016 IPS at 1000. Mr. Conner opines CITs are comparable investments and to the extent "they're not visible on the Internet" fiduciaries can "inform the participants" other ways. Conner Tr. 249:17-250:20. Mr. Case opines CITs and their mutual fund counterparts have a "comparable track record" Case. Tr. 151:2-6. Lastly, it is undisputed that Bridgebay characterized CITs and Mutual funds as "counterparts." Defs. Mem. at 12.

It is further disputed that "the Contrafund K had an effective expense ratio of 41 basis points (net of recordkeeping offset), which was lower than the Contrafund CIT's expense ratio of 43 basis points." Defs. Mem. at 13. Fidelity provided the Committee with a chart demonstrating the Contrafund K had a recordkeeping offset (revenue sharing amount) of 20bps, incurred performance fees, and had a net expense ratio of 61 bps; however, the chart also shows the Contrafund CIT version had no recordkeeping offset, did not incur performance fees, and had 43 bps with no listed net bps. *See* 113-02 Ex 52, Fidelity

Presentation, Mar. 18, 2016, at 579. Basically, the performance fees present in the Contrafund K but absent in the CIT version outweighed any net-cost-benefit of the recordkeeping offset.

It is disputed that Fidelity believed CITs had any "issues" such as "the relative lack of a performance history for the Contrafund CIT and the lack of a Morningstar rating." Defs. Mem. At 13. The document Defendants cite is a chart that does not indicate Fidelity thought its own CITs had "issues," but instead highlights the two investments are comparable, and while the mutual funds historical performance was "available through fund inception date" the CIT counterpart "began tracking on inception date." 113-02 Ex 52, Fidelity Presentation, Mar. 18, 2016, at 579. In fact, the chart highlights the fund types are overwhelmingly similar except for fees. *Id*.

**Plaintiffs' Statement of Undisputed Facts**

**G.  CITs are nearly identical to their Mutual Fund Counterparts**

As discussed in Plaintiffs' Responses To Defendants' Statement Of Facts, Section F, *supra*, CITs are materially similar to their mutual fund counterparts, with the exception of lower fees, different regulatory agencies, and different disclosure requirements. Apart from fees, the differences between CITs and their mutual fund counterparts are easy to overcome. *See* Conner Tr. 249:17-250:20; Conner Rebuttal Rpt. ¶21.  As Defendants concede, the IPS allowed the Committee to consider the history of mutual fund counterparts in lieu of a CIT's performance record (Defs. Mem at 12-13), and Mr. Case opined "it's very common among my clients to kind of look at the comparable track record" between CITs and their mutual fund counterparts. Case Tr. 151:2-6. As Defendants point out, "Bridgebay found [the JPMorgan TDFs and the Passive Blend CIT series] to have 'similar investment profiles and strategies but … had lower fees." Defs. Mem. at 15.

**H.  The Committee's Flawed Process Included Failing to Consider Lower Cost Versions of the Plan's Funds**

**i.  The Committee Should Have Switched to The R6 Share Class Sooner.**

"Even though the JPM SmartRetirement Target Date Funds with the lowest-cost share class, R6, was established in November of 2014, and was available at all times thereafter, it was not until the end of the 4th Quarter of 2017 that R5[/institutional] Target Date Funds were finally exchanged for the lower-cost R6 shares." Conner Rpt. at ¶ 37. Defendants' expert Mr. Case admitted that the Committee had not thoroughly considered the benefits of the R6 share class prior to 2017 and had not even "discussed the share class unless prompted [by Bridgebay]–and I don't believe they did." Case. Tr. 123:4-124:4. The absence of a prudent share class review by the Committee and the dramatic decrease in fees under the flat fee structure indicates the Committee also did not consider whether revenue sharing truly justified the more expensive share classes and lessened compounding returns.

Mr. Conner originally opined the Plan could have switched from an even more expensive share class to the JPMorgan SmartRetirement 2020 R5 sooner, based on an inconsistent record that the Institutional share class was the same as the i-share class. Upon further review, Mr. Conner later acknowledged "the 'Institutional' and 'R5' designations used to identify the JPMorgan TDFs on the Plan's menu prior to December 29, 2017, were in fact successive names for the same share class," and the I-share class was different fund, previously named the select class. Defs. Mem. at 19. This early mistake is inconsequential. First, the fact remains Defendants had an opportunity to switch from the higher cost Institutional/R5 class to the R6 class for *years*.  Defendants do not dispute there was a "fee differential between the Institutional/R5 class and the R6 class throughout the relevant period", they instead argue the revenue sharing component of the Institutional/R5 class affected the true cost of the Institutional/R5 class, whereas Mr. Conner disagrees. Defs. Mem. at 19; *see also Davis v. Salesforce.com, Inc*., No. 21-15867, 2022 WL 1055557, at *1 (9th Cir. Apr. 8, 2022) ("plaintiffs also allege that defendants acted imprudently by failing to switch to the R6 class earlier, and the judicially noticed documents support plaintiffs' allegation that the R6 class had a lower expense ratio than the R5 class.").  Importantly, the conflicting

