**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| GREGOR MIGUEL and AMANDA BREDLOW, Individually and on behalf of all others similarly situated,<br><br>　　　　　　Plaintiffs,<br><br>　v.<br><br>SALESFORCE.COM, INC., BOARD OF DIRECTORS OF SALESFORCE.COM, INC., MARC BENIOFF, THE INVESTMENT ADVISORY COMMITTEE, JOSEPH ALLANSON, STAN DUNLAP, and JOACHIM WETTERMARK,<br><br>　　　　　　Defendants. | Case No. 3:20-cv-01753-MMC<br><br>**REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Judge: Maxine M. Chesney |

Robyn C. Crowther (CA Bar No. 193840)
Tahir L. Boykins (CA Bar No. 323441)
STEPTOE LLP
633 W. Fifth Street, Suite 1900
Los Angeles, California 90071
Tel: (213) 439-9400, Fax: (213) 439-9599
rcrowther@steptoe.com
tboykins@steptoe.com

Paul J. Ondrasik, Jr. (*pro hac vice*)
Eric G. Serron (*pro hac vice*)
STEPTOE LLP
1330 Connecticut Ave., NW
Washington, DC 20036
Tel: (202) 429-3000, Fax: (202) 429-3902
pondrasik@steptoe.com
eserron@steptoe.com

Justin Ben-Asher (*pro hac vice*)
STEPTOE LLP
1114 Avenue of the Americas
New York, N.Y. 10036
Tel: (212) 506-3900, Fax: (212) 506-3950
jbenasher@steptoe.com

*Counsel for Defendants Salesforce, Inc., Board of Directors of Salesforce, Inc., Marc Benioff, The 401(k) Plan Committee, Joseph Allanson, Stan Dunlap, and Joachim Wettermark*

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ......................................................................................................................... 3

    A.    The Committee Engaged in a Prudent Process for Selecting and Monitoring Investments ........................................................................................................... 4

    B.    There Is No Genuine Dispute that Defendants Selected the Lowest-Cost Share Class of the JPMorgan TDFs ................................................................................. 6

    C.    Defendants Reasonably Decided Not to Replace the JPMorgan TDFs with Plaintiffs' Preferred CITs Prior to July 19, 2019 ...................................................10

    D.    Defendants Reasonably Decided Not to Replace the Fidelity Mutual Funds with Plaintiffs' Preferred CITs Prior to July 19, 2019 ...........................................12

    E.    Plaintiffs' Remaining Assertions Regarding Alleged Procedural Deficiencies Do Not Create a Genuine Issue of Material Fact ..................................................14

    F.    Plaintiffs Cannot Prove Any Loss to the Plan ....................................................... 15

CONCLUSION..................................................................................................................... 15

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Albert v. Oshkosh Corp.*,
   47 F.4th 570 (7th Cir. 2022) ............................................................................................12

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986).................................................................................................4, 10

*Call v. Sumitomo Bank of Cal.*,
   881 F.2d 626 (9th Cir. 1989) .............................................................................................3

*Clark v. Feder Semo and Bard, P.C.*,
   739 F.3d 28 (D.C. Cir. 2014)............................................................................................5

*Cunningham v. Cornell Univ.*,
   86 F.4th 961 (2d Cir. 2023) ................................................................................... *passim*

*Cunningham v. Cornell Univ.*,
   No. 16-CV-6525 (PKC), 2017 WL 4358769 (S.D.N.Y. Sept. 29, 2017), *aff'd*, 86
   F.3d 961 (2d Cir. 2023)..................................................................................................15

*Davis v. Salesforce.com, Inc.*,
   No. 21-15867, 2022 WL 1055557 (9th Cir. Apr. 8, 2022) ..........................................6, 11

*Donovan v. Cunningham*,
   716 F.2d 1455 (5th Cir. 1996) ..........................................................................................5

*Haley v. Tchrs. Ins. & Annuity Ass'n of Am.*,
   No. 17-CV-855 (JPO), 2018 WL 1585673 (S.D.N.Y. Mar. 28, 2018)............................9

*Hughes v. Nw. Univ.*,
   595 U.S. 170 (2022)...........................................................................................1, 2, 7, 10

*Hughes v. Nw. Univ.*,
   63 F.4th 615 (7th Cir. 2023) ..............................................................................2, 7, 9, 10

*Loomis v. Exelon*,
   658 F.3d 667 (7th Cir. 2011) ............................................................................................9

*Matney v. Barrick Gold of North America*,
   80 F.4th 1136 (10th Cir. 2023) ...............................................................................7, 8, 10

*In re Northrop Grumman Corp. ERISA Litig.*,
   No. CV 06-06213 MMM, 2015 WL 10433713 (C.D. Cal. Nov. 25, 2015) ...................3

*Quan v. Comput. Sciences Corp.*,
 623 F.3d 870 (9th Cir. 2010), *abrogated on other grounds by Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409 (2014) ............................................................................. 3, 12, 14

*Sweda v. Univ. of Penn.*,
 923 F.3d 320 (3d Cir. 2019) ................................................................................................. 7

*Terraza v. Safeway Inc.*,
 241 F. Supp. 3d 1057 (N.D. Cal. 2017) ............................................................................ 2, 9

*Tibble v. Edison Int'l*,
 639 F. Supp. 2d 1074 (C.D. Cal. 2009) ............................................................................... 3

*Tussey v. ABB, Inc.*,
 746 F.3d 327 (8th Cir. 2014) ................................................................................................ 7

*Wright v. Oregon Metallurgical Corp.*,
 360 F.3d 1090 (9th Cir. 2004) ............................................................................................ 12

**Statutes**

ERISA ................................................................................................................................. *passim*

