1
2
3
4          IN THE UNITED STATES DISTRICT COURT
5        FOR THE NORTHERN DISTRICT OF CALIFORNIA
6

7   GREGOR MIGUEL, et al.,                Case No. 20-cv-01753-MMC
8              Plaintiffs,
                                          **ORDER DENYING DEFENDANTS'**
9       v.                                **MOTION FOR SUMMARY JUDGMENT**
10  SALESFORCE.COM, INC., et al.,
11             Defendants.

12

13          Before the Court is defendants' Salesforce.com, Inc. ("Salesforce"), Board of

Directors of Salesforce ("Board"), Marc Benioff ("Benioff"), The Investment Advisory

Committee ("Committee"), Joseph Allanson ("Allanson"), Stan Dunlap ("Dunlap"), and

Joachim Wettermark's ("Wettermark") "Motion for Summary Judgment" ("Defs.' Mot.")

filed November 13, 2023. (See Doc. No. 112.) Plaintiffs have filed opposition, to which

defendants have replied. Having read and considered the papers filed in support of and

in opposition to the motion, the Court rules as follows.[1]

**BACKGROUND**

            Plaintiffs are former Salesforce employees who participated in the Salesforce

401(k) Plan ("the Plan"). (See First Am. Compl. ¶¶ 20–23, Doc. No. 38.) In the operative

complaint, the First Amended Complaint ("FAC"), plaintiffs allege defendants breached

their fiduciary duties to the Plan and Plan participants in violation of the Employee

Retirement Income Security Act of 1974 ("ERISA"), 20 U.S.C. § 1001 et seq. (See

FAC ¶ 10.) Plaintiffs allege the Committee, Allanson, Dunlap, and Wettermark

27

28
_____
            [1] By order filed February 9, 2024, the Court took the matter under submission.

1  (collectively, "Committee Defendants") breached their fiduciary duty of prudence by

2  selecting and retaining investment options with high costs relative to other, comparable

3  investments. (See id. ¶ 130.)

4      Specifically, plaintiffs fault the Committee Defendants for: (1) offering only

5  JPMorgan's "Institutional" share class of Target Date Retirement Funds ("TDFs") rather

6  than the lower cost "R5" or "R6" share class of TDFs (see id. ¶ 78); (2) retaining nine

7  actively managed JPMorgan SmartRetirement funds rather than passively managed

8  collective investment trusts ("Passive Blend CITs") (see id. ¶ 106); and (3) failing to

9  substitute the Fidelity mutual funds with Fidelity collective investment trusts ("CITs") (see

10  id. ¶ 78). Plaintiffs also allege the Board, Salesforce, and Benioff (collectively, "Monitoring

11  Defendants") breached their fiduciary monitoring duty by failing to adequately monitor the

12  Committee Defendants. (See id. ¶¶ 135–138.)

**LEGAL STANDARD**

14      Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a "court shall grant

15  summary judgment if the movant shows that there is no genuine issue as to any material

16  fact and that the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P.

17  56(a).

18      The Supreme Court's 1986 "trilogy" of Celotex Corp. v. Catrett, 477 U.S. 317

19  (1986), Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), and Matsushita Elec.

20  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986), requires that a party seeking

21  summary judgment show the absence of a genuine issue of material fact. The moving

22  party need not "produce evidence showing the absence of a genuine issue of material

23  fact," but may discharge its burden simply by pointing out "that there is an absence of

24  evidence to support the nonmoving party's case." See Celotex, 477 U.S. at 325. Once

25  the moving party has done so, the nonmoving party must "go beyond the pleadings and

26  by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions

27  on file, designate specific facts showing that there is a genuine issue for trial." See id. at

28  324 (internal quotation and citation omitted).  "When the moving party has carried its

United States District Court
Northern District of California

burden under Rule 56[ ], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586.  "If the [opposing party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted). "[I]nferences to be drawn from the underlying facts," however, "must be viewed in the light most favorable to the party opposing the motion." See Matsushita, 475 U.S. at 587 (internal quotation and citation omitted).