information "doesn't affect the damage calculation" pertaining to the R6 share class or CIT calculations. Conner Tr. 177:8-9. Indeed, Mr. Conner explained "[b]ecause I utilize a uniform methodology to calculate damages, the damages calculated in this report may be amended to reflect the scope of any allegations upheld by the court." Conner Rpt. at ¶ 19. Meaning, the rest of Mr. Conner's opinions and damages are unconnected to the mistaken belief the R5 class could have replaced a more expensive fund sooner.

Lastly, as Mr. Conner's Rebuttal Report explained, "documents produced by the Defendants demonstrate that the Investment Committee [] recordkeeper[,] Fidelity, and investment advisor Bridgebay show conflicting information regarding the two share classes." Conner Rebuttal Rpt. at ¶17. Hence, the incorrect share class information reviewed by the Committee "is further evidence of the Committee's failure to apply methodologies to choose and review investments which would have identified and corrected these conflicts." *Id.* at ¶ 17.

### ii. The Committee did not thoroughly consider switching to CIT versions of funds in the Plan.

The Committee also did not thoroughly consider CITs. Mr. Case could not point to any evidence that the Committee discussed CITS at any time between March 2016 and November 2018, over two years, though Bridgebay pointed out there are some pros to CITs. Case Tr. 145:21-146:3. While Defendants proffer hindsight speculation on why the Committee did not switch to the CIT versions of their mutual fund counterparts sooner, the record indicates the Committee did not actually analyze whether any of the potential cons actually applied to the Plan and participants. Mr. Case speculates Bridgebay may have been aware that CITs could involve challenging "complexities of setting up recordkeeping systems," but, in reality, he "saw no evidence that *the committee* discussed that" *Id.* at 158:8-23 (emphasis added). Also, while Mr. Case notes Ms. Zaiko of Bridgebay testified that she did not want the Participants to be confused about CITs when receiving plan information, he also testified that he

did not "see any evidence that *the committee* discussed the issue regarding communication costs and mass communication required to explain the differences between mutual funds and CITs." Case Tr. 159:8-12 (emphasis added).  As Mr. Conner pointed out, prudent fiduciaries "don't rule out CITs because they're not visible on the Internet;" they instead inform participants in another way. Conner Tr. 249:17-250:20. Nor do prudent fiduciaries rule out CITs based on "the different definitions and regulatory agencies." Conner Rebuttal Rpt. ¶21. It is fiduciary standard to "look[] at both these investments with little bias and appl[y] viable methodologies to narrow down what is in the plan participants' sole interest." *Id.*

## I.   The Committee Breached Their Fiduciary Duty by Overly Relying On Their Third Party Advisor.

Defendants had a "pattern and practice" of deferring too much to Bridgebay's advice, "without engaging in a critical review of their own, even when such data strongly suggested that a given fund should be investigated in further detail." Conner Rpt. at ¶ 54. As mentioned, Mr. Case testified the Committee did not discuss CITs or share classes, and any analysis, if conducted, would have been conducted by Bridgebay. Case. Tr. 123:4-16; Case Tr. 159:8-12. Mr. Conner opines the role of the Committee, as fiduciaries, is to independently evaluate investment decisions "as opposed to simply defer[ring] to or accepting the recommendations" of the advisor. Conner Tr. 225:12-25. Mr. Conner opined Bridgebay's reports "required a dependence on someone explaining concepts, and it doesn't allow the Committee to make its own determination." Conner Tr. 229:14-22. Committee member Joseph Allanson testified that Bridgebay's reports were sometimes distributed the day before the meetings, leaving Committee members with little time to review the extensive documents. Allanson Tr. 145:7-12.

For the Committee members to independently monitor the Plan, they must have a sophisticated investment "understanding conceptually, not just the [investment management] credentials." Conner Tr. 231:15-232:7. That was not the case here. After a review of the record, Mr. Conner testified that he did

not believe that the Committee members possessed the necessary qualifications or expertise to make investment decisions. Conner Tr. 227:21-228:12.