# INTRODUCTION

Plaintiffs' Opposition confirms that their ERISA duty of prudence claims are meritless and that Defendants are entitled to summary judgment. The only claims that remain in this action are those alleging that Defendants acted imprudently by failing to: (1) select lower-fee share classes of the JPMorgan SmartRetirement® mutual fund series of target date funds ("JPMorgan TDFs"); (2) replace the JPMorgan TDFs with the JPMCB SmartRetirement® Passive Blend series of target date collective investment trusts ("Passive Blend CITs"); and (3) replace two Fidelity mutual funds—the Contrafund K class ("Contrafund K") and the Diversified International Fund K class ("International K")—with two allegedly similar Fidelity collective investment trusts, the Contrafund Commingled Pool ("Contrafund CIT") and the Diversified International Commingled Pool ("International CIT"), respectively. Defendants' motion cited specific materials in the record demonstrating that these claims are ripe for summary judgment. Dkt. 112 ("Mot.") at 3-15. Plaintiffs cannot defeat that demonstration with bald assertions that facts are disputed. To the contrary, Plaintiffs must either (a) cite to "particular parts of materials in the record" that support their assertions, or (b) show that the materials cited by Defendants "do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1). Plaintiffs have done neither.

As to Plaintiffs' claim that Defendants failed to select the lowest-fee share class of the JPMorgan TDFs, Plaintiffs now admit that the Plan offered the R5, formerly named "Institutional," class from the outset of the Class Period, and never offered the higher-fee "I," formerly named "Select," class on which Plaintiffs based their claim. Dkt. 128 ("Opp.") at 6, 10. There is likewise no genuine dispute that the R5 class paid 15 basis points (.15%) in revenue sharing to cover Plan expenses that would otherwise be charged directly to participants, while the R6 class did not. Mot. at 9. Nor is there any dispute that the revenue sharing paid by the R5 class exceeded the fee differential between the R5 class and the R6 class, or that the revenue sharing was in fact used only to pay Plan expenses or rebated to participants. *Id.* Defendants' decision to retain the R5 class under these circumstances was well within the "range of reasonable judgments" that Defendants were entitled to make. *Hughes v. Nw. Univ.*, 595 U.S. 170, 177 (2022); *see also Cunningham v. Cornell Univ.*, 86 F.4th 961, 983 (2d Cir. 2023) (quoting *Hughes*).

If Plaintiffs wanted to challenge the reasonableness of the Plan's expenses, it was their burden to plead that claim in their First Amended Complaint and come forward with evidence to prove it, which they have not done. Having failed to assert any such claim, Plaintiffs cannot escape summary judgment simply by arguing that the *non-revenue sharing* R6 class had a *nominally* lower expense ratio than the R5 class. *See* Opp. at 3-7, 10, 14, 19-21, 28. That argument, which is based entirely on the *ipse dixit* opinion of Plaintiffs' expert, Robert E. Conner, that revenue sharing cannot be used to pay plan expenses without violating ERISA's fiduciary provisions,[1] is both contrary to law and unsupported by any analysis of the record. *See Hughes v. Nw. Univ.*, 63 F.4th 615, 625 (7th Cir. 2023) (reaffirming that "the use of revenue sharing does not amount to a *per se* violation of fiduciary duty under ERISA"); *Terraza v. Safeway Inc.*, 241 F. Supp. 3d 1057, 1081 n.8 (N.D. Cal. 2017) (revenue sharing is a "common and acceptable investment industry practice[] that frequently inure[s] to the benefit of ERISA plans" (citation omitted) (alteration in original)).

Defendants' decision to forego replacing the JPMorgan TDFs, the Contrafund K, and the International K (collectively, the "Challenged Funds") with Plaintiffs' preferred CIT alternatives prior to July 19, 2019 was also well within the "range of reasonable judgments" that Defendants were entitled to make. *Hughes*, 595 U.S. at 177. Defendants' decision to forego switching to CITs earlier was based on advice from their investment consultant regarding the lack of transparency and short track records of the CIT alternatives, which made them questionable options under a provision of the Plan's investment policy requiring that each option have "a minimum of 5 years of verifiable investment performance, unless specifically exempted by the Committee." Mot. at 3-4, 21. The testimony of the Plan's investment consultant—supported by other material cited in Defendants' motion—shows that the Committee members were particularly concerned about the lack of a 5-year track record for CITs due to participants' inability to access additional information about CITs from public databases such as Morningstar. *See id.* at 12-15, 21-22.

Plaintiffs' remaining assertions—including that the Committee members lacked "the

---

[1] *See* Supplemental Declaration of Eric G. Serron ("Supp. Serron Decl."), Ex. 93, Conner Tr. at 215:11-219:6 (testifying that "the fiduciaries of a 401(k) plan would not – cannot be acting in the sole interest of the plan, . . . or satisfy their fiduciaries duties if they are using that kind of [revenue sharing] arrangement").

2
REPLY IN SUPPORT OF SUMMARY JUDGMENT                                   3:20-cv-01753-MMC

requisite qualifications or training to make investment decisions," that they "overly relied" on the Plan's investment consultant, that they failed to correct allegedly "conflicting information regarding the [Institutional and R5] share classes," and that they failed to "adequately diversify" the plan's investment menu (*see* Opp. at 3, 11, 12-13)—are either unsupported by the record, immaterial, or both.

Finally, the "share class" loss calculations of Mr. Conner do not show that the Plan suffered a loss from any of the alleged fiduciary breaches. *See Call v. Sumitomo Bank of Cal.*, 881 F.2d 626, 623-33 (9th Cir. 1989). Not only are Mr. Conner's loss calculations for the alleged failure to switch to the R6 class JPMorgan TDFs, the Contrafund CIT and the International CIT riddled with errors, but Plaintiffs have offered no evidence whatsoever of any loss resulting from the alleged failure to switch to the Passive Blend CITs prior to July 19, 2019.