### ANALYSIS

An ERISA fiduciary has a statutory duty to act for the exclusive purposes of "providing benefits to participants and their beneficiaries" and "defraying reasonable expenses." See 29 U.S.C. § 1104(a)(1). A fiduciary must "discharge his responsibility 'with the care, skill, prudence, and diligence' that a prudent person 'acting in a like capacity and familiar with such matters' would use," see Tibble v. Edison Intern., 575 U.S. 523, 528 (2015) (quoting 29 U.S.C. § 1104(a)(1)).

By the instant motion, defendants argue "[t]he undisputed evidence makes clear that [p]laintiffs' prudence claims are meritless, and that [d]efendants are entitled to summary judgment." (See Defs.' Mot. at 2:15–16.)

### I.      Breach of Fiduciary Duty of Prudence

Defendants argue they are entitled to summary judgment on plaintiffs' breach of fiduciary duty claim because the record does not show evidence of: (1) defendants' failure to select the lowest-cost share of JPMorgan Target Date Retirement Funds ("TDFs"); (2) the reasonableness of defendants' decisions not to replace the JPMorgan TDFs and Fidelity Mutual Funds with plaintiffs' preferred collective investment trusts ("CITs") before July 19, 2019; (3) damages from the alleged breaches; and (4) deficiencies in defendants' monitoring process. (See Defs.' Mot. at 17:3–13.)

United States District Court
Northern District of California

### A. Failure to Select Lowest-Cost JPMorgan SmartRetirement TDFs

As set forth above, plaintiffs allege defendants "knew or should have known of the existence of cheaper share classes" of JPMorgan's SmartRetirement Target Date Funds ("TDFs") and "failed to choose or switch to the R5 share class from 2014 to 2018 and again failed to choose or switch to the R6 class from 2015 to 2018." (See FAC ¶¶ 11, 78, 80.)

At the outset, defendants note that the record shows the "Institutional" share class was renamed the "R5" share class as of April 3, 2017, and was offered by the Plan throughout the class period. (See Decl. of Eric Serron in Supp. of Defs.' Mot. for Summ. J. ("Serron Decl.") Ex. 84 (JPMorgan SmartRetirement Funds, Supplement to Summary Prospectus, Doc. No. 113-28) (providing "[e]ffective on or about April 3, 2017, each Fund's Institutional Shares will be redesignated as and renamed Class R5 Shares").)

In response, plaintiffs assert that the "heart" of their claim is defendants' failure to timely switch from the Institutional/R5 to the R6 share class of TDFs and submit evidence that the R6 class had a lower expense ratio[2] than the Institutional/R5 class. (See Pls.' Opp'n. to Defs.' Mot. for Summ. J. ("Pls.' Opp'n.") at 6:11–23 citing Serron Decl. Ex. 84 (Expert Report of Robert E. Conner, Doc. No. 113-23) ¶ 37; see also Serron Decl. Ex. 86 (JPMorgan SmartRetirement 2040 Fund, Summary Prospectus November 1, 2016, Doc. No. 113-30) (showing lower "Total Annual Fund Operating Expenses" in R6 class than Institutional/R5 class).) Although defendants concede the R6 class had a "nominally lower expense ratio," they submit evidence that the R5 class paid 15 basis points of

---

[2] A fund's "expense ratio" is "[t]he total percentage of a fund's assets that goes towards paying annual recurring expenses." (See Serron Decl. Ex. 37 (Expert Report of Lee Heavner ("Heavner Rpt."), Doc. No. 112-37) ¶ 17.)

revenue sharing,[3] which defendants argue rendered it "cheaper on a net cost basis than the R6 class." (See Defs.' Mot. at 9:1–7, citing Heavner Rpt. ¶ 29.)[4]