The once yearly ERISA "training" Defendants discuss was an ERISA updates segment of a larger two and a half hour meeting. Allanson Tr. 33:4-5. The bulk of each Committee member's fiduciary training was a one-time, twenty-minute session which, as indicated by the record, did not leave the members with a lasting understanding of their duties under ERISA. *Id*. at 28:18-20. When prompted, Committee member Joachim Wettermark admitted he could not give any detail about his responsibilities under ERISA. Wettermark Tr.  66:4-8 ("Q: And what are those responsibilities? A: I don't know if I can give you a lot of detail.").

In sum, the Committee was unable to understand their duties under ERISA or the Plan's investments and breached their fiduciary duties to the Plan by deferring too much of their investment selection and monitoring duties to a non-fiduciary, third party.

## J.   Defendants Did Not Adequately Diversify the Plan's Investment Menu.

Mr. Conner explains Defendants did not have "a viable review process in the sole interest of plan participants" because, among other things, Defendants failed to appropriately diversify the Plan's non-target date investments. Conner Rpt. at ¶¶ 55-60.  Despite readily available information on the Plan's top ten holdings, Defendants retained an investment line up that exposed participant "too much to investments purchasing the same securities. Security, style, and industry overlap can expose participants to additional volatility and correlation." *Id*. at ¶ 60. While Defendants note the 2013 IPS instructed the Committee to ensure the Plan had a diverse line up, Defendants do not cite to any proof of diversification, or even address Mr. Conner's diversification opinions. Defs. Mem. at 3. The Committee did not follow their own IPS, and alongside their other imprudent processes, failed to monitor the Plan's investments close enough to recognize the Plan's lack of diverse offerings.

### K. The Plan Suffered Losses

Mr. Conner calculated losses by calculating the difference between what the Plan paid in investment fees and what the plan could have paid had Defendants selected the more prudent lower cost share classes or CITs. *See* Conner Rpt. at ¶43. Mr. Conner breaks down his lower share class calculations for each year. *Id*. As detailed further in Section IV.E. *infra*, this "alternative-investment test" is a common method for calculating damages in ERISA breach of fiduciary duty cases. Because Mr. Conner did not find revenue sharing provided the Plan or participants with any cost-benefits, he did not calculate damages under Defendants' "net cost" revenue sharing theory. *See* ECF No. 127, (Daubert opp), at IV.D. titled "Conner Is Not Obligated to Accept Defendants' Revenue Sharing Opinions." Importantly, both of Defendants' experts found positive damages by applying Mr. Conner's methodology under Mr. Conner's opinion that revenue share was not a defense for selecting more expensive share classes. *See* Case Tr. 131:10-24; Heavner Tr. 97:6-98:3.

### III. LEGAL STANDARD

#### A. Summary Judgment Standard

Summary judgment is appropriate where the record, read in the light most favorable to the nonmovant, indicates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). Facts that are "material" are those necessary to the proof or defense of a claim and are determined by referring to substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986). To determine if a dispute about a material fact is "genuine," the trial court must not weigh the evidence and instead must draw all reasonable inferences in the nonmoving party's favor. *Tolan v. Cotton*, 572 U.S. 650, 655–59 (2014) (per curiam). An undisputed fact may support several reasonable inferences, but a trial judge must

resolve those differing inferences in favor of the nonmoving party. *Hunt v. Cromartie*, 526 U.S. 541 (1999).

## B. ERISA's Prudence Standard

A fiduciary must act for the exclusive purposes of (1) "providing benefits to participants and their beneficiaries;" and (2) "defraying reasonable expenses." 29 U.S.C. § 1104(a)(1).  Reasonableness requires "the care, skill, prudence, and diligence" of a person "'acting in a like capacity and familiar with such matters.'" *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015) (quoting 29 U.S.C. § 1104(a)(1)). Additionally, "ERISA imposes a stringent duty on fiduciaries to root out imprudent investments within a reasonable time and on a continuous, systematic basis." *Lauderdale v. NFP Ret., Inc.*, No. 8:21-CV-301-JVS-KES, 2022 WL 17260510, at *10 (C.D. Cal. Nov. 17, 2022) citing *Tibble*, 575 U.S. at 523, 135 S.Ct. 1823; *Hughes*, 142 S. Ct. at 738.