## ARGUMENT

Contrary to Plaintiffs' Opposition, it is not the Defendants' burden to "indisputably prove" that they "acted prudently." Opp. at 2. Rather, Plaintiffs have the burden of proving that Defendants breached their duty of prudence, and must therefore "demonstrate that there are genuine issues of material fact that make summary judgment improper." *Quan v. Comput. Sciences Corp.*, 623 F.3d 870, 878 (9th Cir. 2010), *abrogated on other grounds by Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409 (2014); *see also Cunningham*, 86 F.4th at 983-85 (affirming summary judgment for defendants on claims that they failed to employ a prudent process in reviewing plan's investments). Furthermore, Plaintiffs cannot defeat summary judgment with "[c]onclusory, speculative testimony in affidavits or moving papers," but must instead "set forth, by affidavit or otherwise as provided in Rule 56, specific facts showing that there is a genuine issue for trial." *In re Northrop Grumman Corp. ERISA Litig.*, No. CV 06-06213 MMM (JCx), 2015 WL 10433713, at *15 (C.D. Cal. Nov. 25, 2015) (internal quotations omitted); *see also Tibble v. Edison Int'l*, 639 F. Supp. 2d 1074, 1083-84 (C.D. Cal. 2009) ("'A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact.'") (quoting *Addisu v. Fred Meyer*, 198 F.3d 1120, 1134 (9th Cir. 2000)).

As explained below, Plaintiffs have failed to come forward with "significantly probative"

1  evidence to support their claims of imprudence, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249

2  (1986), and Defendants' motion for summary judgment should be granted.

### A. The Committee Engaged in a Prudent Process for Selecting and Monitoring Investments

Plaintiffs have failed to demonstrate a triable issue of fact on whether Defendants "employed the appropriate methods to investigate and determine the merits" of retaining the Challenged Funds on the Plan's menu, and thus cannot avoid summary judgment on that issue. *See, e.g.*, *Cunningham*, 86 F.4th at 983 (quoting *Pension Ben. Guar. Corp. ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 716 (2d Cir. 2013)).[2] They effectively concede that Defendants had a monitoring process and do not dispute its key features. Mot. at 3-5, 17-18; Opp. at 2-3. Plaintiffs do not dispute that the Committee adopted an Investment Policy Statement ("IPS") in 2013 setting forth guidelines for the Plan's investment program, which the Committee updated in 2016. Mot. at 3-4, 17; Opp. at 3. They do not dispute that the 2013 and 2016 IPS both provided that each investment option should have "a minimum of 5 years of verifiable investment performance, unless specifically exempted by the Committee." Mot. at 3-4; Opp. at 3. They do not dispute that the Committee met at least quarterly, and more frequently in most years during the Class Period. Mot. at 4, 17; Opp. at 16. They do not dispute that the Plan's investment consultant, Bridgebay Financial Services, Inc. ("Bridgebay"), attended Committee meetings and prepared quarterly reports that evaluated, among other things, the performance, risks, and fees of the Plan's investment options as well as other topics. Mot. at 4-5. They do not dispute that each Committee member received and was expected to review the quarterly reports prior to the meetings. *Id.* at 5. Nor do they dispute that Committee members received annual ERISA fiduciary training from an outside ERISA attorney, who attended meetings and provided updates on important ERISA fiduciary developments. *Id.*

Plaintiffs' argument that "the Committee has repeatedly ignored the 5-year guideline" (Opp. at 3) is not supported by the record. The only basis for that argument is their expert's assertion that

---

[2] The cases Plaintiffs cite (Opp. at 17) do not support their contention that claims of imprudence cannot be resolved at summary judgment. The courts in those cases denied summary judgment simply because the plaintiffs were able to show that there were genuine issues of material fact, not because claims of imprudence are somehow "inappropriate" for summary judgment.

1  "in 2019, the Committee selected the JPM SmartRetirement CIT CF-B share class which was only
2  three years old; in 2022 it selected [the] CIT CF-C share class which was less than a year old at the
3  time; in 2022 it selected [the] CIT CF-D share class which was less than two years old."[3]  These
4  assertions are completely unfounded, as demonstrated by an April 2019 Fund Summary issued by
5  JPMorgan that was produced to Plaintiffs in discovery.  The Fund Summary demonstrates that the
6  "CF-B Class," "CF-C Class" and "CF-D Class" were all unit classes of the same Passive Blend CIT,
7  which also had a "CF Class" with a 2010 inception date.[4]  Because the CF Class invests in the same
8  portfolio, the historical performance of the CF-B Class, CF-C Class and CF-D Class are all reported
9  based on the performance of the CF-Class.[5]  Furthermore, that is exactly how the Plan's
10 recordkeeper reported the historical performance of these CIT unit classes in the ERISA-mandated
11 fee disclosures that were furnished to participants.[6]

12      Plaintiffs' attempt to diminish the Committee members' experience and qualifications
13 likewise does not create a triable issue of fact.  *See* Opp. at 3.  Plaintiffs do not and cannot dispute
14 the significant qualifications and experience that each Committee member in fact had.  Mot. at 4
15 n.16 (citing Ex. 10, Case Rep. at 30-32).  Furthermore, ERISA allows fiduciaries to rely on the
16 advice of others when they need specialized expertise.  *See, e.g.*, *Clark v. Feder Semo and Bard,*
17 *P.C.*, 739 F.3d 28, 31-33 (D.C. Cir. 2014) (citing cases); *Donovan v. Cunningham*, 716 F.2d 1455,
18 1474 (5th Cir. 1996) ("ERISA fiduciaries need not become experts in the valuation of closely-held
19 stock—they are entitled to rely on the expertise of others.").  The Committee members properly
20 relied on the advice of the Plan's fiduciary investment consultant, Bridgebay, to assist them in
21 selecting and monitoring the Plan's investment options consistent with the Plan's IPS.