Plaintiffs, however, have submitted testimony from their expert, Robert Conner,[5] that the revenue sharing paid by the R6 class does not directly offset the expense ratio, because, in Conner's opinion, revenue sharing "reduces the investment returns plan participants receive" and "makes recordkeeping and administrative costs interdependent with plan participant returns." (See Serron Decl. Ex. 74 (Rebuttal Expert Report of Robert E. Conner ("Conner Rebuttal Rpt."), Doc. No. 113-22) ¶ 20; see also Serron Decl. Ex. 36 (Deposition Transcript of Robert Conner ("Conner Dep."), Doc. No. 112-36) at 188:13–17 (stating money for revenue sharing is "coming from the participants as paying expenses for the fund").)

Given the above, the Court finds plaintiffs have produced evidence sufficient to raise a triable issue as to the prudence of defendants' decision to retain the Institutional/R5 share class of the JPMorgan TDFs until September 13, 2017.

**B.  Failure to Substitute Collective Investment Trusts**

Defendants next argue the evidence does not show their failure to replace the JPMorgan TDFs and the Fidelity Contrafund and Diversified International Fund with

---

[3] In "revenue sharing" arrangements, "a portion of [a fund's] expense ratio [is] used to cover plan-related costs like recordkeeping and administrative expenses." (See Heavner Rpt. ¶ 20.)

[4] On September 13, 2017, defendants ultimately did switch to the R6 class (see Serron Decl. Ex. 26 (Minutes of Meeting of 401(k) Committee of Salesforce.com, Inc., Sept. 13, 2017, Doc. No. 112-26) at SALESFORCE_0079170), "in connection with the reduction of Fidelity's recordkeeping fees to $37 per participant." (See Defs.' Mot. at 9:15–17, citing Serron Decl. Ex. 24 (2Q 2017 Review of Salesforce 401(k) Savings Plan, June 30, 2017, Doc. No. 112-24) at SALESFORCE_0031877.)

[5] By separate order filed concurrently herewith, the Court has denied defendants' motion to exclude Conner's testimony.

United States District Court
Northern District of California

collective investment trusts ("CITs")[6] prior to July 19, 2019, was imprudent. (See FAC ¶¶ 11–12, 78, 112; Defs.' Mot. at 20:14–16; 22:22–24.)

It is undisputed that the mutual fund versions of the JPMorgan TDFs had higher average expense ratios than their CIT counterparts. (See FAC ¶ 112; see also Serron Decl. Ex. 32 (Target Date Fund Review, Dec. 31, 2015, Doc. No. 115) at SALESFORCE_0038459 (showing average expense ratio is 65 basis points for mutual funds and 59 basis points for CITs).) It is also undisputed that the Plan became eligible for the CIT versions of the JPMorgan TDFs on September 30, 2015 (see id.), and that the Committee did not authorize the switch until April 19, 2019 (see Serron Decl. Ex. 48 (Minutes of Meeting of 401(k) Committee of Salesforce.com, Inc., Doc. No. 112-47) at SALESFORCE_0060863).

Similarly, it is undisputed that the Fidelity mutual funds had higher expense ratios than their CIT counterparts. (See Serron Decl. Ex. 17 (3Q 2016 Review of Salesforce.com, Inc. 401(k) Savings Plan, Sept. 30, 2016, Doc. No. 112-17) at SALESFORCE_0004563 (noting "[f]ees for the Contrafund CIT are 0.43%" and the Contrafund K mutual fund are "0.61% with 0.20% in revenue share"); see also Serron Decl. Ex. 89 (Fidelity Transparency Report, Q3 2017, Doc. No. 113-33) (showing 0.92% expense ratio with 0.20% revenue share for International fund); Serron Decl. Ex. 92 (Fidelity Transparency Report, Q3 2019, Doc. No. 113-36) (showing 0.58% expense ratio for International CIT).) The Committee was informed the Plan qualified for the Contrafund

---

[6] A CIT is an investment "administered by banks or trust companies, which assemble[s] a mix of assets such as stocks, bonds, and cash." (See FAC ¶ 109 n.21.) CITs are "[r]egulated by the Office of the Comptroller of the Currency rather than the Securities and Exchange Commission" and have "lower or no administrative costs" because they have "simple disclosure requirements[] and cannot advertise or issue formal prospectuses." (See id. ¶ 113.)