In quoting *Tibble v. Edison Int'l* (*Tibble IV*), the Third Circuit recently opined:

> Cognizant of the impact of fees on Plan value, fiduciaries should be vigilant in 'negotiation of the specific formula and methodology' by which fee payments such as 'revenue sharing will be credited to the plan and paid back to the plan or to plan service providers.' DOL Advisory Opinion 2013-03A, 2013 WL 3546834, at *4.5 Fiduciaries must also consider a plan's 'power ... to obtain favorable investment products, particularly when those products are substantially identical—other than their lower cost—to products the trustee has already selected.' *Tibble v. Edison Int'l* (*Tibble IV*), 843 F.3d 1187, 1198 (9th Cir. 2016).

843 F.3d 1187, 1198 (9th Cir. 2016).

ERISA breach of fiduciary duty claims are "ill-suited for summary judgment." *Cates v. Trs. of Columbia Univ. in City of New York*, No. 1:16-cv-06524 (GBD) (SDA), 2019 WL 8955333, at *5 (S.D.N.Y. Oct. 25, 2019), R. & R. adopted, 2020 WL 1528124 (S.D.N.Y. Mar. 30, 2020). This is because "[t]he fiduciary standard imposed by ERISA requires the application of a reasonableness standard." *Board of Trs. of S. California IBEW-NECA Defined Contribution Plan v. Bank of N.Y. Mellon Corp.*, No. 09 Civ. 6273 (RMB), 2011 WL 6130831, at *3 (S.D.N.Y. Dec. 9, 2011) ("Rarely will such a determination

be appropriate on a motion for summary judgment."); *accord Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) ("A fiduciary's obligations are a fact intensive inquiry which typically cannot be resolved on summary judgment."); *see also Pension Fund-Mid Jersey Trucking Industry-Local 701 v. Omni Funding Group*, 731 F. Supp. 161, 169 (D.N.J. 1990). Indeed, "[i]t is a question for a fact finder to decide whether [an action] is prudent in the context of all of the defendants' actions." *Cryer*, No. 16-cv- 04265- CW, 2018 WL 6267856, at *9 (N.D. Cal. Nov. 16, 2018) (citation omitted).  Accordingly, the "reasonableness" of a fiduciary's action is a "fact-intensive inquiry," and courts have recognized that "rarely will such a determination be appropriate on a motion for summary judgment." *Id*. at *10 (internal citations omitted); *see also, Anderson ex rel. Bd. of Trs. v. DePhillip*s, No. 02 C 7685, 2004 U.S. Dist. LEXIS 4264, at *27 (N.D. Ill. Mar. 15, 2004) ("Whether ERISA fiduciaries acted 'prudently' involves a question of fact precluding summary judgment.").

## IV. SUMMARY JUDGEMENT IS INAPPROPRIATE BECAUSE PLAINTIFFS HAVE OFFERED EVIDENCE DEMONSTRATING THE COMMITTEE DID NOT FOLLOW A PRUDENT PROCESS RELATING TO THE PLAN'S INVESTMENTS

### A.  The Prudence of Defendants' Processes And Decisions Hinges on Questions of Reasonableness That Are Inappropriate at The Summary Judgement Stage.

Plaintiffs' Expert Mr. Conner opines Defendants' processes and decisions for monitoring and selecting the Plan's investments were inconsistent with the standard of care of a fiduciary acting in the best interests of an ERISA governed retirement plan. *See* Conner Rpt. section VI. A-B. Defendants attempt to argue they are entitled to summary judgment because "the record shows that the Defendants had a robust process for monitoring the Plan's investment options." Defs. Mem. at 17. Simply having an IPS and quarterly meetings with an advisor is not indisputable proof of a prudent process, let alone a "robust" process. It is of no moment that Defendants' process checked certain boxes because their processes lacked the core characteristics of a *sufficient* process. Indeed, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process

does not . . . suffice in every case to demonstrate prudence." *Sacerdote v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021). This is because "[d]eliberative processes can vary in quality or can be followed in bad faith. In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Id.* (*quoting Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Medical Center*, 712 F.3d 705, 720 (2d Cir. 2013) (emphasis in original).