22      Finally, the documents cited by Plaintiffs' expert do not "show conflicting information"

---

[3] Ex. 74, Conner Rebuttal Rep. ¶ 9.
[4] Supp. Serron Decl., Ex. 94, JPMorgan Asset Management, "Fund Summary," Apr. 2019, SALESFORCE_0011590-610, at 603.
[5] *Id.* at SALESFORCE_0011601-02.
[6] *See, e.g.*, Supp. Serron Decl., Ex. 95, "Required Disclosure Information," Nov. 11, 2019, SALESFORCE_0054263-83, at SALESFORCE_0054266-69 (stating for each CF-B Class Passive Blend CIT that the returns "reflect the historical performance of the oldest, eligible share class of the Pool . . ., adjusted to reflect the fees and expenses of this share class (when this share class's expenses are higher.)"); *see also id.* at SALESFORCE_0054275-76 (showing 1-year, 5-year, and 10-year returns for the CF-B Class).

regarding the Institutional and R5 classes of the JPMorgan TDFs, much less evidence any procedural failure by the Committee. *See* Opp. at 11 (citing Ex. 74, Conner Rebuttal Rep. ¶ 17). Instead, those documents only highlight the dogged refusal of both Plaintiffs and their expert to even contemplate the possibility—which they have now admitted—that the Institutional class of the JPMorgan TDFs was renamed the R5 class as of April 3, 2017.

### B. There Is No Genuine Dispute that Defendants Selected the Lowest-Cost Share Class of the JPMorgan TDFs

The first question that the Ninth Circuit found could not be resolved at the pleading stage—whether "the plan held R5 class shares of the nine JPMorgan SmartRetirement funds all along," *Davis v. Salesforce.com, Inc.*, No. 21-15867, 2022 WL 1055557, at *1 (9th Cir. Apr. 8, 2022)—is now an undisputed fact. Plaintiffs admit that "[t]he Institutional class of the JPMorgan TDFs was renamed the R5 class as of April 3, 2017," and that "[t]he Plan included the Institutional/R5 class of the JPMorgan TDFs on its menu at all times between the start of the Class Period and December 29, 2017, when the Plan switched to the R6 class." Opp. at 6, 10.

The Ninth Circuit also identified a second question that required further factual development—whether "defendants acted imprudently by failing to switch to the R6 class earlier"—but the court made clear that revenue sharing provides a "plausible" explanation for the retention of the R5 class on the Plan's menu, and that "defendants may well be able to substantiate it at the summary judgment stage." *Davis*, 2022 WL 1055557, at *1. That question, too, is ripe for summary judgment in Defendants' favor. Despite Plaintiffs' unsupported assertions to the contrary, the following facts cannot be disputed:

- The Institutional/R5 class paid 15 basis points in revenue sharing to cover Plan recordkeeping fees and other administrative expenses, which would otherwise be charged directly to participants. Mot. at 9.[7] Plaintiffs quibble with the phraseology (Opp. at 3-5), but there is no question that the revenue sharing was paid *by the mutual fund*, not by the

---

[7] *See also* Ex. 6, "Salesforce 401(k) Plan Form 5500," 2017, at SALESFORCE_0001234-38; Ex. 20, "Fidelity Transparency Report," Mar. 31, 2014, at 3 of 8; Ex. 89, "Fidelity Transparency Report," Sept. 30, 2017, at 3 of 8. Citations in the form "Ex. __" refer to the exhibits to the Declaration of Eric G. Serron submitted in support of Defendants' opening brief.

Plan's participants.  *See Sweda v. Univ. of Penn.*, 923 F.3d 320, 339 (3d Cir. 2019) (revenue sharing payments do not involve a transfer of Plan assets because the payments are drawn from the mutual fund's assets, not from Plan assets).

- The R6 class paid no revenue sharing.[8]
- The revenue sharing paid by the Institutional/R5 class exceeded the fee differential between the Institutional/R5 class and the R6 class.[9]

This Court has already recognized that revenue sharing "frequently inure[s] to the benefit of ERISA plans."  Dkt. 35 (Order at 8) (quoting *Terraza*, 241 F. Supp. 3d at 1081 n. 8); *see also Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) (describing revenue sharing as a "common and 'acceptable' investment industry practice[] that frequently inure[s] to the benefit of ERISA plans"). Plaintiffs do not and cannot dispute that the revenue sharing paid by the R5 class was either used to pay Plan expenses or rebated to participants.  Mot. at 9.  Nor have Plaintiffs alleged that the Plan's expenses were unreasonable, much less come forward with evidence to support such a claim.  *Id.* Under these circumstances, the decision to retain the R5 class was plainly within the "range of reasonable judgments" that Defendants could make.  *Hughes*, 595 U.S. at 177; *see also Cunningham*, 86 F.4th at 983; *Hughes*, 63 F.4th at 630 (stating on remand that "a plaintiff must plausibly allege fiduciary decisions outside a range of reasonableness").