CIT as of September 30, 2016 (see Serron Decl. Ex. 17 at SALESFORCE_0004563), but as with the JPMorgan TDFs, did not authorize the switch until April 19, 2019 (see Serron Decl. Ex. 48, at SALESFORCE_0060862).[7]

Defendants argue the Committee's delay in switching to lower-cost CITs was "within the range of reasonable judgments" to which a prudent fiduciary is entitled. (See Defs.' Mot. at 20:14–16.) In support thereof, defendants submit evidence that such delay was based on the Committee's concerns regarding the CITs' lack of third-party evaluations, such as Morningstar ratings (see Serron Decl. Ex. 29 (Deposition Transcript of Linda Ruiz-Zaiko ("Ruiz-Zaiko Dep."), Doc. No. 112-29) at 71:25–72:14), the differing regulatory regimes governing mutual funds and CITs (see id. at 72:20–73:6), and the shorter available track record for CITs, which was not in accordance with the Plan's Investment Policy Statement ("IPS") (see Serron Decl. Ex. 49 (4Q 2015 Review of Salesforce 401(k) Savings Plan, Dec. 31, 2015, Doc. No. 116-2) at SALESFORCE_0004754 (noting CITs' track records ranging from three to five years); Serron Decl. Ex. 12 (2013 IPS, Doc. No. 112-12) at SALESFORCE_0060750 (requiring "5 years of verifiable investment performance, unless specifically exempted by the Committee"); Serron Decl. Ex. 13 (2016 IPS, Doc. No. 112-13) at SALESFORCE_0000999 (same)).

Additionally, as to the JPMorgan funds, defendants note that the CIT and mutual fund TDFs had different returns (see Decl. of D. Lee Heavner in Supp. of Defs.' Opp'n. to

---

[7] Neither party submits evidence as to when the Plan qualified for the International CIT, but its inception date is December 13, 2013. (See Serron Decl. Ex. 59 (2Q 2020 Review of Salesforce.com, Inc. Savings Plan, Sept. 15, 2020, Doc. No. 116-6) at SALESFORCE_0049353.)

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Pls.' Mot. for Class Cert. at Ex. 1, Doc. No. 82-4 (showing retained funds outperforming CITs in 2014, 2017, 2019; showing CITs outperforming retained funds in 2015, 2016, and 2018)), and argue such results "refute[] [p]laintiff's claim that their underlying assets are 'substantially identical.'" (See Defs.' Mot. at 22:14–17.) As to the Fidelity funds, defendants submit evidence that the retained mutual funds offered revenue sharing, which, defendants argue, offsets the cost differential between those funds and the CITs. (See Serron Decl. Ex. 17 at SALESFORCE_0004563 (showing for Contrafund CIT, expense ratio of 0.43%, and for Contrafund K mutual fund, expense ratio of 0.61% with 0.20% revenue share); see also Serron Decl. Ex. 89 (showing for International mutual fund, expense ratio of 0.92% with 0.20% revenue share); Serron Decl. Ex. 92 (showing for International CIT, expense ratio of 0.58%).)

In response, plaintiffs submit Conner's opinion that a prudent fiduciary would not consider either the lack of publicly available information regarding CITs or the differing regulatory regimes sufficient reason to exclude CITs from consideration. (See Conner Dep. at 249:17–250:20; Conner Rebuttal Rpt. ¶ 21; see also Davis v. Salesforce, No. 21-15867, 2022 WL 1055557, at *2 (9th Cir. 2022) (noting whether regulatory differences justify defendants' delay in switching to CITs is "factual issue").)  Further, to the extent defendants argue the two types of funds are not comparable, plaintiffs submit evidence that Bridgebay Financial, Inc., defendants' investment consultant, itself described JPMorgan's CITs and mutual funds as having "similar investment profiles and strategies". (See Serron Decl. Ex. 44 (Minutes of Meeting of 401(k) Committee of Salesforce.com, Inc., Nov. 16, 2018, Doc. No. 112-44) at SALESFORCE_0006050–51.)