Courts repeatedly reject arguments identical to Defendants' in denying summary judgment. *See e.g., Davis et al. v. Magna et al.*, No. 20-11060, slip op. at p. 13, (E.D. Mich. June 5, 2023) (holding that despite the defendants' quarterly reviews with an investment advisor there were still genuine issues of material fact regarding the fiduciary's investment review processes); *McCool v. AHS Mgmt. Co., Inc.*, No. 3:19- CV-01158 (M.D. Tenn. Mar. 31, 2023) (evidence of quarterly meetings did not equal an "absence of evidence to support Plaintiffs' claims, as required to shift the burden to Plaintiffs as the nonmoving party"); *Pizarro v. Home Depot, Inc.*, 634 F.Supp.3d 1260, 1292 (N.D. Ga. Sep. 30, 2022) (meeting with investment fund managers and attending quarterly committee meetings did not indisputably prove prudence); *Feinberg v. T. Rowe Price Group, Inc.*, 2021 WL 488631, at *8 (D. Md. Feb. 10, 2021) ("though the evidence shows the Trustees engaged in a legitimate oversight process and that the Plan's assets tripled under their stewardship, it would be premature to find that their conduct was loyal and prudent in all instances as a matter of law.").

## B. Plaintiffs Have Shown There Is a Genuine Dispute as to Whether The Committee Independently Reviewed The Plan's Investments

Under ERISA, "[a] fiduciary's process must bear the marks of loyalty, skill, and diligence expected of an expert in the field. It is not enough to avoid misconduct, kickback schemes, and bad-faith dealings." *Sweda et al. v. Univ. of Penn.*, No. 17-3244, 2019 WL 1941310, at * 5 (3rd Cir. May 2, 2019). Courts in this circuit and across the country have held fiduciaries cannot rubberstamp the direction of third-party advisors and instead must "review the data a consultant gathers, to assess its significance and

to supplement it where necessary." *In re Unisys Corp. Sav. Plan Litig.,* 74 F.3d 420, 435 (3d Cir.1996); *see also Donovan v. Mazzola*, 716 F.2d 1226, 1234 (9th Cir. 1983) (an ERISA fiduciary "is not justified, however, in relying wholly upon the advice of others, since it is his duty to exercise his own judgment in the light of the information and advice which he receives."); *see also Keach v. U.S. Trust Co.*, 419 F.3d 626, 636–37 (7th Cir.2005) (relying on advice from an outside consultant "is not a complete defense to a charge of imprudence"); *Fink v. Nat'l Sav. & Tr. Co.*, 772 F.2d 951, 957 (D.C. Cir. 1985) ("beneficiaries are entitled to assume that in performing these acts, the fiduciaries thought about them. If this were not so, the lengthy list of fiduciary duties under ERISA would mean nothing more than caveat emptor. A fiduciary's independent investigation of the merits of a particular investment is at the heart of the prudent person standard."); *Liss v. Smith*, 991 F.Supp. 278, 297 (S.D.N.Y.1998) ("failure to make any independent investigation and evaluation of a potential plan investment is a breach of fiduciary obligations").

The Committee's fiduciary training lacked depth, and the Committee's over-reliance on Bridgebay demonstrated members were not dedicated to or able to monitor the Plan's investments. Defendants have not proven that the Committee "considered and discussed [Bridgebay's] information at length before reaching a decision." Defs. Mem. at 17. Sometimes the information was not given to Committee members until the day before the meetings, and Defendants' experts testified the Committee failed to conduct share class reviews or discuss CITs. *See* Section II. Fact H; Case Tr. 159:8-12; Case. Tr. 123:4-16. "Of course, the thoroughness of a fiduciary's investigation is measured not only by the actions it took in performing it, but by the facts that an adequate evaluation would have uncovered." *In re Unisys Sav. Plan Litig.*, 74 F.3d at 436. The Committee's failure to thoroughly review the Plan's investments fees resulted in participants paying unnecessary fees and losing out on compounding returns.

Defendants argue "Plaintiffs have yet to identify *any* deficiency in the Committee's monitoring process. Instead, Plaintiffs have attempted to infer a deficient process from factually unsupported claims." Defs. Mem. at 18.  Not so.  First, it is factually supported that "Defendants failed to (i) select the lowest-cost share class of the JPMorgan TDFs; and (ii) timely replace the JPMorgan TDFs and the mutual fund versions of the Fidelity Contrafund and Diversified International Fund with allegedly lower-cost CITs that

purportedly had substantially identical underlying assets." *Id*. Second, it is beyond inference that Committee Members' fiduciary training was limited, and as Defendants' expert testified, share class and CIT discussions were nonexistent. *See* Section II. Fact H; Case Tr. 159:8-12; Case. Tr. 123:4-16. Third, Mr. Conner dispensed with many of the excuses Defendants made for their decision making, particularly their revenue sharing reasons and reasons for not selecting the CIT versions sooner. *See* Section II, Facts C, F-I.