The Tenth Circuit's recent decision in *Matney v. Barrick Gold of North America*, 80 F.4th 1136 (10th Cir. 2023), is directly on point.  The court in *Matney* affirmed the dismissal of a claim of imprudence alleging that the R5 class of JPMorgan TDFs should have been replaced with the nominally lower-cost R6 class on a 401(k) plan's investment menu.  *Id.* at 1150-51.  Although the plaintiffs alleged that "the R5 funds offered by the Plan were more expensive than the R6 funds," the court found that documents referenced in the complaint established that "the R5 funds are actually less expensive than the R6 funds" because "the Plan applied a 15 basis-point revenue credit to the overall cost of the R5 funds."  *Id.*  Because documents referenced in the complaint revealed "the exact revenue credit used by the Plan" and confirmed that it "yielded a lower cost share class fund,"

---

[8] Ex. 36, Conner Tr. at 187:8-10; Dkt. 24-15 (JPMorgan Press Release).
[9] Ex. 36, Conner Tr. at 187:11-188:23; *see also* Ex. 10, Case Rep. ¶¶ 78-79 & Exhibit 7.

the court concluded that "no factual development" was needed "to discern whether the revenue sharing arrangement . . . actually reduced the cost of the R5 funds." *Id.* at 1152.

Plaintiffs' attempt to distinguish *Matney* based on the Barrick Gold plan's "master trust agreement" is misplaced. Opp. at 20. Just as in this case, Fidelity served as the Barrick Gold plan's recordkeeper, and Plaintiffs have failed to identify any significant difference between Fidelity's "master trust agreement" in *Matney* and Fidelity's service agreements here.[10] In short, the key facts on which the Tenth Circuit relied in *Matney* are also undisputed here—*i.e.*, the R5 class was in fact cheaper than the R6 class on a net-cost basis because the Plan received a 15 basis-point credit to the overall cost of the R5 class. Defendants' motion for summary judgment on Plaintiffs' challenge to the retention of the R5 class should therefore be granted.

Nor can Plaintiffs escape summary judgment based on a conclusory assertion that the Plan's participants were somehow worse off under a revenue sharing arrangement than they would have been under a "flat fee structure." Opp. at 5-6. Plaintiffs' suggestion that Fidelity would have been willing to reduce its fee to $37 per participant earlier than it did if the Committee had only moved to a "flat fee structure" sooner (Opp. at 5-6, 10, 19-20) is not only speculative, but also contrary to the actual sequence of events.[11] There is no dispute that Fidelity agreed to reduce its fees from $49 per participant to $37 per participant at least two months *before* the Committee decided to transition to zero-revenue share classes and charge Plan expenses directly to participant accounts. Mot. at 6-7; Opp. at 4. Plaintiffs have presented no evidence whatsoever that Fidelity's agreement to reduce its per participant fee was influenced *in any way* by the Committee's decision to transition to a flat fee arrangement.

Plaintiffs' argument that the Plan's revenue sharing arrangement caused participants to lose

---

[10] *See* Ex. 23, "Fidelity Investments Retirement Plan Service Agreement," May 19, 2016, SALESFORCE_0002699-726 at 700-701, 725-726; Ex. 19, "Fidelity Investments Retirement Plan Service Agreement," July 13, 2015, SALESFORCE_0002672-698 at 673, 695-697.

[11] Plaintiffs' assertion that "the per participant recordkeeping fees decreased by 24.5% when moving away from revenue sharing" (Opp. at 5) (emphasis removed) is misleading. Bridgebay's reference to a 24.5% reduction was simply the product of dividing $12 (the difference between $49 and $37) by $49 (*i.e.*, $12/$49 = 24.5%). Plaintiffs have offered no evidence that the reduction in Fidelity's recordkeeping fee from $49 per participant to $37 per participant resulted from the Committee's *later* decision to transition to a flat fee arrangement, much less that the switch from the R5 class to the R6 class resulted in a 24.5% reduction in recordkeeping fees.

investment returns is equally speculative, since it fails to account for the fact that under a flat fee arrangement Plan expenses would be charged up front directly to participants' accounts, rather than impacting investment returns gradually over time. Plaintiffs do not attempt to quantify the "net cost" to participants of one arrangement compared to the other, but instead offer only their expert's conclusory opinion that revenue sharing arrangements cannot be used to pay Plan expenses without violating ERISA's fiduciary provisions—an opinion which is both wrong as a legal matter and unsupported by any analysis of the record. *See Hughes*, 63 F.4th at 635 (reaffirming that "the use of revenue sharing does not amount to a *per se* violation of fiduciary duty under ERISA"); *Terraza*, 241 F. Supp. 3d at 1081 n.8 ("revenue sharing is a 'common and acceptable investment industry practice[] that frequently inure[s] to the benefit of ERISA plans'") (quoting *Tussey*, 746 F.3d at 336) (alterations in original).

Plaintiffs' speculation that participants would have been better off under a flat fee structure also ignores the fact that the two types of fee arrangements affect different groups of participants in different ways. Flat fee arrangements tend to be more attractive for participants with larger account balances, while revenue sharing arrangements tend to be more attractive for participants with smaller account balances. In this case, for example, Fidelity determined that the *median* account balance of Plan participants was $27,900 as of December 31, 2015.[12] A participant with that median account balance who invested her entire account in an R5 class JPMorgan TDF would bear only $41.85 of the Plan's *total* expenses annually ($27,900 x .15% = $41.85), which is significantly *less* than the $49 per participant that Fidelity was charging for recordkeeping services *alone*. Stated another way, *more than half* of the Plan's participant population would be economically *worse off* under a flat fee arrangement. *See, e.g., Loomis v. Exelon*, 658 F.3d 667, 672-73 (7th Cir. 2011) ("[F]or younger employees and others with small investment balances, a capitation fee could work out to more, per dollar under management. . . . [F]lat payments per participant may help some participants but hurt others, depending on the size of each participant's account."); *Haley v. Tchrs. Ins. & Annuity Ass'n of Am.*, No. 17-CV-855 (JPO), 2018 WL 1585673, at *10 (S.D.N.Y. Mar. 28, 2018) ("[T]here is no prima facie reason to think that 'asset-based fees' . . . are inherently more expensive for

---

[12] Ex. 52, Fidelity Presentation, Mar. 18, 2016, SALESFORCE_0074558-592 at 561.

participants." (citation omitted)).