Lastly, as plaintiffs point out and as discussed above, the presence of a revenue sharing arrangement in the retained Fidelity funds does not, in the absence of evidence showing how the credit benefitted Plan participants, justify a delay in switching.

In light of the above, the Court finds plaintiffs have produced sufficient evidence to raise a triable issue as to the defendants' alleged imprudence in not switching to CITs at an earlier point in time.

## C.  Damages

In countering plaintiffs' assertion of damages in an amount totaling $5,234,737 (see Conner Rpt. ¶ 43), defendants argue plaintiffs "claims based on the failure to switch to the R6 class of the JPMorgan TDFs, the Contrafund CIT, and the International CIT" are not supported by the evidence because Heavner, after adjusting Conner's calculations for what Heavner describes as "errors," determined a "total alleged 'share class' damages [figure] of <u>negative</u> $1.1 million." (See Defs.' Mot. at 24:20–25, citing Heavner Rpt. ¶¶ 39–40, Ex. 2.A (emphasis in original).) In particular, Heavner criticizes Conner for using a fixed expense ratio when the actual expense ratio of the challenge funds varied, as well as "ignoring" revenue sharing and "inaccurately us[ing] year-end data." (See Heavner Rpt. ¶ 39.) As discussed above, however, defendants have not offered sufficient evidence that revenue sharing credits directly offset plan expenses, and the experts' disagreement as to the best method of calculating damages reflects a dispute of material fact rather than grounds for summary judgment.

Lastly, defendants point out that Conner's damages calculation does not include a damages figure attributable to the failure to replace the JPMorgan TDFs with plaintiffs' preferred CITs. (See Conner Rpt. at 31.) Unlike at trial, however, at this stage of the proceedings, defendants, rather than plaintiffs, have the initial burden of production. See Nissan Fire & Marine Ins. Co. Ltd. V. Fritz Cos., Inc., 210 F.3d 1099, 1102 (9th Cir. 2000). For purposes of summary judgment, "a moving party without the ultimate burden of persuasion of trial . . . may carry its initial burden of production" either by "produc[ing] evidence negating an essential element of the nonmoving party's case" or by "show[ing]

9

that the nonmoving party does not have enough evidence of an essential element . . . to carry its ultimate burden of persuasion at trial." <u>See</u> <u>id.</u> at 1106. Defendants have done neither here. Heavner does not purport to show plaintiffs suffered no losses from defendants' failure to substitute the JPMorgan TDFs with CITs, nor that such damages cannot be supported by the record or otherwise shown; rather, defendants only note that plaintiffs have not yet offered evidence on this point. <u>See</u> <u>id.</u> at 1105 (citing with approval Eleventh Circuit's holding in <u>Clark v. Coats & Clark, Inc.</u>, 929 F.2d 604, 608 (11th Cir. 1991) that "[e]ven after <u>Celotex</u>," moving party "must point to materials on file which demonstrate that a party will not be able to meet" its burden of persuasion at trial).

The Court thus finds a triable issue of fact exists as to damages.

## II. Failure to Monitor

The Court, having found a triable issue exists as to whether defendants breached their fiduciary duty of prudence, a triable issue likewise exists as to plaintiffs' claim for failure to monitor. (<u>See</u> Defs.' Mot. at 25:5 (describing claim for failure to monitor as "derivative of the underlying breach claim"); Pls.' Opp'n. at 24:14 (describing claim for failure to monitor as "derivative of [p]laintiffs' claims").)

**IT IS SO ORDERED.**

Dated: March 20, 2024

MAXINE M. CHESNEY
United States District Judge