Accordingly, there are material questions about the factual prudence of the Defendants' fiduciary processes, and thus summary judgment should be denied.

### C.  Plaintiffs Have Shown There is a Material Dispute as to Whether Revenue Sharing Justified Defendants' Decisions to Select More Expensive Funds.

The existence of revenue sharing offsets does not indisputably prove the higher cost share classes were prudent. *See England et al. v. Denso Int'l America, Inc.,* 2023 WL 4851878, at * 6 (E.D. Mich. July 28, 2023) (holding claims or defenses "based on the net expense ratio theory are not plausible" because "there is not necessarily a one-to-one correlation such that revenue sharing always redounds to investors' benefit.").  This is a factual question for trial. As discussed, Plaintiffs' expert opined on the flaws in Defendants' logic. The totality of the circumstances show (i) even through revenue sharing Plaintiffs still paid for plan fees and had their accounts lessened because of the use of revenue sharing; (ii) the participants' recordkeeping fees were lowered under a flat fee structure; and (iii) the Contrafund K did not have a lower net expense ratio than the Contrafund CIT's when the two were compared by Fidelity (meaning, their own fund manager found them comparable).

Many courts have found a breach of prudence when fiduciaries "choose otherwise imprudent investments specifically to take advantage of revenue sharing." *Tibble*, 2017 WL 3523737, at * 11. *See also Tussey,* 746 F.3d at 336 (affirming the district court's finding that revenue sharing did not justify the fiduciaries failure to "adequately leverage the Plan's size to reduce fees"); *Sacerdote v. New York Univ.*, 9 F.4[th] 95, 111 (2d Cir. 2021) (refusing to assume that "each of the retail-class shares selected was necessary to pay the recordkeeping costs and none of them resulted in lost opportunity costs."). The cost-

benefit of revenue sharing is especially disputable because neither of Defendants' experts opined the recordkeeping and administrative fees were more reasonable under revenue sharing than a flat fee structure that allows participants to receive compounding returns in line with the objectives of their account. *See* Heavner Tr. 98:6-11 ("I did not evaluate whether the recordkeeping fees were reasonable in this case."); Case Tr. 106:12-15 (the plan sponsor could determine that they want to take a flat fee out of each participant's account and it could be more or less); *see also Sellers v. Trs. of Bos. Coll.*, No. 22-cv-10912-WGY, 2022 WL 17968685 (D. Mass. Dec. 27, 2022) ("it is recognized that revenue sharing may hide the true scope of the fees attached to the recordkeeping process.").  Mr. Heavner testified that there were still recordkeeping and administrative costs owed after the portion deducted from revenue sharing and revenue sharing does impact the amount in a participant's account. *See* Heavner Tr. 77:12-16. Accordingly, Defendants cannot rely on the motion to dismiss holding in *Hughes*, because Plaintiffs provide evidence that the use of revenue sharing was not within "the range of reasonable judgments a fiduciary may make based on her experience and expertise" under these circumstances. Defs. Mem. at 20 (quoting *Hughes*, 142 S. Ct. at 742). Particularly, because Defendants "fail[ed] to remove an imprudent investment from the plan within a reasonable time, they breach[ed] their duty." *Hughes v. Nw. Univ.*, 142 S. Ct. 737, 742 (2022).

Defendants' reliance on the out-of-circuit motion to dismiss case in *Matney v. Barrick Gold of N. Am.,* 80 F.4th 1136, 1150-51 (10th Cir. 2023) is misplaced. That case found the revenue sharing credit was indisputably a cost-benefit as it related to the Plaintiffs' interrelated allegations that recordkeeping fees were too high, and because of ***that specific plan's master trust agreement*** which "clearly showed" the quality of recordkeeping services, what the revenue credit was used to pay for, and exactly how the "revenue credit [was] applicable to 'Non-Fidelity investment products' with a rate 'the non-Fidelity vendor has agreed to use.'" *Id. at* 26, 30. No such Master Trust Agreement or specific revenue sharing detail is presented by Defendants here. Importantly, the court in *Matney* agreed with the plaintiffs that "it is possible revenue sharing does not actually reduce costs." *Id*. at 28-29. The court in *Matney* also noted the courts in *Kong v. Trader Joe's Co*., No. 20-56415, 2022 WL 1125667, at *1 (9th Cir. Apr. 15, 2022) and *Troud tv. Oracle Corp.*, No. 1:16-cv-00175-REB-CBS, 2017 WL 1100876, at *2 (D. Colo. Mar. 22,

2017) refused to dismiss cases where, like here, the defendants only presented a "theory" that revenue sharing was reasonable. *Id*. at 30, n.13. Likewise, here, Defendants only offer a theory that revenue share justified the higher share class.