Simply put, the decision whether to charge recordkeeping costs under a revenue sharing arrangement or a flat fee arrangement is within the "range of reasonable judgments" that Defendants were entitled to make. *Hughes*, 595 U.S. at 177; *Cunningham*, 86 F.4th at 983; *Matney*, 80 F.4th at 1146; *Hughes*, 63 F.4th at 630. Because Plaintiffs have failed to come forward with "significantly probative" evidence to support their claim that the retention of the R5 class was imprudent, *Liberty Lobby*, 477 U.S. at 249, Defendants' motion for summary judgment should be granted.

### C. Defendants Reasonably Decided Not to Replace the JPMorgan TDFs with Plaintiffs' Preferred CITs Prior to July 19, 2019

Plaintiffs have failed to demonstrate a triable issue regarding the reasonableness of Defendants' decision to retain the JPMorgan TDFs on the Plan's investment menu prior to July 19, 2019. The undisputed facts show that the Committee had a robust process for evaluating whether to retain JPMorgan as the Plan's TDF provider. Mot. at 7-8, 11, 14; Opp. at 5. The record further establishes that the JPMorgan TDFs performed well in comparison to their peer group throughout the Class Period, with all but one or two of the TDF vintages having 4-star or 5-star Morningstar ratings at the end of every quarter. Mot. at 20-21.

It is also undisputed that Bridgebay presented an annual due diligence review at the Committee's June 17, 2016 meeting, which states that the Plan "now qualifies for the CIT version" of the JPMorgan TDFs. *Id.* at 14. However, the CIT that Bridgebay identified—the JPMCB SmartRetirement CF-10 class—had an inception date of September 30, 2015, which meant that it had a track record of less than one year. *Id.* As Ms. Ruiz-Zaiko of Bridgebay testified, the Committee was always concerned about the relatively short track records of CITs given participants' inability to obtain information about CITs from third-party sources such as Morningstar:

> A. . . . Their big concern was that when you have a mutual fund, a participant can look up the Morningstar rating. They can look at a Morningstar analysis. There are a lot of services that can provide analysis, third-party services, so there is a lot of investment information for participants under a mutual fund.
>
> When you switch to a CIT, the CIT has a shorter track record than the mutual fund. It also has less – has less third-party information.

> . . . .
>
> Q. What – did the committee or Bay Bridge [sic] have a criteria of how long a track record you needed in order to select a fund?
>
> A. The policy says five-year track record is what my recollection for an investment option, and the committee could have made exceptions for an investment of – for that track record, but they did not. If anything, if it said – let's say it said, you know, two years is fine, they would have stuck with the five-year track record because, again, they were always looking at what is a participant going to see when they see that fact sheet? Is it going to have sufficient track record? And they didn't want to have the participant look at a fact sheet with only a two-year track record and wonder, wait a minute, what is the CIT? I've never heard of this before. Wait a minute. I can't look this up. I have no idea. It has the same name, but I have no idea what the investment's all about. What happened to my Morningstar rating? What is this? So they always wanted to be sure that it had at least a five-year track record.[13]

Plaintiffs' expert, Mr. Conner, admitted it would be appropriate to consider such concerns in deciding whether to switch from a mutual fund to a CIT version of the same strategy.[14]

Although the Passive Blend CITs had an inception date in 2010, Plaintiffs do not dispute that, unlike the JPMorgan TDFs, the Passive Blend CITs invest a significant percentage of their assets in *passively* managed funds. Mot. at 14; Opp. at 22-23. In remanding this claim for further factual development, the Ninth Circuit assumed the truth of Plaintiffs' allegation that the Passive Blend CITs "had 'the same underlying investments and asset allocations as their mutual fund counterparts' but had better annual returns and a lower expense ratio." *Davis*, 2022 WL 1055557, at *2. The record shows, however, that the Passive Blend CITs do *not* have the "same underlying investments," and that the relative returns of the JPMorgan TDFs and the Passive Blend CITs in fact seesawed back and forth during the Class Period. Mot. at 22. Plaintiffs have failed to come forward with any evidence to rebut the comparative returns analysis prepared by Defendants' expert D. Lee Heavner, which shows that the JPMorgan TDFs *outperformed* the Passive Blend CITs net of fees in 2014, 2017 and 2019.[15] As Mr. Heavner explained, the "variation in relative returns" could not "result solely from fee differences"—instead, it could only result from *different* underlying

---

[13] Ex. 29, Ruiz-Zaiko Tr. at 71:24-72:10, 77:17-78:19.
[14] Ex. 36, Conner Tr. at 250:21-252:18; *see also* Ex. 10, Case Rep. ¶ 94.
[15] Dkt. 82-4 (Declaration of D. Lee Heavner), Ex. 1.

investments.[16]

Because the Passive Blend CITs include a significant percentage of passively managed funds, they are not a "meaningful benchmark" for evaluating the JPMorgan TDFs' expense ratios. Mot. at 22; *see also Albert v. Oshkosh Corp.*, 47 F.4th 570, 581 (7th Cir. 2022) ("The fact that actively managed funds charge higher fees than passively managed funds is ordinarily not enough to state a claim because such funds may also provide higher returns."). Moreover, the rule in this Circuit is that "a 'fiduciary's failure to investigate an investment decision alone is not sufficient to show that the decision was not reasonable." *Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1099 (9th Cir. 2004) (citation omitted). To establish a triable issue of fact, Plaintiffs must show a "*causal link*" between any alleged "failure to investigate" and "the harm suffered by the plan." *Quan*, 623 F.3d at 885 (emphasis in original) (citation omitted). Given the variations in relative returns during the first four years of the Class Period, there was no compelling reason to replace the JPMorgan TDFs with the Passive Blend CITs prior to July 19, 2019.