Moreover, it is of no moment the Ninth Circuit "recognized that revenue sharing may provide a 'plausible' explanation for Defendants' alleged failure to offer the R6 class of the JPMorgan TDFs." Defs. Mem. at 19 (quoting *Davis v. Salesforce.com, Inc.*, No. 21-15867, 2022 WL 1055557, at *1 (9th Cir. Apr. 8, 2022)). In the same decision, the Ninth Circuit also held that under these circumstances the Court "could not determine 'at the pleading stage' how revenue sharing affected the plan's costs." *Davis*, 2022 WL 1055557, at *1. In any event, whether revenue sharing justified the more expensive share classes is a question of fact that precludes granting summary judgment. Defendants can present their revenue sharing arguments at trial. *See e.g. Nunez*, No. 20-4195, at 2 (holding that the prudence of revenue sharing is a question of fact precluding summary judgement); *see also Garthwait, et al. v. Eversource Energy Co.*, 2022 WL 3019633 (D. Conn. July 9, 2022) (denying summary judgment where Plaintiffs challenged the prudence of the plan's funds "[b]ecause a reasonable juror could find in the plaintiffs' favor on the basis of the record evidence, which includes conflicting expert testimony, the court cannot resolve these questions as a matter of law."); *Sacerdote*, 9 F.4th at 111 ("[s]imply concluding that revenue sharing is appropriate does not speak to how the revenue sharing is implemented in a particular case. We do not know, for example, whether revenue sharing could prudently be achieved with fewer retail shares.")

### D. Whether CITs are Appropriate alternative funds is a question of fact.

The question of whether a fund is a proper comparator for an imprudent investment claim is a question of fact that cannot be answered at the summary judgment stage. *Brotherston v. Putnam Invs., LLC*, 907 F.3d 17, 34 (1st Cir. 2018). This is especially true when comparing CITs to their mutual fund counterparts. The court in *Nunez et al., v. B. Braun Medical, Inc. et al.*, similarly held that CITs were not too distinct from mutual funds to defeat summary judgment, because "whether the Committee behaved prudently in waiting until 2019 to swap its target date funds from a mutual fund to a collective investment trust" was a question of fact. No. 20-4195, at 1. Defendants' memorandum undermines their arguments, because Defendants point to where CITs are deemed comparable to mutual funds by Bridgebay, Fidelity, and the IPSs. *See* Defs. Mem. at 12-13.

Defendants also rely on disproven, *post-hoc* reasoning for not selecting the CIT versions sooner. Conner Rebuttal Rpt. ¶10. Defendants attempt to argue the Committee members did not implement CITs because the Committee members believed that without the Morningstar ratings participants would not want a CIT without a five-year track record. The record proves this could not be the real reason because the Committee *ultimately did* select CITs without a five-year track record, using the five-year track record of the mutual fund counterpart was permissible, and there was no evidence the Committee actually discussed these concerns.  *Id*.; *see also* section II., Facts F-H.

Defendants point out that "the Ninth Circuit recognized, "the different regulatory regimes governing mutual funds and collective investment trusts" could "justif[y] defendants' delay in making the switch [to CITs] earlier." Defs. Mem. at 21 (quoting *Davis*, 2022 WL 1055557, at *2). Defendants conveniently leave out the Ninth Circuit, in the same decision, also held "defendants' retention of allegedly higher-cost target date funds over collective investment trusts cannot simply be deemed reasonable as a matter of law" and "[w]hether the different regulatory regimes governing mutual funds and collective investment trusts justified defendants' delay in making the switch earlier is itself a factual issue." *Davis*, 2022 WL 1055557, at *2.

Defendants misconstrue the data in Mr. Heavner's declaration in support of Defendants' Opposition to Plaintiffs' Motion for Class Certification to argue "the JPMorgan TDFs' annualized net returns exceeded those of the Passive Blend CITs over multiple periods not only refutes Plaintiffs' claim that their underlying assets are 'substantially identical,' but also demonstrates the absence of any compelling performance-based reason to replace them." Defs. Mem. At 22 (referencing Dkt. 82-4, Exhibit 2A). First, Defendants undermine themselves by pointing that "Bridgebay found [the JPMorgan TDFs and the Passive Blend CIT series] to have 'similar investment profiles and strategies but … had lower fees." Defs. Mem. at 15. Defendants further contradict themselves by arguing differing returns proves the

"underlying assets are substantially identical" because, as their expert testified, "returns are after fees", and the fees are different. Heavner Tr. 103:24-25.