### D. Defendants Reasonably Decided Not to Replace the Fidelity Mutual Funds with Plaintiffs' Preferred CITs Prior to July 19, 2019

Plaintiffs have also failed to establish a genuine issue regarding the reasonableness of Defendants' decision to retain the Contrafund K and International K on the Plan's menu. There is no dispute that the Contrafund CIT and the International CIT were both formed less than three months before the start of the Class Period, and thus lacked any meaningful performance history. Mot. at 12-13. Together with the testimony of Ms. Ruiz-Zaiko, *see supra* at 10-11, contemporaneous materials produced in discovery confirm that the lack of a 5-year track record, combined with the lack of a Morningstar rating, were the main reasons the Committee did not switch to these CITs prior to July 19, 2019. Mot. at 12-14. These materials include a Bridgebay quarterly review presented at the Committee's December 16, 2016 meeting, which informed the Committee that the Contrafund CIT's "inception date is 1/17/2014," that "[t]he investment policy currently requires that an investment option have a minimum 5 years' track record to be considered," and that "[t]he CIT

---

[16] *Id.* at ¶ 10.

currently does not have a Morningstar Rating."[17]  Minutes of that meeting further reflect that Bridgebay "provided the Committee with background and considerations regarding continued use of the Fidelity Contra Fund, as either a mutual fund or a collective investment trust," and that "[a]dditional questions and discussion ensued."[18]

Far from creating a dispute about the Committee's reasons for not switching to CITs earlier, Plaintiffs' argument that the Committee "ultimately did select CITs without a five-year track record" (Opp. at 22 (emphasis removed)) only exposes their own failure to investigate how the historical performance of the Passive Blend CITs' CF-B Class ("CF-B Class") was actually reported to participants in 2019.  Because the CF-B Class was invested in the very same portfolio of securities as the JPMorgan SmartRetirement® Passive Blend CF Class ("CF Class"), the Plan's disclosures to participants reported the historical performance of the CF-B Class based upon the performance of the CF Class, which had an inception date in 2010.  *See supra* at 5.

Nor is there any genuine dispute that the Contrafund K was cheaper on a net cost basis than the Contrafund CIT.  *See* Mot. at 13.  Plaintiffs' attempt to manufacture a dispute regarding Fidelity's 2016 comparison of the Contrafund K to the Contrafund CIT (Opp. at 8-9) is refuted by the Contrafund K's summary prospectuses.  The 2016 Contrafund K summary prospectus shows an expense ratio (including the performance adjustment) of 61 basis points,[19] which is the same ratio shown in Fidelity's chart.  The Contrafund K summary prospectuses from 2014, 2015, and 2017—the year the Plan switched to the Contrafund K6 class—show fluctuating management fees with expense ratios totaling *less* than 61 basis points.[20]  In short, there is no genuine dispute that the 20 basis points in revenue sharing paid by the Contrafund K *exceeded* the fee differential between the Contrafund K and the Contrafund CIT, making the Contrafund K cheaper on a net cost basis.

---

[17] Ex. 17, "3Q 2016 Review of the Salesforce.com inc. 401(k) Savings Plan," Sept. 16, 2016, SALESFORCE_0004561-658 at 563.
[18] Ex. 53, "Minutes of a Meeting of the 401k Committee of Salesforce.com, Inc.," Dec. 16, 2016, SALESFORCE_0079189-191 at 191.
[19] *See* Supp. Serron Decl., Ex. 96, "Fidelity Contrafund, Summary Prospectus," Feb. 29, 2016, at 1.
[20] *See* Supp. Serron Decl., Ex. 97, "Fidelity Contrafund, Summary Prospectus," Mar. 1, 2017, at 5; Supp. Serron Decl., Ex. 98, "Fidelity Contrafund, Summary Prospectus," Feb. 28, 2015, at 1; Supp. Serron Decl., Ex. 99, "Fidelity Contrafund, Summary Prospectus," Mar. 1, 2014, at 4.

### E. Plaintiffs' Remaining Assertions Regarding Alleged Procedural Deficiencies Do Not Create a Genuine Issue of Material Fact

Plaintiffs' contention that Defendants "overly rel[ied]" on Bridgebay is baseless. Opp. at 12-13, 18. Plaintiffs do not suggest that Bridgebay was unqualified to provide investment advice or gave any bad advice. Rather than present evidence of a material deficiency in the quality or reliability of Bridgebay's advice, Plaintiffs point to a conclusory opinion of Mr. Conner, which is based entirely on his absurd view (contrary to law and untethered to any real-world experience) that every 401(k) plan committee must have at least one member who has "investment management" expertise.[21] Their remaining criticisms concerning Committee members' engagement and training are contradicted by the record. Minutes of the Committees' March 18, 2016, September 13, 2016, and December 16, 2016 meetings reflect that the Committee members did in fact discuss CITs with Bridgebay and Fidelity at those meetings,[22] and the relevant portions of the testimony of Messrs. Wettermark and Allanson show that Plaintiffs have simply mischaracterized what they said about their training.[23]

Plaintiffs' assertion that the Plan's investment menu was inadequately diversified (Opp. at 13) is even further afield. No such claim is alleged in the First Amended Complaint, but even if the claim had been alleged, the conclusory opinion of their expert does not show that the Plan's investment menu was somehow deficient. Nor have Plaintiffs shown that any Plan participant was harmed by any such deficiency even if there were one. *Quan*, 623 F.3d at 885 (quoting *Wright*, 360

---

[21] Supp. Serron Decl., Ex. 93, Conner Tr. at 223:20-229:8; Ex. 36, Conner Tr. at 232:22-233:12, 234:19-235:16.