Second, Defendants conveniently ignore that Mr. Heavner's report clearly demonstrates that Plaintiff Bredlow would have earned $27.95 **more** had Defendants selected the JPMorgan SmartRetirement Passive Blend Plaintiffs allege was more prudent than the JPMorgan SmartRetirement 2045 R5/R6 funds. Dkt. 82-4, Exhibit 2A. This also means that Defendants' pointing to snapshots of better performance does not mean the funds were performing better overall. Indeed, hindsight arguments about performance cannot be proven by a mere "snapshot" of a long-term funds' performance, especially as performance relates to the prudence of a fiduciary's decision-making, which is "largely a process-based inquiry." *Smith v. Commonspirit Health*, 37 F.4th 1160, 1166 (6th Cir. 2022). Accordingly, it is of no moment that "Miguel would have earned $25.20 less during the Class Period had his money been invested in the Passive Blend 2055 CF fund." Defs. Mem. at 22.  In sum, Defendants cannot cite better returns in one instance and ignore worse returns in another instance to argue the R5/R6 share classes were incomparable or more prudent than the Passive Blend CITs.

### E.  Plaintiffs Can Prove the Plan Suffered Damages as a Result of Defendants' Imprudent Investment Processes.

Defendants are wrong in stating "Plaintiffs have failed to establish[] that the Plan suffered a loss as a result of any of the alleged fiduciary breaches." Defs. Mem. at 17. Mr. Conner uses a widely accepted ERISA methodology in calculating damages for the Plan by calculating the difference between the Plan's investments and the lower share class version of the same funds or their mutual fund counterparts. *See* Conner Rpt. at ¶ 43; *see also* ECF No. 127 (Daubert Opp), II.C., IV.D.-G. "There is no question that the alternative-investment test has been recognized as a reliable means of calculating damages in ERISA cases that involve breaches of fiduciary duty for failures to prudently invest and manage an employee retirement plan." *Harris v. Koening*, 815 F. Supp. 2d 6, 9 (D.D.C. 2011) (listing cases from the First,

Second, Third and D.C. Circuits). Moreover, damages are proven because Mr. Conner's "[r]eport provided a number of justifications for treating them as prudent investment alternatives." *Id.* at 11.

Finally, Mr. Conner's intentional decision not to include revenue sharing in his calculations was not an error, because he believes revenue sharing was not a justifying decision and did not provide an actual cost-benefits to participants. *See* Conner Rpt. at ¶26; Conner Rebuttal Rpt. at ¶20; Conner Tr. 93:2-8; 187:16-17; 188:13-14.; 217:4-10; *see also* ECF No. 127, (Daubert opp), at IV.D. titled "Conner Is Not Obligated to Accept Defendants' Revenue Sharing Opinions." Furthermore, neither of Defendants' experts dispute that had revenue share not been considered then there would be damages. *See* Case Tr. 131:10-24; Heavner Tr. 97:6-98:3. In other words, if the finder of fact at trial determines the use of revenue share was not a prudent justification for the more expensive funds (it was not) then Defendants agree there would be damages.

**F.  Plaintiffs' Duty to monitor claim is derivative of Plaintiffs claims.**

Because Plaintiffs have proven there are genuine issues of material facts pertaining to their prudence claims, Plaintiffs' derivative duty to monitor claims should also survive summary judgment.

**V.  CONCLUSION**

For the reasons stated above, Plaintiff respectfully requests that this Court deny Defendants' motion for summary judgment.

Dated: December 21, 2023           **CAPOZZI ADLER, P.C.**

*/s/ Mark K. Gyandoh*
Mark K. Gyandoh
James A. Wells
312 Old Lancaster Road
Merion Station, PA 19066
Email: markg@capozziadler.com
           Jayw@capozziadler.com
Tel: (610) 890-0200
Fax: (717) 233-4103

*Counsel for Plaintiffs and the Putative Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on -------, 2023, a true and correct copy of the foregoing document was filed with the Court utilizing its ECF system, which will send notice of such filing to all counsel of record.


By:   <u>/s/ *Mark K. Gyandoh*</u>
              Mark K. Gyandoh, Esq.