[22] Ex. 51, "Minutes of a Meeting of the 401k Committee of Salesforce.com, Inc.," Mar. 18, 2016, SALESFORCE_0060886-888, at 887; Ex. 26, "Minutes of a Meeting of the 401K Committee of Salesforce.com, Inc.," Sept. 13, 2017, SALESFORCE_0079169-171, at 170; Ex. 53, "Minutes of a Meeting of the 401k Committee of Salesforce.com, Inc.," Dec. 16, 2016, SALESFORCE_0079189-191, at 191; *see also* Supp. Serron Decl., Ex. 100, Allanson Tr. at 15:17-16:25, 75:1-16; Supp. Serron Decl., Ex. 101, Case Tr. at 160:16-163:22.

[23] *See* Supp. Serron Decl., Ex. 100, Allanson Tr. at 27:7-29:7, 30:14-31:20. Mr. Wettermark testified he "can['t] give . . . a lot of detail, but generally [ERISA duties include] loyalty to the participants in the plan and prudent – act in a prudent manner on behalf of the participants." Supp. Serron Decl., Ex. 102, Wettermark Tr. at 66:1-66:8. He then added that this "means we're representing the participants in the plan when we're making decisions, we're acting on their behalf, so to speak, in selecting, for instance, investment options and such. And in selecting those options we act in a prudent and reasonable manner." *Id.* at 66:11-66:15.

F.3d at 1099); *Cunningham v. Cornell Univ.*, No. 16-CV-6525 (PKC), 2017 WL 4358769, at *6 (S.D.N.Y. Sept. 29, 2017) ("[W]hile plaintiffs claim that the Plans offered too many options to participants, they do not allege that any plan participant was actually harmed by defendants' failure to reduce the number of options available."), *aff'd*, 86 F.3d 961 (2d Cir. 2023).

### F. Plaintiffs Cannot Prove Any Loss to the Plan

Plaintiffs concede that they have the burden of proving that the Plan suffered a loss as a result of any alleged imprudence. Mot. at 24-25; Opp. at 23-24. They likewise do not dispute that their expert, Mr. Conner, has offered *no* opinion or calculation regarding any losses resulting from the alleged failure to switch to the Passive Blend CITs prior to July 19, 2019. Mot. at 24; Opp. at 14, 23-24. Plaintiffs' assertion that Mr. Conner's mistake regarding the JPMorgan TDFs' name change "did not impact [his] damage calculations" (Opp. at 6; *see also id.* at 10-11) is demonstrably false. When questioned about his loss calculation spreadsheet, Mr. Conner admitted that the R5 expense ratios shown on his spreadsheet were "just for your information" and were "not driving the damage method."[24] He further admitted that his damage calculation *assumed* "that the plan was not in either the R5 or R6 Share Class in 2015, '16, or '17 until the fourth quarter of 2017, it went into the R6 class."[25] The report submitted by Defendants' expert D. Lee Heavner further demonstrates that 52 out of the 66 datapoints shown in Mr. Conner's loss calculation are wrong.[26] Mr. Conner's failure to account for revenue sharing is also improper because it ignores the recordkeeping fees and other Plan expenses that would have been charged directly to participants' accounts if revenue sharing was not employed. Correcting for all these errors, Mr. Conner's analysis results in total alleged "share class" losses of **negative** $1.1 million.[27] Plaintiffs cannot rebut this showing, and indeed, do not even try.

### CONCLUSION

For the foregoing reasons and those set forth in Defendants' opening brief, Defendants respectfully request that the Court grant Defendants' Motion for Summary Judgment.

---

[24] Supp. Serron Decl., Ex. 93, Conner Tr. at 127:12-128:2, 132:17-137:14.
[25] *Id.* at 137:15-23.
[26] Ex. 37, Heavner Rep. ¶¶ 39-40, Ex. 2.A.
[27] *Id.*

| | | |
|---|---|---|
| DATED: January 22, 2024 | | Respectfully submitted, |
| | | STEPTOE LLP |
| | By: | /s/ Eric G. Serron |

        Robyn C. Crowther (CA Bar No. 193840)
        Tahir L. Boykins (CA Bar No. 323441)
        STEPTOE LLP
        One Market Plaza
        Spear Tower, Suite 3900
        San Francisco, CA 94105
        Telephone: (415) 365-6700
        Facsimile: (415) 365-6699
        rcrowther@steptoe.com
        tboykins@steptoe.com

        Paul J. Ondrasik, Jr. (*pro hac vice*)
        Eric G. Serron (*pro hac vice*)
        STEPTOE LLP
        1330 Connecticut Ave., NW
        Washington, DC 20036
        Telephone: (202) 429-3000
        Facsimile: (202) 429-3902
        pondrasik@steptoe.com
        eserron@steptoe.com

        Justin Ben-Asher (*pro hac vice*)
        STEPTOE LLP
        1114 Avenue of the Americas
        New York, N.Y. 10036
        Phone: (212) 506-3900
        Facsimile: (212) 506-3950
        jbenasher@steptoe.com

*Counsel for Defendants Salesforce, Inc., Board of Directors of Salesforce, Inc., Marc Benioff, The 401(k) Plan Committee, Joseph Allanson, Stan Dunlap, and Joachim Wettermark*